**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:  MERRILL LYNCH & CO., INC.,
AUCTION RATE SECURITIES (ARS)
MARKETING LITIGATION
_____

|  |  |
|---|---|
| ) | |
| This Document Relates To: ) | |
| ) | 1:09-md-02030-LAP |
| UNITED STATES DISTRICT COURT ) | ECF CASE |
| SOUTHERN DISTRICT OF NEW YORK ) | |
| No. 1:09-cv-09888-LAP ) | |
| ) | **FIRST AMENDED COMPLAINT** |
| THE ANSCHUTZ CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MERRILL LYNCH & CO., INC; ) | |
| MERRILL LYNCH, PIERCE, ) | |
| FENNER & SMITH INCORPORATED; ) | |
| DEUTSCHE BANK SECURITIES INC.; ) | |
| MOODY'S INVESTORS SERVICE, INC.; ) | |
| THE McGRAW-HILL COMPANIES, INC.; ) | |
| FITCH, INC.; AND FITCH RATINGS, LTD., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

The Anschutz Corporation ("Plaintiff" or "TAC") brings this action against Merrill Lynch & Co., Inc. ("Merrill Lynch & Co."), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Moody's Investors Service, Inc. ("Moody's"), the McGraw-Hill Companies, Inc. ("McGraw-Hill") doing business as Standard & Poors ("S&P"), Fitch, Inc., and Fitch Ratings, Ltd. ("Fitch Ratings" and, collectively with Fitch, Inc., "Fitch").[1]  The allegations set forth herein are based upon corporate knowledge and documents and information in TAC's possession; upon investigation by TAC and by counsel that included consultation with industry experts; a review of publicly available documents, including administrative and legal actions brought against Merrill Lynch, Merrill Lynch & Co., and Deutsche Bank, investigations of and congressional hearings concerning Moody's, S&P, and Fitch, trial testimony from *United States v. Butler*, No. 08-CR-370 (JBW) (E.D.N.Y.), Defendants' press releases and filings with the Securities and Exchange Commission ("SEC"), documents that appear to have been drafted in whole or in part by the Defendants, news articles, and other publicly available materials; and upon information and belief.

## PRELIMINARY STATEMENT

1.    This is an action to recover damages and for other relief resulting from TAC's purchase of approximately $58.95 million in auction rate securities that were underwritten by Merrill Lynch and Deutsche Bank and marketed and sold to investors.  As described more fully

---

[1] By order dated December 1, 2009, the Judicial Panel on Multidistrict Litigation transferred TAC's claims related to the Merrill Lynch-underwritten securities to the Southern District of New York for pre-trial purposes.  Because this action will return to the Northern District of California for trial, and because TAC reserves the right to pursue all of its claims (involving both the Merrill Lynch-underwritten and Deutsche Bank-underwritten securities) in a single trial against all of the named Defendants, this First Amended Complaint includes TAC's claims against all Defendants and is being filed in both the Southern District of New York and the Northern District of California.

below, TAC has suffered substantial losses as a result of its purchase of these securities.[2]  TAC bought the Merrill Lynch and Deutsche Bank securities in reliance on material omissions made, directly and indirectly, by Merrill Lynch and Deutsche Bank.  In fact, the actual value of the Merrill Lynch- and Deutsche Bank-underwritten securities that TAC purchased was substantially less than the approximately $58.95 million that TAC paid.  TAC purchased the securities that are the subject of this action based upon the appearance of ready and regular liquidity for these securities that was created by an extensive pattern of deceptive and manipulative activities by Merrill Lynch and Deutsche Bank in connection with the Dutch auctions for re-marketing of these and other auction rate securities.  As a result of these manipulative and deceptive activities, TAC believed that it could resell the Merrill Lynch- and Deutsche Bank-underwritten securities, at par, in Dutch auctions conducted on pre-scheduled dates (28 days or monthly).  Also, as a result of these manipulative and deceptive activities, TAC believed that an investment in these auction rate securities would be extremely safe and highly liquid, and have virtually no risk of loss of principal.

2.     Between July 2006 and August 2007, in reliance on the deceptive and manipulative conduct of Merrill Lynch and Deutsche Bank described in this First Amended Complaint, TAC purchased the auction rate securities that are the subject of this action through the San Francisco office of its broker-dealer, Credit Suisse Securities (USA) LLC ("Credit Suisse").  Merrill Lynch and Deutsche Bank had entered into re-marketing agreements with broker-dealers across the country to create a distribution channel for auction rate securities, and

---

[2] This action concerns three securities underwritten by Merrill Lynch – Anchorage Finance – Sub-Trust # II, Cusip #033300203; Dutch Harbor Finance – Sub Trust # II, Cusip #26702H207; and Dutch Harbor Finance – Sub-Trust # III, Cusip #26702J203 – and three securities underwritten by Deutsche Bank – Pivot Master Trust – Series 1, Cusip #725809AA5; Capstan Master Trust – Series 1, Cusip #14069KAA2; and Capstan Master Trust – Series 2, Cusip #14069LAA0.

paid commissions to these distribution partners in return for placing the Merrill Lynch-underwritten and Deutsche Bank-underwritten securities with their own customers. Merrill Lynch and Deutsche Bank also made extraordinary upfront payments in order to incentivize members of the distribution channels to encourage their own clients to participate in the initial placement of the Merrill Lynch- and Deutsche Bank-underwritten securities. Neither Merrill Lynch nor Deutsche Bank ever disclosed these financial arrangements to the ultimate purchasers of the securities they underwrote.

3.      At the time it made these purchases, TAC believed that each of these securities would perform like a short-term, investment-grade debt security and would pay a market rate of interest for similar securities. TAC also believed that these securities were highly liquid and could be sold at par, if not immediately, then in the periodic auctions.

4.      Unbeknownst to TAC, however, at all relevant times, Merrill Lynch and Deutsche Bank had engaged in an elaborate scheme to deceive investors about their involvement in the auction rate market. As part of this scheme, Merrill Lynch and Deutsche Bank were secretly manipulating the auction process for auction rate securities underwritten by Merrill Lynch and Deutsche Bank, respectively, by, among other things, submitting bids in 100 percent of auctions in which they served as the sole or leading broker-dealer[3] to control the interest rate the securities

---

[3] *See*, *e.g.*, Assurance of Discontinuance Pursuant to Executive Law § 63(15), ¶ 8, *In re Deutsche Bank Sec. Inc.* (N.Y. Att'y Gen. Inv. Prot. Bur. June 3, 2009), *available at* http://www.oag.state.ny.us/media_center/2009/july/pdfs/Deutsche Bank AOD.pdf (finding that, in *all* auctions where it served as sole or lead manager, Deutsche Bank submitted support bids "for the entirety of [the] auction rate security issue"); Assurance of Discontinuance Pursuant to Executive Law § 63(15), ¶ 8, *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, AOD No. 08-174 (N.Y. Att'y Gen. Inv. Prot. Bur. July 2, 2009) ("Merrill Lynch Assurance of Discontinuance"), *available at* http://www.oag.state.ny.us/media_center/2009/july/pdfs/Merrill Lynch AOD.pdf (finding that Merrill Lynch submitted "purchase orders for the entirety of an auction rate security issue for which it acted as the sole or lead broker"); Consent Agreement and Final Order ¶ 52, *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, Cause No. SEC-2009-29 (Mont. Auditor &

would pay and to ensure that the auctions did not fail.  Merrill Lynch and Deutsche Bank also made material omissions about the nature and characteristics of these auction rate securities and about the manner in which the auction process functioned.  Their deceptive and manipulative activities ensured that all auctions would be successful, as long as Merrill Lynch and Deutsche Bank continued to place support bids, and that investors seeking to sell their auction rate securities would seemingly be able to exit the market whenever they chose to do so.

5.      Merrill Lynch and Deutsche Bank withheld information from the investing public about the extent of their regular participation in auctions in order to perpetuate the myth of a well-functioning and liquid market.  Indeed, with every bid that Merrill Lynch and Deutsche Bank submitted for its own accounts in an auction for its own securities, Merrill Lynch and Deutsche Bank represented to the marketplace and to actual and prospective investors, including TAC, that there was sufficient legitimate third-party demand for the Merrill Lynch and Deutsche Bank auction rate securities (other than from bids placed on behalf of Merrill Lynch's and Deutsche Bank's proprietary trading accounts) for each auction to clear and, therefore, significant liquidity in the market for these securities.

6.      Unbeknownst to the investing public, the "market" for auction rate securities was a sham, secretly propped up by investment banks like Deutsche Bank and Merrill Lynch, in order to create the appearance of a well-functioning, liquid, and efficient market.  This illusion enabled the banks to earn hundreds of millions of dollars in underwriting fees.  Without the secret support of Merrill Lynch and Deutsche Bank and other investment banks, there was no market for auction rate securities; they were unsaleable.

---

Comm'r of Sec. June 2, 2009) ("Montana Order"), *available at* http://www.sao.mt.gov/legal/securities/S09_Merrill_ARS.pdf (finding that "[u]ntil August of 2007 Merrill Lynch had a policy of placing support bids into every auction for which it was the sole or lead broker-dealer").

7.    Credit rating agencies such as Moody's, S&P, and Fitch enabled this fraud by consistently giving these auction rate securities the highest or second highest rating available, thereby representing to investors such as TAC that the auction rate securities were highly safe and liquid instruments, and that the collateral underlying these instruments was of sufficient quality to virtually ensure principal and interest payments.  These ratings were false and misleading and, in assigning these ratings, the credit rating agencies – which were paid billions of dollars by the investment banks in return for providing their seal of approval on these and other structured securities – acted intentionally, were willfully blind, or failed to exercise reasonable care.  In exchange for higher profits, the credit rating agencies abandoned their role as neutral and disinterested guardians of the public interest.  At all times, TAC reasonably relied on the accuracy and integrity of the ratings issued by Moody's, S&P, and Fitch, and had TAC known that the high ratings the rating agencies assigned to the auction rate securities TAC purchased were false, it would not have purchased these securities.

8.    In late 2007, Merrill Lynch and Deutsche Bank abruptly abandoned their historic practice of submitting bids for the entirety of the auctions for which they served as the sole or lead broker-dealer.  In particular, at a time when the market for asset-backed securities ("ABS") was showing signs of strain, Merrill Lynch and Deutsche Bank ceased placing support bids for a class of complex auction rate securities that involved structured investments.[4]  When Merrill Lynch and Deutsche Bank decided that they would no longer place support bids as they had done in the past, reality intervened and the "market" for these auction rate securities collapsed altogether.  Auctions failed across the board as all of the investment banks (including Merrill

---

[4] As detailed in the myriad of enforcement actions brought by federal and state securities regulators against Merrill Lynch, Deutsche Bank, and other investment banks, the market for more traditional auction rate securities evaporated in February 2008 when broker-dealers like Merrill Lynch and Deutsche Bank abruptly stopped submitting support bids in these auctions.

Lynch and Deutsche Bank) that previously had manipulated the auctions and fraudulently created the appearance of liquidity withdrew from the market altogether. Only then, when it was too late, did investors like TAC learn that there was no liquid market for auction rate securities, and that Merrill Lynch and Deutsche Bank had fraudulently created the appearance of a liquid market through their undisclosed and manipulative support bids.

9.    When the truth emerged, TAC was left holding toxic securities worth a fraction of the nearly $59 million that TAC had invested. Because every single auction for these securities has failed since August 2007, TAC has not been able to sell at auction and at par any of the auction rate securities that are the subject of this suit.

10.    At all times, TAC reasonably relied on the appearance of an efficient and liquid market for auction rate securities that had been created by Merrill Lynch's and Deutsche Bank's market manipulation and on the false and misleading ratings given to these securities by the credit rating agencies. Were it not for the actions of Merrill Lynch and Deutsche Bank in falsely creating the appearance of a well-functioning and liquid market for auction rate securities when none, in fact, existed, and the misinformation communicated by the rating agencies, TAC never would have invested in the securities that were underwritten and propped up by these Defendants. Moreover, if the credit rating agencies had not assigned improper ratings to the securities that are the subject of this lawsuit, those securities could not have been issued in the first place.

11.    On November 17, 2009, more than two years after the collapse of the market, Deutsche Bank announced a tender offer for a portion of the auction rate securities it had underwritten. Deutsche Bank offered, on average, approximately 42 to 45 cents on the dollar for its securities, notwithstanding the fact that they had been structured in such a way that Deutsche

Bank (but only Deutsche Bank) could immediately turn around and cash out the securities for 100 cents on the dollar. Only after this tender offer was TAC able to sell its holdings of Deutsche Bank-underwritten auction rate securities in the secondary market, incurring a loss of $21.65 million on the Deutsche Bank-underwritten securities as a result of Deutsche Bank's fraud. TAC has not been able to sell the Merrill Lynch-underwritten securities at all.

## THE PARTIES

12.    The Anschutz Corporation is a corporation organized under the laws of Kansas and has its principal place of business in Denver, Colorado. TAC conducts business across a number of industries, including oil and gas, transportation, telecommunications, and entertainment. It has significant working capital needs and therefore maintains significant resources in short-term, liquid investments that can be called upon as needed.

13.    Merrill Lynch & Co., Inc. is a global financial services and banking institution incorporated in Delaware and headquartered in New York, New York. Merrill Lynch & Co. conducts business and has offices in the State of California. As of approximately January 1, 2009, Merrill Lynch & Co. became a wholly owned subsidiary of Bank of America Corporation. At all relevant times, Merrill Lynch & Co. exercised control over and directed the policies and management of Defendant Merrill Lynch. Merrill Lynch & Co. shared principal officers and directors with Defendant Merrill Lynch, including its Chief Executive Officer, Chief Financial Officer, and numerous Directors, Executive Vice Presidents, and Senior Vice Presidents. For instance, during the relevant time period the following individuals held senior, controlling positions at both Merrill Lynch and Merrill Lynch & Co.:

| Name | Title at Merrill Lynch | Title at Merrill Lynch & Co. |
|---|---|---|
| Gregory J. Fleming | Director and Executive Vice President | Co-President and Co-Chief Operating Officer |
| James P. Gorman | Director, Chairman of the Board, and Chief Executive Officer | Executive Vice President and President of Global Private Client |

| Name | Title at Merrill Lynch | Title at Merrill Lynch & Co. |
|---|---|---|
| Do Woo Kim | Director and Executive Vice President | Executive Vice President and Co-President of Global Markets and Investment Banking |
| Carlos M. Morales | Director and Senior Vice President | Senior Vice President, Strategic Initiatives Counsel |
| Rosemary T. Berkery | Executive Officer | Executive Vice President and General Counsel |
| Ahmass L. Fakahany | Director and Executive Vice President | Co-President and Co-Chief Operating Officer |
| Robert J. McCann | Director, Chairman of the Board, and Chief Executive Officer | Executive Vice President; President and Vice Chairman, Global Private Client |
| Joseph F. Regan | First Vice President, Chief Financial Officer and Controller | First Vice President, Merrill Lynch & Co. Inc. Finance |

Merrill Lynch & Co. issued consolidated financial statements that included the results for Defendant Merrill Lynch.

14.     Merrill Lynch, Pierce, Fenner & Smith Incorporated is a Delaware corporation with its principal place of business in New York, New York. Merrill Lynch is, and was at all relevant times, a securities broker-dealer licensed to do business in the State of California and is registered with the SEC, the State of California, and the Financial Industry Regulatory Authority ("FINRA"). Merrill Lynch also conducts business under the name "Merrill Lynch & Co." Merrill Lynch is a wholly owned principal operating subsidiary of Defendant Merrill Lynch & Co.

15.     Deutsche Bank Securities Inc. is a Delaware corporation with its principal place of business in New York, New York. Deutsche Bank is, and was at all relevant times, a securities broker-dealer licensed to do business in the State of California and is registered with the SEC, the State of California, and FINRA. Deutsche Bank conducts business and has offices in the State of California.

16.     Moody's Investors Service, Inc. is the credit rating agency portion of Moody's Corporation and publishes credit ratings on investments. Moody's is a wholly owned subsidiary

of Moody's Corporation.  Moody's is incorporated under the laws of the State of Delaware and maintains an office and principal place of business at 7 World Trade Center, 250 Greenwich Street, New York, New York 10007.  Moody's regularly transacts business in the State of California and derives substantial revenue from its business within the State of California.

17.    Standard & Poors is a division of Defendant The McGraw-Hill Companies, Inc., a New York corporation.  McGraw-Hill has a principal business address of 1221 Avenue of the Americas, New York, New York 10020.  McGraw-Hill is registered with the California Secretary of State to conduct business within the State of California.  S&P regularly transacts business in the State of California and derives substantial revenue from its business within the State of California.

18.    Fitch, Inc. is a Delaware corporation with a principal place of business at One State Street Plaza, New York, New York 10004.  Fitch, Inc. is registered with the California Secretary of State to conduct business within the State of California.  Fitch, Inc. regularly transacts business in the State of California and derives substantial revenue from its business within the State of California.

19.    Fitch Ratings, Ltd. is an English limited company and is a subsidiary or affiliate of Fitch, Inc.

## JURISDICTION AND VENUE

20.    The United States District Court for the Northern District of California has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1332, and 1367.  The claims asserted herein arise (in part) under Section 10(b) and Section 20(a)

of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. This action additionally contains supplemental state law claims.

21.     The United States District Court for the Northern District of California has personal jurisdiction over Defendants because each of the Defendants is present in the State of California and has transacted, and continues to transact, business within this state.  This Court has personal jurisdiction over Fitch Ratings because Fitch Ratings provided the rating for the Deutsche Bank-underwritten securities, with knowledge and understanding that its ratings would be published across the United States and around the world, and would form an integral part of the investment decision of prospective investors in those securities, in California, and elsewhere. It was reasonably foreseeable that Fitch Ratings's wrongdoing would cause, and in fact it has caused, injury in the State of California and throughout the United States.

22.     Venue is proper within the Northern District of California under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because a substantial part of the events giving rise to the claims occurred within this District and because the subject securities were purchased by TAC in this District.

## BACKGROUND

### I.     TAC's Working Capital Account

23.     TAC conducts business across a number of industries, including oil and gas, transportation, telecommunications, and entertainment.  TAC maintained significant cash balances in a reserve or working capital account invested in short-term instruments that could be liquidated on short notice.

24.     TAC's investment objectives reflected the fact that TAC might need access to the invested capital at short notice to fund its business needs, and the fact that TAC treated the funds

in its working capital account as a reserve.  The primary goals were the preservation of the principal and access to liquidity.  Therefore, TAC had a policy prohibiting any investment of its reserve cash in long-term, illiquid, or speculative instruments.  TAC was also willing to forgo greater potential returns in order to ensure the safety and security of its reserve funds.

**II.  Auction Rate Securities**

A.   Background

25.    Auction rate securities are long-term or perpetual equity or debt instruments that pay interest or dividends at rates set through periodic Dutch auctions.  Auction rate securities trade at par and can be sold through the periodic auctions (typically every 7, 28, or 35 days) and potentially in a secondary market.  They are typically issued by states, municipalities, state agencies, student loan originators and lenders, and closed-end preferred funds.  A subset of the market consists of auction rate securities issued by special purpose vehicles or analogous trusts that hold a portfolio of ABS and/or derivative instruments.  By February 2008, the market for auction rate securities had grown to approximately $330 billion.

26.    Orders to purchase or sell an auction rate security at auction can be placed only through designated broker-dealers, which contract with the issuer to serve in that capacity. These participating broker-dealers collect all buy and sell orders, and then forward them along to the designated auction agent, which conducts the Dutch auction.

27.    At each periodic auction, existing holders of auction rate securities can either place an order to sell their securities, hold their securities at whatever rate is established through the Dutch auction, or hold their securities provided that the clearing rate for the auction is at or above a specified level.  Potential investors place bids in which they specify the amount of the

auction rate securities that they are interested in purchasing and the interest rate at which they seek to acquire them.

28.     In a Dutch auction, buy orders are filled beginning from the lowest specified interest rate until all securities available for sale are matched with purchase orders.  The rate at which the final sell order is filled is known as the "clearing rate," and that rate applies to the entire issue of the auction rate securities – including all other buy orders, as well as to existing holders that held at market.

29.     In the event that there are more sell orders than buy orders, the auction "fails." When an auction fails, investors seeking to sell their securities are forced to hold onto them and are denied any liquidity.  The offering statements for each auction rate security identify the interest rate that will be paid in the event of a failed auction.  For traditional auction rate securities, such as those issued by municipalities, the "fail rate" is typically set at an interest rate substantially above the ordinary clearing rate of the auction rate securities notes, often times as much as 15 percent or more.  For asset-backed or derivative-based auction rate securities such as those at issue in this First Amended Complaint, the "fail rate" is substantially lower and typically less than 100 basis points above the minimum applicable rate.

B.     The Role of Investment Banks Like Merrill Lynch and Deutsche Bank

30.     Investment banks like Merrill Lynch and Deutsche Bank have played numerous roles in developing and sustaining an apparent market for auction rate securities.  First, investment banks underwrite auction rate securities on behalf of the issuers, earning lucrative investment banking fees in the process.  Merrill Lynch and Deutsche Bank were significant underwriters of auction rate securities, including auction rate securities tranches of collateralized debt obligations ("CDOs"), ABS-backed auction rate securities, and derivative-based auction

rate securities. Second, investment banks like Merrill Lynch and Deutsche Bank serve as participating broker-dealers for the periodic auctions, generating revenue for each unit of the auction rate securities that they succeeded in placing. For example, Merrill Lynch and Deutsche Bank typically served as participating broker-dealers for securities underwritten by their respective investment banking arms. Merrill Lynch and Deutsche Bank additionally served as broker-dealers for other issues that they did not underwrite, receiving commission payments for every security they placed with an institutional or retail customer.

31.    Investment banks also played a critical third role that was never disclosed to investors like TAC and that has only become apparent in the wake of the collapse of the entire market for auction rate securities. Specifically, prior to the market collapse, participating broker-dealers like Merrill Lynch and Deutsche Bank functioned as market makers for auction rate securities by placing "support bids" in every auction. In every auction for which they served as the sole broker-dealer, Merrill Lynch and Deutsche Bank would place bids for the full amount of the auction. They thereby ensured that auctions would clear, creating the artificial appearance of a liquid and efficient market by injecting false information into the marketplace about the nature and extent of demand for auction rate securities. Merrill Lynch and Deutsche Bank were well aware that their support bids cleared the auction and established the clearing rate for a significant percentage of all auctions. Because they collected all buy and sell orders, Merrill Lynch and Deutsche Bank knew that there was insufficient legitimate third-party demand for the securities for auctions to clear. Nevertheless, Merrill Lynch and Deutsche Bank withheld these critical facts from the investing public.

32.    The New York Attorney General has concluded that Deutsche Bank placed support bids in *every* auction in which it served as the sole or lead broker-dealer. Likewise, the

New York Attorney General and the Montana State Auditor and Commissioner of Securities found that Merrill Lynch had a policy of placing support bids in every auction for which it was sole or lead broker-dealer. *See supra* note 3.

33.    In the absence of these support bids, a huge percentage of auctions would have failed. The Montana State Auditor and Commissioner of Securities, for example, has determined that "[f]or the period of January 3, 2006 through May 27, 2008, 5892 auctions for which Merrill Lynch was the sole lead dealer would have failed but for Merrill Lynch's support bid." Montana Order ¶ 57.

34.    When the participating broker-dealers decided to stop submitting these support bids, the reality that they had concealed through their manipulative activities – including the fact that there was insufficient legitimate demand for the securities – manifested itself, as the market for auction rate securities collapsed. As a result, it has become apparent that there never really was a vibrant, functioning market for these securities in the first place. Rather, the appearance of liquidity was entirely dependent upon both the willingness of the participating broker-dealers such as Deutsche Bank and Merrill Lynch to place support bids, and to perpetuate the myth that these securities were safe and liquid cash-equivalents.[5]

C.    Best Practices for Auction Rate Securities

35.    Broker-dealers are not barred from participating in auctions altogether. However, given the potential for market manipulation, numerous regulatory agencies and industry associations have issued guidelines and best practices for broker-dealers to follow in order to

---

[5] Numerous lawsuits and administrative complaints have been filed against Merrill Lynch and Deutsche Bank alleging that these banks misrepresented the nature and risk of auction rate securities to their brokerage customers and that they engaged in market manipulation to create the false appearance of a liquid and functional market.

avoid violations of the securities laws.  These guidelines require express disclosure of the nature

and extent of broker-dealer participation in auctions.

36.    In May 2006, the SEC initiated cease-and-desist proceedings against 15

investment banks, including Merrill Lynch, that participated in a certain segment of the auction

rate market.  As found by the SEC, beginning as early as January 1, 2003, these banks willfully

violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a)(2),

which prohibits material misstatements and omissions in any offer or sale of securities, by

"interven[ing] in auctions by bidding for their proprietary accounts or asking customers to make

or change orders without adequate disclosures."[6]  The SEC concluded that investment banks

such as Merrill Lynch had engaged in one or more enumerated violative practices, although it did

not specify which of the 15 settling banks had engaged in which activity.  In holding that broker-

dealers must fully disclose their bidding activities, the SEC concluded that disclosures merely

indicating that "[a] broker-dealer may submit orders in Auctions for its own accounts," and that

"[a]ny Broker-Dealer submitting an order for its own account in any Auction might have an

advantage over other bidders in that it would have knowledge of other orders placed through it

for that Auction . . ." were inadequate as a matter of law.[7]

37.    Each of the settling banks, including Merrill Lynch, entered into an agreement

with the SEC whereby they agreed that, "commencing not later than 6 months after the entry of

this Order, each Respondent shall, at or before the completion of the applicable transaction,

provide all customers who are first-time purchasers, and all broker-dealers who are purchasers,

---

[6] Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and
Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the
Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934, at 6, *In re
Bear, Stearns & Co.*, Admin. No. 3-12310, Release Nos. 8684 *et al.* (SEC May 31, 2006),
*available at* http://www.sec.gov/litigation/admin/2006/33-8684.pdf.

[7] *Id.* at 5 (internal quotation marks omitted).

of auction rate securities from the Respondent . . . with a written description of the Respondent's

material auction practices and procedures."[8]  The settling banks additionally agreed to post their

"then-current material auction practices and procedures" on their websites,[9] and to pay a civil

money penalty to the SEC.  Merrill Lynch, in particular, was ordered to pay a penalty of

$1,500,000 in light of its "relatively large share of the auction rate securities market" and the fact

that it "engaged in more types of violative practices than" many of the other banks.

38.    Pursuant to this settlement, Merrill Lynch posted a document entitled

"Description of Merrill Lynch's Auction Rate Securities Practices and Procedures" on its

website.  Despite the fact that Merrill Lynch intervened and placed "support" bids in every

auction where it served as lead or sole broker-dealer, bidding for the full amount of the auction,

Merrill Lynch stated only that it "*may* routinely place one or more bids in an auction for its own

account to acquire auction rate securities for its inventory, to prevent an auction failure . . . or an

auction from clearing at a rate that Merrill Lynch believes does not reflect the market for the

securities. . . .  Merrill Lynch also may routinely encourage bidding by others in auctions,

including to prevent an auction failure or an auction from clearing at a rate that Merrill Lynch

believes does not reflect the market for the auction rate securities."  These disclosures, which

amount to little more than the disclosures the SEC already found to be inadequate in the May

2006 cease-and-desist order, are false and misleading.

39.    In January 2007, the SEC initiated cease-and-desist proceedings against three

banks, including Deutsche Bank Trust Company Americas (an affiliate of Deutsche Bank), that

participated in the auction rate market.  The SEC found that, beginning January 1, 2003,

Deutsche Bank Trust Company Americas violated Section 17(a)(2) of the Securities Act, in its

---

[8] *Id.* at 10.

[9] *Id*. at 11.

capacity as auction agent in the auction rate securities market, by "accept[ing] initial or revised bids after submission deadlines and allow[ing] broker-dealers to intervene in auctions."[10] Deutsche Bank Trust Company Americas entered into a settlement with the SEC in which it agreed to "supply a written description of [its] current material practices and procedures for auctions to broker-dealers and issuers of each offering of auction rate securities for which it serves as auction agent to whom such written description has not previously been provided prior to the issuance of such securities."[11]  In addition, Deutsche Bank Trust Company Americas agreed to pay a $750,000 penalty in light of its "relatively large share of the auction rate securities market."[12]

40.     On information and belief, given its prominent role as a participating broker-dealer, and the fact that its auction agent affiliate had entered into a cease-and-desist order with the SEC, Deutsche Bank was well aware of the SEC's settlement with Merrill Lynch and other broker-dealers.  Deutsche Bank therefore knew that the SEC considered the practice of routinely placing bids in auctions for the purpose of avoiding failed auctions, in the absence of full disclosure of the extent and nature of that practice, a violation of the prohibition on material misstatements and omissions in the offer and sale of securities.  Nevertheless, Deutsche Bank placed bids in every auction in which it served as the lead broker-dealer, and for the full amount of the auction, without disclosing these facts.

---

[10] Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933, at 2, *In re Deutsche Bank Trust Company Americas*, File No. 3-12526, Release No. 8767 (SEC Jan. 9, 2007), *available at* http://www.sec.gov/litigation/admin/2007/33-8767.pdf.

[11] *Id.* at 6.

[12] *Id.* at 5.

41.    In April 2007, the Securities Industry and Financial Markets Association ("SIFMA"), an industry organization representing underwriters and broker-dealers (including Merrill Lynch and Deutsche Bank), issued SIFMA's "Best Practices for Broker-Dealers of Auction Rate Securities."  These best practices provide, in pertinent part that:

> A Broker-Dealer should disclose, if true, that it *routinely* places Bids in Auctions generally, and the circumstances in which it may submit Orders in a particular Auction and the possible effect of such Orders.  For example, a Broker-Dealer should disclose, if true, that:  . . .
>
> (b) it routinely places one or more Bids in Auctions generally to prevent a Failed Auction or a Clearing Rate the Broker-Dealer believes is not a market Rate at the time it makes its Bid, even after obtaining knowledge of some or all of the other Orders, but is not obligated to continue to place such Bids or to bid in any particular Auction[.]

SIFMA's best practices required broker-dealers to provide a clear explanation of the extent of their involvement in the market for auction rate securities, echoing the SEC in rejecting as inadequate disclosures that spoke hypothetically about what broker-dealers "may" do.

42.    On February 19, 2008, in response to the collapse of the broader auction rate securities market, the Municipal Securities Rulemaking Board ("MSRB") issued a notice entitled "Application of MSRB Rules to Transactions in Auction Rate Securities."  This notice, the MSRB explained, was intended "to *remind* brokers, dealers and municipal securities dealers . . . of the application of MSRB disclosure and suitability requirements."  The MSRB explained that:

> MSRB Rule G-17 requires dealers to deal fairly with all persons and prohibits deceptive, dishonest, or unfair practices.  A longstanding interpretation of Rule G-17 is that a dealer transacting with a customer must ensure that the customer is informed of all material facts concerning the transaction, including a complete description of the security.  Disclosure of material facts to a customer under Rule G-17 may be made orally or in writing, but must be made at or prior to the time of trade.  In general, a fact is considered "material" if there is a substantial likelihood that its disclosure would have been considered significant by a reasonable investor.
>
> The duty to disclose material facts to a customer in an Auction Rate Securities transaction includes the duty to give a complete description of the security, including features of the auction process that likely would be considered significant by a reasonable investor.

(Internal footnotes omitted.)  MSRB Rule G-17 had been in effect for decades before the conduct relevant to this First Amended Complaint.

43.    On March 14, 2008, the SEC issued a no-action letter concerning auction rate securities, in which it made clear that broker-dealers bidding for proprietary accounts could avoid liability for violating the federal securities laws by disclosing "detailed information regarding bidding in the immediately preceding auction, such as the amount of securities for sale in the auction; the number and aggregate dollar amount of bids made; the number of bidders other than the participating dealers[; and ] . . . the number, interest rate(s) and amount(s) of bids, if any, made by the participating dealers."[13]  Such information would necessarily include the extent of the broker-dealers' support bids and the extent to which those support bids were clearing each successive auction.  While the March 14 no-action letter was limited to municipal auction rate securities (which was the focus of the no-action request), the statutory prohibition on market manipulation applies to all securities, including the complex auction rate securities at issue in this First Amended Complaint.

44.    Merrill Lynch and Deutsche Bank failed to abide by any of these guidelines or best practices.  Neither Merrill Lynch nor Deutsche Bank disclosed the fact that they placed support bids in 100 percent of the auctions for which they served as sole broker-dealer, including all of the securities at issue in this First Amended Complaint.  Nor did they disclose the fact that they bid for the full amount of each auction, the fact that auctions routinely would have failed in the absence of their support bids as there was insufficient legitimate third-party demand for these auction rate securities, nor the number of auctions that would have failed absent their support

---

[13] No-action Letter from E. Sirri, SEC, Director Division of Trading and Markets (Mar. 14, 2008), *available at* http://www.sec.gov/divisions/corpfin/cf-noaction/2008/mars031408.pdf.

bids.  Merrill Lynch and Deutsche Bank thereby concealed the nature and extent of their market manipulation.

## MERRILL LYNCH'S FRAUDULENT SCHEME

45.     Merrill Lynch & Co., acting through Merrill Lynch and its other operating subsidiaries, has underwritten billions of dollars of auction rate securities, including auction rate securities issued by special purpose vehicles and analogous trusts that held portfolios of ABS and/or derivative instruments.  Merrill Lynch performed numerous functions in connection with auction rate securities that it underwrote.  Merrill Lynch selected and hired the auction agent – the entity that receives all auction orders from Merrill Lynch and conducts the Dutch auction that determines the periodic interest payable on each auction rate note.  Merrill Lynch additionally participated in drafting the auction rate supplements to the offering statements.  Furthermore, Merrill Lynch typically served as the sole broker-dealer for the auctions, with responsibility for receiving and transmitting all buy, hold, or sell orders in every auction.  Merrill Lynch received commissions in connection with each auction (typically 25 basis points of the par value of the auction rate tranche), and entered into re-marketing agreements with broker-dealers in California and across the country who placed Merrill Lynch-underwritten securities with their own customers.  Pursuant to these agreements, Merrill Lynch paid placement fees to any downstream broker whose customer acquired any of the Merrill Lynch-underwritten securities in the initial placement, as well as a portion of the commissions earned in connection with each successive auction.  Merrill Lynch knew that its re-marketing agents did not purchase the Merrill Lynch-underwritten securities for their own account, but rather served only as intermediaries for purchases made by brokerage customers, such as TAC.

46.     According to news reports and industry rankings published by Thomson Financial, Merrill Lynch has earned hundreds of millions of dollars in fees for underwriting auction rate securities and CDOs with auction rate security tranches (typically up to 1 to 1.5 percent of the deal's total size), and earned tens of millions of dollars more for acting as the sole or primary broker-dealer for the auction rate securities that it underwrote (typically 25 basis points of the par value of the securities that it manages).  For the years 2006 and 2007, alone, Merrill Lynch earned approximately $90 million in profits from its ARS business.

47.     Among the numerous auction rate securities underwritten and serviced by Merrill Lynch were two offerings of auction rate securities issued by Ambac Assurance Corporation ("Ambac Assurance"), a wholly owned subsidiary of Ambac Financial Group ("Ambac"), identified as Dutch Harbor Finance Sub-Trust I through IV ("Dutch Harbor") and Anchorage Finance Sub-Trust I through IV ("Anchorage Finance").

**I.      The Dutch Harbor and Anchorage Finance Auction Rate Securities**

48.     In November 2001, Merrill Lynch underwrote a $400 million Ambac Assurance auction rate securities offering identified as Dutch Harbor and, in May 2002, Merrill Lynch underwrote another $400 million Ambac Assurance auction rate securities offering identified as Anchorage Finance.

49.     The Dutch Harbor and Anchorage Finance securities were a form of asset-backed auction rate securities.  The Dutch Harbor and Anchorage Finance trust vehicles used the proceeds from their offering to acquire a diversified portfolio of short-term commercial paper, at least 80 percent of which would be rated A-1+ by S&P and the balance of which would be rated at least A-1.  There were four Dutch Harbor Sub-Trusts and four Anchorage Finance Sub-Trusts, each of which issued $100 million of securities that were to be used to acquire a portfolio of

commercial paper for each specific Sub-Trust (after paying underwriting fees to Merrill Lynch).

The interest from this portfolio of commercial paper would be used to make the interest

payments on the Dutch Harbor and Anchorage Finance securities, in amounts that were to be

established at auctions that occurred every 28 days.

       50.     The Dutch Harbor and Anchorage Finance securities had another critical feature.

In particular, TAC has learned that the Dutch Harbor and Anchorage Finance securities had been

issued by Ambac Guaranty to bolster its capital structure and to provide Ambac with contingent

capital that could be drawn upon on demand.  Unbeknownst to the investing public, and

unbeknownst to TAC at the time it purchased these securities, Ambac had been seeking such

contingent capital guarantees for years, but had been unable to secure commitments from

investment banks like Merrill Lynch.  Instead, Merrill Lynch created a structure that would

provide Ambac with the guaranteed capital it sought, with unsuspecting investors in auction rate

securities providing the required funds.  This was achieved through a feature of the Dutch Harbor

and Anchorage Finance securities that granted Ambac a right to "put" Ambac preferred shares to

each of the Dutch Harbor and Anchorage Finance securities holders in exchange for the

commercial paper held in each Sub-Trust.  Ambac could exercise this right at any point in time,

thereby obtaining for itself 100 percent of the value of the commercial paper held in the Dutch

Harbor and Anchorage Finance Sub-Trusts as collateral for the auction rate securities.  This

Ambac preferred stock would not trade on any public market and could not be sold in any

secondary market.  Rather, it could be sold only through periodic auctions for the preferred stock

that would be used to establish the dividend rate that Ambac would pay.  The put feature allowed

Ambac to treat these securities as stockholders' equity on its balance sheet, although this

motivating factor was not disclosed to the investing public.  Nor did Merrill Lynch disclose the

fact that Ambac had been seeking a guaranteed source of contingent capital, that it and other investment banks had refused to provide such capital, and that the auction rate securities had been devised to treat the unsuspecting holders of these securities as Ambac's financiers.

51.    Merrill Lynch was the sole broker-dealer for the Dutch Harbor and Anchorage Finance securities.  Thus, as set forth in the Dutch Harbor and Anchorage Finance offering statements, "existing holders and potential holders may participate in auctions only by submitting orders . . . through Merrill Lynch, Pierce, Fenner & Smith Incorporated, as the sole broker-dealer."

52.    At the time that it served as the underwriter for the Dutch Harbor and Anchorage Finance securities, Merrill Lynch knew that there was no liquid market for auction rate securities.  Merrill Lynch had served as the underwriter and participating broker-dealer for numerous other issues, and Merrill Lynch knew that there was insufficient legitimate third-party demand for the securities, and therefore that the auctions would not clear in the absence of Merrill Lynch's continuing placement of support bids.

53.    Notwithstanding the fact that Merrill Lynch had served as a market maker for such securities, placing support bids in 100 percent of the auctions, the offering statements for the Dutch Harbor and Anchorage Finance securities state only that Merrill Lynch "may submit orders in auctions for its own account," suggesting that there was some uncertainty or doubt about whether it would, in fact, participate in future auctions.  *See* Appendix A (quoting each Offering Memorandum).  These broad disclaimers failed to inform investors of the true nature and extent of Merrill Lynch's market manipulation.  By the time the offering statements were issued, Merrill Lynch knew that it would participate (and had participated) in 100 percent of the auctions and that the continued existence of the purported market for these auction rate

instruments was wholly dependent upon its continued placement of support bids.  Merrill Lynch

likewise knew that it would be unable to continue to underwrite any new auction rate securities

to the extent that it permitted any of the periodic auctions to fail.

54.     Notwithstanding the fact that Merrill Lynch was aware of Ambac's unsuccessful

efforts to secure a guaranteed source of contingent capital and, on information and belief, had

refused to provide such capital itself, Merrill Lynch structured the securities in such a way that

the investors in Dutch Harbor and Anchorage Finance would play the financing role that Merrill

Lynch itself refused to play.  Merrill Lynch was directly involved in drafting and disseminating

the Offering Memoranda for the Dutch Harbor and Anchorage Finance securities, but

nevertheless failed to disclose any of these material facts.[14]

55.     The offering statements for these auction rate notes contained other material

omissions as well.  For example, each supplement stated that there was some possibility that the

securities might not be liquid, because of the possibility that a periodic auction could fail.

Merrill Lynch failed to disclose, however, that there was a virtual certainty that auctions would

fail in the event that Merrill Lynch decided to stop placing support bids.  Based on its

experiences serving as participating broker-dealer for numerous other issues of auction rate

securities, Merrill Lynch knew that the auctions for these securities would, in fact, fail in the

absence of its support bids.  Merrill Lynch similarly knew that the false appearance of liquidity

was essential to the placement of these securities.  Accordingly, Merrill Lynch withheld these

material facts from the investing public.

---

[14] The offering statements for the Dutch Harbor and Anchorage Finance securities merely state that "Ambac may be more likely to exercise its rights under a put agreement during times of financial distress."

56.     Merrill Lynch's refusal to publicly disclose all material facts regarding its bidding practices for auction rate securities continued even in the face of regulatory orders to do so.  In 2006, following the entry of the SEC's cease-and-desist order against it, and pursuant to its obligations thereunder, Merrill Lynch posted on its public website a document entitled "Description of Merrill Lynch's Auction Rate Securities Practices and Procedures." Notwithstanding its multi-year practice of placing support bids in the full amount of the auction for 100 percent of the auctions where it served as lead or sole broker-dealer, notwithstanding the SEC's order to disclose all material facts concerning the extent of its auction rate practices, and notwithstanding the SEC's determination that such disclosures violated Section 17(a)(2) of the Securities Act, Merrill Lynch again stated only that it "may" place bids in an auction for its own account.  Merrill Lynch knew that it would participate and place bids in these auctions, and further that the market would collapse should it fail to do so, yet failed to make these necessary disclosures.

## II.     Merrill Lynch Fraudulently Manipulated the Market for the Dutch Harbor and Anchorage Finance Securities

57.     According to the Massachusetts Office of the Secretary of the Commonwealth's Securities Division, which took extensive testimony from Merrill Lynch employees prior to filing an administrative complaint against the company, Merrill Lynch marketed auction rate securities to its own brokerage customers as "safe, cash like, and liquid investments," and its financial advisors "routinely represented [auction rate securities] to clients as fully-liquid, principal protected and cash-like."  Merrill Lynch was also aware that downstream brokers and its distribution partners marketed auction rate securities in the same manner.

58.     In order to perpetuate this myth and to collect the enormous fees associated with underwriting and servicing these securities, Merrill Lynch had to mask the inherent lack of

liquidity of the these securities. To that end, Merrill Lynch fraudulently manipulated the market for the Dutch Harbor and Anchorage Finance securities.

59. Acting in its capacity as the sole broker-dealer for these securities, Merrill Lynch placed "support bids" in 100 percent of the Dutch Harbor and Anchorage Finance auctions. When placing these support bids, Merrill Lynch would bid for the entire notional value of the issue being auctioned, thereby ensuring that the auctions would clear without regard to the legitimate volume of buy, sell, or hold orders Merrill Lynch had received. *See* Appendix B (setting forth the dates on or about which the auctions for the subject securities occurred, and in which Merrill Lynch placed support bids for the entire notional value of the issue being auctioned). On information and belief, these support bids cleared the auction and established the clearing rate for a significant percentage of all Dutch Harbor and Anchorage Finance auctions.

60. Merrill Lynch's pervasive practice of placing "support bids" to prevent auction failures had two primary effects. First, the "support" bids directly affected the clearing rate of the Dutch Harbor and Anchorage Finance auctions, reducing the amount of interest paid to holders of the Dutch Harbor and Anchorage Finance securities. Second, these undisclosed "support" bids injected false information into the marketplace and disturbed the natural interplay of supply and demand, creating the outward appearance that the Dutch Harbor and Anchorage Finance securities were readily liquid investments. Indeed, with each "successful" auction, Merrill Lynch implicitly represented that there was sufficient legitimate third-party demand for these securities to provide liquidity to any actual or potential investor. By intervening to prevent auction failures, Merrill Lynch was able to obscure the liquidity risks inherent in the Dutch Harbor and Anchorage Finance auction rate securities.

61.    Merrill Lynch had no legitimate investment reason to purchase the Dutch Harbor and Anchorage Finance securities at auction.  Merrill Lynch did not want to own these securities in its proprietary accounts for investment purposes, and it was not necessary for Merrill Lynch to maintain an inventory of these securities to satisfy demand from its customers.  Indeed, Merrill Lynch routinely tried to reduce – not increase – its inventory of auction rate notes.  Rather, Merrill Lynch placed bids for the sole purpose of preventing auction failures and controlling the interest rate at which the auction cleared.  According to the trial testimony of James Child, who served as head of the fixed-income trading desk at Credit Suisse in 2007 and who testified on August 13, 2009 in *United States v. Butler*, Merrill Lynch routinely offered its inventory of auction rate notes to other broker-dealers like Credit Suisse in the hope that their customers might purchase those securities from Merrill Lynch's inventory.

62.    On information and belief, Merrill Lynch additionally sought to reduce its growing inventory of auction rate notes by placing these securities in the accounts of its advisory clients.  MetroPCS Communications, Inc. ("MetroPCS"), for example, has filed suit against Merrill Lynch arising out of Merrill Lynch's provision of investment advisory services to MetroPCS.[15]  According to the complaint, Merrill Lynch used its authority over MetroPCS's cash reserves to cause MetroPCS to acquire approximately $134 million of auction rate securities underwritten by Merrill Lynch.  These purchases had the effect of reducing the quantity of auction rate securities held in Merrill Lynch's inventory.  Merrill Lynch appears to have engaged in similar conduct with other clients as well.  The Commonwealth of Massachusetts, for example, brought suit against Merrill Lynch after it was discovered that Merrill Lynch had used its authority and control over a cash account for the City of Springfield, Massachusetts to

---

[15] *See* Plaintiffs' Original Petition and Jury Demand, *MetroPCS Communications, Inc.  v. Merrill Lynch & Co.*, No. 07-12430 (Tex. Dist. Ct. Dallas County filed Oct. 18, 2007).

purchase $14 million of Merrill Lynch-underwritten auction rate securities out of Merrill Lynch's inventory.[16]  Once again, Merrill Lynch appears to have taken steps to reduce its own holdings of auction rate securities by placing these unwanted securities with its unwitting advisory clients.  Merrill Lynch settled this lawsuit by purchasing the auction rate securities from the City of Springfield and covering Springfield's legal fees.[17]

63.     In the absence of Merrill Lynch's undisclosed support bids, a huge percentage of auctions would have failed.  That is precisely what happened during August 2007 when Merrill Lynch stopped submitting support bids in the Dutch Harbor and Anchorage Finance auctions.

64.     Immediately following this decision, and beginning in August 2007, the market for these structured securities completely evaporated.  It has become apparent that there never really was a functioning market for these securities in the first place, as there was insufficient legitimate third-party demand to clear the auctions.  Rather, the appearance of liquidity was pure fiction, as it was entirely dependent upon the willingness of Merrill Lynch to place support bids, support that could be withdrawn at any time.

65.     By manipulating the auctions for the Dutch Harbor and Anchorage Finance auction rate securities, Merrill Lynch prevented investors, such as TAC, from learning the true risk, value, and liquidity features of these securities.  TAC relied on the appearance of liquidity created by Merrill Lynch in the market for the Dutch Harbor and Anchorage Finance securities when it invested in those securities for its working capital account.  Had TAC known the true risk, value, and liquidity features of these securities, and the absence of any genuine market demand, it never would have purchased them.  Indeed, under the investment guidelines and

---

[16] *See* Administrative Complaint, *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 2008-0001 (Mass. Office Sec. Div. Feb. 1, 2008).

[17] *See* Craig Karmin, *Merrill Lynch Pays Back Springfield, Mass., For CDO Purchase*, Wall St. J., Feb. 1, 2008, at C2.

principles that TAC has applied to its working capital account, TAC would have been precluded from acquiring these illiquid securities.

### III.    Merrill Lynch Omitted Material Facts About the Liquidity and Risks of the Dutch Harbor and Anchorage Finance Securities Markets, and its Manipulation of the Market for Those Securities

66.    Merrill Lynch developed and engaged in a comprehensive fraudulent scheme to market and sell the Dutch Harbor and Anchorage Finance securities to investors, such as TAC, that included making omissions and false and misleading statements of material fact.

67.    As previously explained, Merrill Lynch played a central role in drafting the Offering Memoranda used in connection with underwriting the Dutch Harbor and Anchorage Finance securities.  Those documents contained, among other things, disclosures about the role of Merrill Lynch in structuring, issuing, underwriting, and trading the Dutch Harbor and Anchorage Finance securities.  As a result, Merrill Lynch had a duty to ensure that it made full and accurate disclosures about its roles and activities and that the offering documents did not omit information necessary to make those disclosures complete and accurate in all material respects.

68.    In addition, Merrill Lynch had a duty to make full and accurate disclosures of all material information concerning Merrill Lynch's participation as the sole broker-dealer in auctions for the Dutch Harbor and Anchorage Finance securities.  Merrill Lynch was required to make robust disclosures about the nature, extent, and motivation for any trading for its own account in auctions for these securities, including but not limited to disclosures about the extent of its bidding to prevent auction failures, and every instance that Merrill Lynch placed a bid at a price that Merrill Lynch did not believe to be at the then-prevailing market rate at the time it entered the bid.  These disclosures included the number, interest rate(s), and amount of any bids

made by Merrill Lynch in any previous auction for the Dutch Harbor and Anchorage Finance securities, as well as the effect those bids had on the result of that previous auction.

69.     Under the terms of a May 31, 2006 SEC cease-and-desist order, beginning no later than August 31, 2006, Merrill Lynch was required to make these disclosures readily available to investors and to post on its website a written description of its then-current material practices and procedures with respect to its placement of bids in auctions for the Dutch Harbor and Anchorage Finance securities, and other activities that had the possibility of affecting the results of any auction for these securities.

70.     In addition, as *de facto* market maker for the Dutch Harbor and Anchorage Finance securities, a position that Merrill Lynch occupied by virtue of its bidding for 100 percent of the securities at auction and its subsequent attempts to sell any inventory it acquired, Merrill Lynch had an affirmative obligation to disclose all material information concerning its role as market maker.

71.     Nonetheless, Merrill Lynch knowingly and/or recklessly failed to disclose, among other things that:

(a)     the auction market operated without transparency to investors, thus enabling manipulation by Merrill Lynch in its capacity as the sole broker-dealer for the Dutch Harbor and Anchorage Finance securities;

(b)     the "auctions" for the Dutch Harbor and Anchorage Finance securities were not true auctions, as Merrill Lynch submitted "support bids" and engaged in other manipulative practices for its own account in all of the auctions for these securities;

(c)     Merrill Lynch submitted bids in auctions for Dutch Harbor and Anchorage Finance securities for the full amount of the securities at auction;

(d)     Merrill Lynch intervened in auctions for its own benefit, to set rates and to prevent all-hold auctions and failed auctions;

(e)     there was insufficient legitimate third-party demand in a significant number of the auctions for the Dutch Harbor and Anchorage Finance securities to avoid auction failures;

(f)     there were more sell orders than buy orders in a large percentage of the auctions, such that Merrill Lynch's bidding activity directly or indirectly set the clearing rate in those auctions;

(g)     without Merrill Lynch's bids in these auctions, the interest rate paid to holders of the Dutch Harbor and Anchorage Finance securities would have been the fail rate;

(h)     the Dutch Harbor and Anchorage Finance securities appeared to be liquid only because Merrill Lynch was artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability;

(i)     the short-term liquid nature of the Dutch Harbor and Anchorage Finance securities and the ability of investors to liquidate these securities at par depended on the perpetuation of the artificial auction rate market created by Merrill Lynch;

(j)     Merrill Lynch had no legitimate interest in acquiring the Dutch Harbor and Anchorage Finance securities, and was actively seeking to sell the securities that it acquired at auction;

(k)     as a result of the involvement of Merrill Lynch in auctions for the Merrill Lynch-underwritten securities, Merrill Lynch maintained a substantial inventory of Merrill Lynch-underwritten securities;

(l)     in the event of auction failures, the Dutch Harbor and Anchorage Finance securities would be saleable only at a substantial discount from their purchase price, if at all; and

(m)     Ambac had issued the securities in order to bolster its balance sheet by obtaining access to a guaranteed source of contingent capital, which investment banks like Merrill Lynch had refused to provide. Indeed, Ambac viewed the Anchorage Finance and Dutch Harbor structures as providing a mechanism through which the holders of the securities would take the place of investment banks as the source of financing.

## IV.    The Market Impact of Merrill Lynch's Manipulative and Deceptive Conduct

72.     By placing bids for its own account in the auctions for the Dutch Harbor and Anchorage Finance securities, notwithstanding the absence of any legitimate investment interest in owning those securities, Merrill Lynch caused the rates set in the auctions to be lower than they otherwise would have been. As a result, holders of the Dutch Harbor and Anchorage

Finance securities, including TAC, earned less in interest than they would have earned in the absence of Merrill Lynch's bidding.

73.     Merrill Lynch's practice of placing bids for 100 percent of the securities available for auction in 100 percent of the auctions injected false information into the marketplace about the extent of legitimate third-party demand for the Dutch Harbor and Anchorage Finance securities.  Merrill Lynch's conduct created the false impression that there was sufficient liquidity in the auction process for any actual holder or potential purchaser of these securities to be able to sell them at par through the auction process.  Merrill Lynch's actions significantly overstated the extent of perceived investor demand for these securities, and created the false impression that the Dutch Harbor and Anchorage Finance securities would perform like short-term, liquid securities and money market alternatives rather than as illiquid long-term notes.

## V.     Merrill Lynch Has Been the Target of Investigation by Securities Regulators

74.     As a result of its market manipulation and false and misleading misstatements and omissions, Merrill Lynch has been a target of investigations and civil litigation by securities regulators and law enforcement officials.

75.     As set forth above, on May 31, 2006, Merrill Lynch entered into a settlement with the SEC regarding its auction rate procedures.  Merrill Lynch agreed to pay civil money penalties of $1.5 million.

76.     After an investigation conducted pursuant to Article 23-A of the New York General Business Law, the Office of the Attorney General of the State of New York entered into an Assurance of Discontinuance with Merrill Lynch that was announced on July 7, 2009.  The Attorney General issued written findings in which it concluded that Merrill Lynch had materially misrepresented the nature, risk, and liquidity of auction rate securities, falsely portraying them as

"highly liquid, safe, cash management alternative investments."[18]  The Attorney General further found that "[s]ince the inception of the auction rate securities market, Merrill Lynch and other broker-dealers submitted support bids, purchase orders for the entirety of an auction rate security issue for which it acted as the sole or lead broker."[19]

77.    Overall, Merrill Lynch has agreed to pay state securities regulators penalties in the amount of $125 million (including New York) and to buy back over $26 billion in auction rate securities from Merrill Lynch's retail customers.  As part of this multi-state agreement, on or about June 2, 2009, Merrill Lynch entered into a settlement with the Montana Securities Department whereby Merrill Lynch agreed to pay $372,977 in fines and buy back $38 million in auction rate securities.  On or about June 11, 2009, Merrill Lynch entered into a settlement with the Arizona Corporation Commission whereby Merrill Lynch agreed to pay a $1,751,003 fine and to buy back $168.6 million in auction rate securities from retail customers in Arizona.  On or about June 18, 2009, Merrill Lynch entered into a settlement with the Colorado Division of Securities whereby Merrill Lynch agreed to buy back $256 million worth of auction rate securities from retail customers in Colorado.

78.    On or about August 28, 2008, the SEC's Division of Enforcement announced that it had entered into a preliminary settlement-in-principle with Merrill Lynch arising out of Merrill Lynch's misrepresentations concerning the safety and liquidity of the auction rate securities market, and Merrill Lynch's failure to disclose "that the liquidity of these securities was based on Merrill Lynch supporting the auctions it managed when there was not enough demand."[20]  The

---

[18] *See* Merrill Lynch Assurance of Discontinuance ¶¶ 6-7.

[19] *Id.* ¶ 8.

[20] SEC Enforcement Division Announces Preliminary Settlement with Merrill Lynch To Help Auction Rate Securities Investors, Release No. 2008-181 (Aug. 28, 2008), *available at* http://www.sec.gov/news/press/2008/2008-181.htm.

SEC further indicated that Merrill Lynch faced "the prospect of a financial penalty to the SEC after it has completed its obligations under the settlement agreement."[21]

## DEUTSCHE BANK'S FRAUDULENT SCHEME

79.    Deutsche Bank has underwritten billions of dollars of auction rate securities, including auction rate securities issued by trusts that were set up by Deutsche Bank and that held portfolios of ABS and/or derivative instruments.  For each of these securities, Deutsche Bank performed a number of additional functions.  Deutsche Bank selected and hired the auction agent, interacted with rating agencies to ensure investment-grade ratings, and served as the sole broker-dealer for the auctions, with responsibility for receiving and transmitting all buy, hold, or sell orders in every auction.  Deutsche Bank received commissions in connection with each auction (typically 25 basis points of the par value of the securities that it manages), and entered into re-marketing agreements with broker-dealers like Credit Suisse to place Deutsche Bank-underwritten securities.  Pursuant to these agreements, Deutsche Bank paid placement fees to any downstream broker whose customer acquired any of the Deutsche Bank-underwritten securities in the initial placement, as well as a portion of the commissions earned in connection with each successive auction.  Deutsche Bank knew that its re-marketing agents did not make purchases for their own accounts, but rather served only as intermediaries for purchases made by their brokerage customers, such as TAC.

80.    Deutsche Bank has earned tens to hundreds of millions of dollars in fees for underwriting auction rate securities and has earned millions of dollars more for acting as the sole or primary broker-dealer for the auction rate securities that it underwrote.

---

[21] *Id.*

81.     Even as the credit markets were deteriorating in the spring and summer of 2007, and after Deutsche Bank had made the internal decision to exit the structured finance related market (including the market for the auction rate securities at issue here), it continued to underwrite billions of dollars of auction rate securities, including auction rate securities that held highly complex derivative instruments.

## I.     The Pivot Master Trust and Capstan Master Trust Auction Rate Securities

82.     Among the numerous auction rate securities underwritten and serviced by Deutsche Bank are the following derivative-backed auction rate securities that were issued by two trusts – the Pivot Master Trust and Capstan Master Trust[22] – that were set up by Deutsche Bank for the sole purpose of issuing these securities:

| Security | Date of Issuance | Amount |
|----------|------------------|--------|
| Pivot Master Trust Series 1 | May 8, 2007 | $125,000,000 |
| Capstan Master Trust Series 1 | August 1, 2007 | $150,000,000 |
| Capstan Master Trust Series 2 | August 1, 2007 | $150,000,000 |

### A.     The Structure of the Pivot Master Trust and Capstan Master Trust Securities

83.     The Pivot Master Trust and Capstan Master Trust securities are a form of highly complicated derivative auction rate securities that were devised, structured, and underwritten by Deutsche Bank.  Each issuer (*i.e.*, the Pivot Master Trust and Capstan Master Trust, each of which was established by Deutsche Bank) used the proceeds from its offering to acquire a series of Credit Linked Notes ("CLNs") that had been issued by another special purpose vehicle trust established by Deutsche Bank.  The proceeds received by the special purpose vehicle trust were

---

[22] Deutsche Bank underwrote at least eight different series of auction rate securities issued by the Pivot Master Trust, with an aggregate par value of $1.1 billion, and four different series of auction rate securities issued by the Capstan Master Trust, with an aggregate par value of $600 million.  The particular securities listed in the foregoing table are those series that were acquired by TAC.

then invested in medium term notes, or deposited in an account with Deutsche Bank or its affiliate.

84.    The special purpose vehicle trust then entered into a series of credit default swaps ("CDS") with Deutsche Bank AG (Deutsche Bank's parent company).  A CDS is an over-the-counter contract between two parties through which one of the parties purchases protection or insurance against any losses associated with some specified reference entity.  The purchaser of the insurance pays a periodic premium and, in return, the counter-party (or seller of the protection) guarantees that it will make the purchaser whole should a credit event (such as a credit downgrade or a failure to make an interest payment) occur with respect to the reference entity.  With respect to these particular auction rate securities, Deutsche Bank AG purchased protection from the special purpose vehicle trust that Deutsche Bank had established, and the medium term notes acquired by the trust or the deposit account with Deutsche Bank served as the collateral for the CDS transactions.  The reference securities were a portfolio of corporate bonds.  In effect, the special purpose vehicle trust provided a form of insurance against the performance of the portfolio of reference corporate bonds, agreeing to compensate the Deutsche Bank AG office in the event the bonds were downgraded or otherwise failed to make any payments of interest or principal.  In return for a nominal "premium," Deutsche Bank AG received a guarantee that it would be made whole in the event that the portfolio of corporate bonds were downgraded or otherwise failed to perform, offloading the risk from its balance sheet onto the shoulders of unsuspecting investors several steps down the chain.

85.    The special purpose trust received two different income streams.  First, it received interest payments from the medium term notes that it had acquired.  These payments would be reduced to the extent that the special purpose trust had to liquidate any of the medium term notes

or the amount on deposit with Deutsche Bank that served as collateral for the CDS. Second, the
special purpose trust received a payment or premium from the Deutsche Bank AG office in
connection with the CDS. These cash flows were then used to pay interest on CLNs issued by
the special purpose trust.

      86.    Separately, the trust that issued the auction rate securities and that held the CLNs
(*i.e.*, the Pivot Master Trust or Capstan Master Trust) entered into a "basis swap" with Deutsche
Bank AG. Pursuant to the terms of the swap, Deutsche Bank AG would receive 100 percent of
the interest payments from CLNs. In exchange, Deutsche Bank AG paid the interest on the
auction rate securities and other administrative fees (including commissions to Deutsche Bank
for serving as the broker-dealer).

      87.    The structure of the Pivot Master Trust and Capstan Master Trust securities is as
follows:



88.     The Pivot Master Trust and Capstan Master Trust securities have another significant feature, the significance of which has only recently become apparent.  To the extent that Deutsche Bank AG or any of its affiliates (including Deutsche Bank) hold any of these securities, the offering documents (drafted by Deutsche Bank) grant Deutsche Bank AG or its affiliates the ability to exchange those holdings for the portion of the CLNs relating to the securities.  Once Deutsche Bank or its affiliates hold the underlying CLNs, they have the ability to exchange the CLNs for the corresponding amount of collateral.  In other words, to the extent that Deutsche Bank AG or its affiliates hold any of these ARS, they can unwind the structure and receive the face value of the securities in cash.  On information and belief, Deutsche Bank AG and its affiliates never exercised this right during the time period in which Deutsche Bank was manipulating the market for these securities, as doing so would have alerted the investing public as to the extent of Deutsche Bank's manipulative activities.

89.     Deutsche Bank designed and structured these securities, created the trusts that issued these securities, created the special purpose trusts that entered into the transactions with the issuing trusts, and it or its affiliates entered into numerous swaps and other transactions with the various trusts.  Accordingly, Deutsche Bank effectively was, for all relevant purposes, the issuer of the Pivot Master Trust and Capstan Master Trust securities.

90.     In contrast to traditional municipal or student loan-backed auction rate securities, the interest rate range for the Pivot Master Trust and Capstan Master Trust securities is narrowly circumscribed.  The table below sets forth the "Minimum Applicable Rate" and the "Maximum Applicable Rate" for these securities, which automatically apply in the event of an auction failure.  The maximum rate for these securities is tied to their rating and increases in the event the securities are downgraded by the rating agencies.  Because all of these securities have been

downgraded by the rating agencies, the current maximum rate is higher than the maximum rate

when the auctions initially failed:

| Security | Minimum Rate | Maximum Rate When AAA-Rated | Current Maximum Rate |
|---|---|---|---|
| Pivot Master Trust Series 1 | 1 Month LIBOR - .25% | 1 Month LIBOR + .50% | 1 Month LIBOR + 2.25% |
| Capstan Master Trust Series 1 | 1 Month LIBOR - .25% | 1 Month LIBOR + .50% | 1 Month LIBOR + 2.00% |
| Capstan Master Trust Series 2 | 1 Month LIBOR - .25% | 1 Month LIBOR + .50% | 1 Month LIBOR + 2.00% |

91.    By structuring them as auction rate securities, Deutsche Bank was able to market

the Pivot Master Trust and Capstan Master Trust securities as short-term, liquid notes, rather

than as fixed-income notes with maturity dates some 10 years in the future.  Because the interest

rate was collared at short-term interest rates, these securities would have been unsaleable without

Deutsche Bank's undisclosed, manipulative, and deceptive practices; no investor would have

purchased long-term notes with a 10-year maturity date that paid only short-term interest rates.

In the alternative, the securities could have been sold only at a significant discount to their face

value.

92.    The offering statements for the Pivot Master Trust and Capstan Master Trust

securities provide that "Existing Holders and Potential Holders of certificates *must* submit orders

through a Broker-Dealer in order to participate in an Auction."  They further identify Deutsche

Bank as the "Broker-Dealer" for the auctions.  At all relevant times, Deutsche Bank was the sole

broker-dealer for the Pivot Master Trust and Capstan Master Trust securities.  In that capacity,

all bids to purchase or orders to sell these auction rate securities had to be submitted to Deutsche

Bank.  This access to all bids to purchase, and orders to sell, these auction rate notes permitted

Deutsche Bank to place bids for its own account in such a way as to influence the outcome of the

auction.  Because the auctions were conducted anonymously, and Deutsche Bank never

identified itself as the source of any particular order, other market participants – including TAC – had no way of knowing whether, and to what extent, Deutsche Bank either submitted bids in the auctions for its own account or was responsible for clearing any individual auction.

93.     At the time it underwrote the Pivot Master Trust and Capstan Master Trust securities, Deutsche Bank knew that there was no liquid market for auction rate securities and insufficient third-party demand.  Deutsche Bank had served as the underwriter and participating broker-dealer for numerous other issues, and Deutsche Bank therefore knew that these auctions would not clear in the absence of Deutsche Bank's continuing placement of support bids.

94.     Indeed, by the time it underwrote the Pivot Master Trust securities in May 2007, Deutsche Bank already had extensive experience with identically structured securities issued by the Camber Master Trust and underwritten by Deutsche Bank that were issued between August 2006 and January 2007.  As the sole broker-dealer, Deutsche Bank received all of the bidding and sales activity for each of the series of Camber Master Trust securities.  Deutsche Bank placed support bids for the full amount of the issue in 100 percent of these auctions and knew that the auctions routinely would have failed in the absence of its support bids.  Accordingly, by the time it underwrote the Pivot Master Trust securities (and later the Capstan Master Trust securities), Deutsche Bank knew that there was no liquid, efficient market for these securities, that there was insufficient legitimate third-party demand to clear the auctions for these securities, and that any appearance of liquidity was predicated entirely upon Deutsche Bank's support bids.  Deutsche Bank similarly knew that, if the truth were to emerge, or if any of the auctions were to fail, it would be unable to place, and to earn the lucrative underwriting fees associated with, the Pivot Master Trust or the Capstan Master Trust securities.  Likewise, it would be unable to obtain the credit protection provided by the CDSs associated with those securities.

95.    Notwithstanding the fact that Deutsche Bank had served as a market maker for other auction rate securities, placing support bids in 100 percent of the auctions, the Private Placement Memoranda for the Pivot Master Trust securities state only that "Broker-Dealers *may* submit Orders and purchase certificates for their own account," suggesting that there was some uncertainty or doubt about whether Deutsche Bank would, in fact, submit such orders or support bids, and further suggesting that its participation would only be periodic rather than a functional necessity.  *See* Appendix A.  These broad disclaimers failed to inform investors of the true nature and extent of Deutsche Bank's market manipulation.  By the time that the offering statements were issued, Deutsche Bank knew that it would participate (and had participated) in 100 percent of the auctions and that the continued existence of a purported market for these auction rate instruments was wholly dependent upon its continued placement of support bids.  Deutsche Bank likewise knew that it would be unable to continue to underwrite these types of auction rate securities to the extent it permitted any of the periodic auctions to fail.  Deutsche Bank structured the Pivot Master Trust and Capstan Master Trust securities, and was directly involved in drafting and disseminating each Private Placement Memorandum and Series Pricing Supplement.  It nevertheless failed to disclose any of these material facts.

96.    The Private Placement Memoranda for these auction rate securities contain other material omissions.  For example, while each memorandum states that there was some possibility that the securities might not be liquid, because of the possibility that a periodic auction could fail, Deutsche Bank failed to disclose the virtual certainty that auctions would fail in the event that Deutsche Bank decided to stop placing support bids.  Based on its experiences serving as participating broker-dealer for numerous other issues of auction rate securities, Deutsche Bank knew that the auctions for these securities would fail in the absence of its support bids.  Deutsche

Bank similarly knew that the false appearance of liquidity was essential to the placement of these securities. Accordingly, Deutsche Bank withheld these material facts from the investing public.

97.    By July 2007, Deutsche Bank had made the conscious decision to exit the market and to forgo placing support bids in auction rate securities backed by derivatives, such as the Capstan Master Trust securities. As Deutsche Bank's Chairman of the Management Board Dr. Josef Ackermann stated in February 2008, "I think one of the reasons we were successful is that *in July [2007], when the first signals started, we said out, exit*, whereas some others hoped for better times. And I still hear this, you are jeopardizing our bonus pool by doing this, or when traders – investors come back from their vacation, they start buying again. We did not share that view. Based on more macroeconomic analysis, we felt that the subprime will not recover and that it will get worse, and so we got out of related products."

98.    Thus, as of July 30, 2007, the date that it underwrote the Capstan Master Trust securities, Deutsche Bank knew that it would not place any support bids for these securities, and it also knew that, in the absence of these support bids, all of the auctions for the Capstan Master Trust securities would fail and therefore any investor who purchased the Capstan Master Trust securities would be holding an illiquid and substantially impaired security. Nonetheless, to secure its lucrative underwriting fees, and the credit protection offered by the structure it established, Deutsche Bank sold these securities into the market knowing that they were completely illiquid and would, only a few days later, become unsaleable. Deutsche Bank failed to disclose any of these material facts to potential investors. In fact, Deutsche Bank continued to support the auctions for the Camber Master Trust and Pivot Master Trust securities until just after it had successfully sold the Capstan Master Trust securities to unsuspecting investors, at which point it allowed all of the relevant auctions to fail.

## II.    Deutsche Bank Fraudulently Manipulated the Market for the Pivot Master Trust and Capstan Master Trust Securities

99.    According to an SEC complaint filed against Deutsche Bank on June 1, 2009, Deutsche Bank was aware that its own client advisors marketed auction rate securities to Deutsche Bank's customers as, among other things, "safe" and "liquid," and represented that there was "no risk involved."  Deutsche Bank was also aware that certain Deutsche Bank client advisors had represented that auction rate securities were "just like money markets," but with a "better return" and that auction rate securities had "equivalent liquidity" in relation to money markets.  Deutsche Bank further knew that downstream brokers were marketing the Deutsche Bank-underwritten auction rate securities in the same manner.

100.    Deutsche Bank's own documents, however, reveal that Deutsche Bank allowed its own employees and downstream brokers to market auction rate securities in this manner even though it knew that such statements were false.  The SEC's complaint states that "[t]he manual that governed [Deutsche Bank's] Fixed Income Desk, which was reviewed and approved annually by the head of the Fixed Income Desk, included ARS as a possible 'Non-Conventional Investment,' which it described as a product that 'may carry comparatively greater risk than conventional products, and often have complex terms and features  . . .'  The Fixed Income Desk's manual also explained that some of the more common traits of non-conventional investments include 'unique structures, varied forms of collateral, less market liquidity, less pricing transparency and heightened credit risks.'"[23]  Moreover, the Deutsche Bank manual that governed its client advisors states that "'[g]iven the distinct, often more difficult character of [non-conventional investments] all CAs and supervisory personnel must comport their sales

---

[23] Complaint ¶ 33, *SEC v. Deutsche Bank Securities Inc.*, No. 09-civ-5174 (S.D.N.Y. filed June 1, 2009), *available at* http://www.sec.gov/litigation/complaints/2009/comp21066-dbs.pdf.

conduct to the following obligations:  due diligence regarding the product, reasonable basis suitability analysis, customer specific suitability analysis, balanced disclosure, and training.'"[24]

101.    In order to place the Pivot Master Trust and Capstan Master Trust securities with investors, to collect the enormous fees associated with underwriting and servicing these securities, and to gain the credit protection from the CDS in favor of Deutsche Bank AG, Deutsche Bank had to mask the inherent lack of liquidity of these securities.  To that end Deutsche Bank fraudulently manipulated the market for the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities, and for other similar auction rate securities that Deutsche Bank managed in its capacity as a broker-dealer.

102.    Acting in its capacity as the sole broker-dealer for these securities, Deutsche Bank placed "support bids" in 100 percent of the auctions for the Pivot Master Trust and Camber Master Trust auctions.  When placing these support bids, Deutsche Bank would bid for the entire notional value of the issue being auctioned, thereby ensuring that the auctions would clear without regard to the volume of buy, sell, or hold orders Deutsche Bank had received.  *See* Appendix B (setting forth the dates on or about which the auctions for the subject securities occurred, and in which Deutsche Bank placed support bids for the entire notional value of the issue being auctioned).  On information and belief, these support bids cleared the auction and established the clearing rate for a significant percentage of the auctions.

103.    Deutsche Bank's pervasive practice of placing "support bids" to prevent auction failures had two primary effects.  First, the "support bids" directly affected the clearing rate of the Pivot Master Trust auctions.  Second, these "support bids" injected false information into the marketplace and disturbed the natural interplay of supply and demand, creating the outward

---

[24] *Id.* ¶ 35.

appearance that auction rate securities underwritten by Deutsche Bank, including the Pivot

Master Trust and Capstan Master Trust securities, were readily liquid investments.  Indeed, with

each "successful" auction, Deutsche Bank implicitly represented that there was sufficient

legitimate third-party demand for the securities to provide liquidity to any actual or potential

investor.  By intervening to prevent auction failures, Deutsche Bank was able to obscure the

liquidity risks inherent in the Pivot Master Trust and Capstan Master Trust auction rate

securities.

104.    Deutsche Bank had no legitimate investment reason to purchase the Pivot Master

Trust securities at auction.  Deutsche Bank did not want to own these securities in its proprietary

accounts for investment purposes, and it was not necessary for Deutsche Bank to maintain an

inventory of these securities to satisfy demand from its customers.  Indeed, Deutsche Bank

routinely tried to reduce – not increase – its inventory of its auction rate notes.  Thus, Deutsche

Bank placed bids for the sole purpose of preventing auction failures and controlling the interest

rate at which the auction cleared.  As set forth above, however, Deutsche Bank had drafted the

offering documents in such a way as to grant it (and its parent and affiliated companies) the

ability to unwind the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust

securities it held in inventory and to exchange those holdings for the unimpaired and liquid

collateral supporting the CDS.  Thus, in the absence of sufficient legitimate third-party demand

for the securities to permit the periodic auctions to clear, Deutsche Bank and its parent and

affiliated companies alone had the ability to recover the face value of the Camber Master Trust,

Pivot Master Trust, and Capstan Master Trust securities.

105.    In the absence of Deutsche Bank's undisclosed support bids, a huge percentage of

auctions would have failed.  Indeed, this is precisely what happened in August 2007 – some three

months after Deutsche Bank underwrote the Pivot Master Trust securities and almost immediately after Deutsche Bank underwrote the Capstan Master Trust securities – when Deutsche Bank stopped submitting support bids for the securities that it had underwritten. Immediately following this decision, and beginning in mid-August 2007, the market for these structured securities completely evaporated. It has become apparent that there never really was a functioning market for these securities in the first place, as there was insufficient legitimate third-party demand to clear the auctions. Rather, the appearance of liquidity was pure fiction, as it was entirely dependent upon the willingness of Deutsche Bank to place support bids – support that could be withdrawn at any time.

106.    By manipulating the auctions for the Pivot Master Trust auction rate securities, the predecessor Camber Master Trust auction rate securities, and for other auction rate securities as well, Deutsche Bank prevented investors, such as TAC, from learning the true risk, value, and liquidity features of these securities. TAC relied on the appearance of liquidity created by Deutsche Bank in the market for the Camber Master Trust and Pivot Master Trust auction rate securities when it invested in the Pivot Master Trust and Capstan Master Trust auction rate securities for its working capital account. Had TAC known the true risk, value, and liquidity features of these securities, it never would have purchased them. Indeed, under the investment guidelines and principles that TAC has applied to its working capital account, TAC would have been precluded from acquiring these illiquid securities.

III.     **Deutsche Bank Omitted Material Facts About the Liquidity and Risks of the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust Securities and its Manipulation of the Market for Those Securities**

107.     Deutsche Bank developed and engaged in a comprehensive fraudulent scheme to market and sell the Pivot Master Trust and Capstan Master Trust securities to investors, such as TAC, that included making omissions of material fact.

108.     As previously explained, Deutsche Bank played a central role in drafting the Private Placement Memoranda used in connection with underwriting the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities. Those documents contained, among other things, disclosures about the role of Deutsche Bank in structuring, issuing, underwriting, and trading the Pivot Master Trust and Capstan Master Trust securities. As a result, Deutsche Bank had a duty to ensure that it made full and accurate disclosures about its roles and activities and that the offering documents did not omit information necessary to make those disclosures complete and accurate in all material respects.

109.     In addition, Deutsche Bank had a duty to make full and accurate disclosures of all material information concerning Deutsche Bank's participation as the sole broker-dealer in auctions for the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities. Deutsche Bank was required to make robust disclosures about the nature, extent, and motivation for any trading for its own account in auctions for these securities, including but not limited to disclosures about the extent of its bidding to prevent auction failures, and every instance that Deutsche Bank placed a bid at a price that Deutsche Bank did not believe to be at the then-prevailing market rate at the time it entered the bid. These disclosures included the number, interest rate(s), and amount of any bids made by Deutsche Bank in any previous auction for the

Pivot Master Trust and Capstan Master Trust securities, as well as the effect those bids had on the result of that previous auction.

110. In addition, as *de facto* market maker for the Deutsche Bank-underwritten securities, a position that Deutsche Bank occupied by virtue of its bidding for 100 percent of the securities at auction and its subsequent attempts to sell any inventory it acquired, Deutsche Bank had an affirmative obligation to disclose all material information concerning its role as market maker.

111. Nonetheless, Deutsche Bank knowingly failed to disclose, among other things, that:

   (a) the auction market operated without transparency to investors, thus enabling manipulation by Deutsche Bank in its capacity as the sole broker-dealer for the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities;

   (b) the "auctions" for the Camber Master Trust and Pivot Master Trust securities were not true auctions, as Deutsche Bank submitted "support bids" and engaged in other manipulative practices for its own accounts in all of the auctions for these securities;

   (c) Deutsche Bank submitted bids in auctions for the Camber Master Trust and Pivot Master Trust securities for the full amount of the securities at auction;

   (d) Deutsche Bank routinely intervened in auctions for its own benefit, to set rates and prevent all-hold auctions and failed auctions;

   (e) there was insufficient legitimate third-party demand in a significant number of the auctions for the Camber Master Trust and Pivot Master Trust securities to avoid auction failures;

   (f) there were more sell orders than buy orders in a large percentage of the auctions for the Camber Master Trust and Pivot Master Trust securities, such that Deutsche Bank's bidding activity directly or indirectly set the clearing rate in those auctions;

   (g) without Deutsche Bank's bids in these auctions, the interest rate paid to holders of the Camber Master Trust and Pivot Master Trust securities would have been the fail rate;

(h)     the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities appeared readily liquid only because Deutsche Bank was artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability;

(i)     the short-term liquid nature of the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities and the ability of investors to liquidate these securities at par depended on the perpetuation of the artificial auction rate market created by Deutsche Bank;

(j)     Deutsche Bank had no legitimate investment interest in acquiring the Camber Master Trust and Pivot Master Trust securities, and was actively seeking to sell the securities that it acquired at auction;

(k)     as a result of the involvement of Deutsche Bank in auctions for the Camber Master Trust and Pivot Master Trust securities, Deutsche Bank maintained a substantial inventory of these securities;

(l)     in the event of auction failures, the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust would be saleable only at a substantial discount from their purchase price, if at all; and

(m)     Deutsche Bank underwrote the Capstan Master Trust securities with full knowledge that it would not place any support bids in the auctions, and therefore that there would never be a functioning market for these securities or sufficient market demand to provide the liquidity expected by purchasers.

## IV.    The Market Impact of Deutsche Bank's Manipulative and Deceptive Conduct

112.    By placing bids for its own account in the auctions for the Camber Master Trust and Pivot Master Trust securities, notwithstanding the absence of any legitimate investment interest in owning those securities, Deutsche Bank caused the rates set in the auctions to be lower than they otherwise would have been.  As a result, holders of the Camber Master Trust and Pivot Master Trust securities, including TAC, earned less in interest than they would have earned in the absence of Deutsche Bank's bidding.

113.    Deutsche Bank's practice of placing bids for 100 percent of the securities available for auction in 100 percent of the auctions injected false information into the marketplace about the extent of legitimate third-party demand for the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities.  Deutsche Bank's conduct created the

false impression that there was sufficient liquidity in the auction process for any actual holder or potential purchaser of these securities to be able to sell them at par through the auction process. Deutsche Bank's actions significantly overstated the extent of perceived investor demand for these securities, and created the false impression that the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities would perform like short-term, AAA-rated liquid securities and money market alternatives rather than as illiquid long-term notes.

**V.      Deutsche Bank Has Been the Target of Investigation by Securities Regulators**

114.    As a result of its fraudulent market manipulation and false and misleading misstatements and omissions, Deutsche Bank has been a target of investigations and civil litigation by securities regulators and law enforcement officials since the collapse of the auction rate securities market.  For instance, on August 21, 2008, the New York Attorney General announced that Deutsche Bank had agreed to a settlement-in-principle with state regulators that involves restoring liquidity to certain Deutsche Bank investor clients holding auction rate securities.  In addition, Deutsche Bank agreed to pay state securities regulators a penalty in the amount of $15 million.  The New York Attorney General's Office issued and Deutsche Bank executed an Assurance of Discontinuance on June 3, 2009.

115.    On June 3, 2009, the SEC announced that it had entered into finalized settlements with Deutsche Bank to resolve SEC charges that Deutsche Bank misled investors regarding the liquidity risks associated with auction rate securities that they underwrote, marketed, or sold.  As part of the settlement Deutsche Bank agreed to buy back auction rate securities that have failed at auction since February 13, 2008 and are still owned by individual or small business investors.

## THE RATING AGENCIES ISSUED FALSE AND MISLEADING RATINGS

116.    Credit rating agencies such as Moody's, S&P, and Fitch played an integral, yet improper role in helping investment banks such as Merrill Lynch and Deutsche Bank market and sell auction rate securities and other complex structured finance instruments.  Moody's, S&P, and Fitch are the three largest credit rating agencies and collectively control 90 percent of the market.

## I.    The Rating Agencies Are Required To Be Independent and Objective

117.    Moody's, S&P, and Fitch each held themselves out as the independent "financial gatekeepers" of Wall Street, and in that capacity were responsible for analyzing and rating debt obligations based upon the ability of issuers to make timely payments.  According to their own publications, "[m]aintaining investor confidence in the objectivity of ratings is . . . critical" and "no rating agency can truly add value in the marketplace unless it is prepared to put its integrity on the line in forthright risk opinions – independent of all interested parties including issuers." In addition, each of these rating agencies' code of conduct state that their ratings were independent, objective, and "not . . . affected by the existence of or potential for a business relationship between [the rating agency] . . . and the issuer . . . or any other party, or the non-existence of such a relationship."

118.    Moody's, S&P, and Fitch are "nationally recognized statistical rating organizations" or "NRSROs."  According to the SEC, the "single most important criterion" to granting NRSRO status is that "the rating organization is recognized in the United States as an issuer of credible and reliable ratings by the predominant users of securities ratings."  Part of awarding the NRSRO label to a rating agency hinges on "the rating organization's independence from the companies it rates."

119.    Moody's, S&P, and Fitch have stated in publicly available documents that they conduct extensive due diligence and independent analysis in order to accurately rate investments. For instance, Fitch stated in its application for registration as a NRSRO that "[t]he rating analysis and rating decision is based on a *thorough analysis* of all information known to Fitch and believed by Fitch to be relevant to the analysis and rating decision."  Moody's states in its NRSRO application that "[Moody's] assigns credit ratings through a process that involves *robust analysis* of the Issuer or obligation to be rated, followed by rating committee deliberation and voting, dissemination of the rating, and monitoring the rating as necessary to ensure that it continues to reflect [Moody]'s opinion of the creditworthiness of the Issuer or obligation." Finally, S&P's NRSRO application states that "Standard & Poor's Ratings Services provides a credit rating only when, in its opinion, there is adequate information to form a credible opinion on creditworthiness and only after applicable quantitative, qualitative, and legal analyses are performed.  Throughout the rating and surveillance process, the analytical team reviews information from a variety of public and nonpublic sources."

120.    Each of these rating agencies have also publicly announced that, if they believed they had "inadequate information to provide an informed credit rating to the market, [they] would exercise [their] editorial discretion and [would] either refrain from publishing the opinion or withdraw an outstanding credit rating."

121.    TAC and other investors believed in the integrity of the rating agencies and trusted the accuracy of ratings assigned to auction rate and other securities when making purchasing decisions.  Indeed, TAC's investment guidelines specifically provided that only securities that received particularly high ratings from these rating agencies were eligible investments for TAC's working capital account.

II.     **The Rating Agencies Sacrificed Their Independence for the Enormous Fees Paid by Banks and Issuers**

122.     Beginning in 2000, however, as the investment banks began to churn out more complex instruments such as auction rate securities, derivative notes, and CDOs, the rating agencies quickly abdicated their responsibility as independent and objective referees in order to take part in the massive fees generated by these financial instruments.  Thus, rather than focusing on the task of issuing independent, objective, and accurate credit ratings, Moody's, S&P, and Fitch gravitated to the much more lucrative business of expediting the issuance of securities.

123.     These rating agencies accepted huge payments from the investment banks in exchange for investment-grade ratings on undeserving instruments.  According to numerous published reports and the testimony of high ranking former officers, the credit rating agencies received three to four times the fees for rating a structured finance security than they received for rating a corporate bond.  Such fees were collected for 99.5 percent of the securities that the agencies rated.

124.     In most instances (including the securities at issue here), the securities could not issue and the credit rating agencies would not get paid unless they provided a pre-determined rating.  These financial incentives, as numerous senior officers of the credit rating agencies have acknowledged, led the credit rating agencies to abandon their historical standards and practices.  As explained by former Congressman Christopher H. Shays:  "When the referee is being paid by the players, no one should be surprised when the game spins out of control.  That is what

54

happened on Wall Street when credit rating agencies followed the delirious mob making millions

on mortgage-backed securities and sold their independence to the highest bidder."[25]

125.    In addition to accepting fees from the investment banks for rating investments, the

rating agencies also charged additional high fees to "consult" on structured finance securities,

such as auction rate securities backed by derivative instruments.  In their role as consultants, the

rating agencies worked hand-in-hand with the investment banks like Merrill Lynch and Deutsche

Bank to structure the complex instruments so that they would receive the investment-grade

ratings necessary to place these assets with institutional investors.  The rating agencies knew that

institutional investors were the intended customers of these securities and that institutional

investors would not use their working capital to purchase assets that carried less than an AAA or

AA rating (or their equivalent).  Accordingly, the rating agencies worked closely with the

underwriters to structure complex securities in a manner that would earn the rating agencies'

necessary stamp of imprimatur.

126.    Moody's, S&P, and Fitch got rich in the process.  From 2001 to 2007, Fitch's

revenue from its ratings business grew from approximately $300 million to $890 million,

Moody's revenue from its rating business grew from approximately $690 million to $1.8 billion,

and S&P's revenue from its rating business grew from approximately $1.4 billion to $3 billion.

At Moody's alone, profits quadrupled between 2000 and 2007, and Moody's had the highest

profit margin, on a percentage basis, of any company in the S&P 500 for five years in a row.

The Chief Executive Officers of all three rating agencies collectively made more than $80

million during that time period alone.

---

[25] *Credit Rating Agencies and the Financial Crisis:  Hearing Before the H. Comm. on Oversight and Government Reform*, 110th Congress 12 (2008) (statement of Rep. Christopher H. Shays, H. Comm. on Oversight and Government Reform).

127.    The integrity of the ratings issued by these rating agencies, however, suffered. Because the market for structured finance securities is comprised of a relatively narrow group of repeat sellers (*i.e.*, investment banks), the rating agencies were eager to accommodate the requests of the banks, who were the lifeblood of this market.[26]  The rating agencies' failure to assign a rating consistent with that desired by the bank would lead to a loss of business.  In what has been described as a "race to the bottom," Moody's, S&P, and Fitch engaged in a fierce competition to maintain and increase their market share and profit margin.  As one S&P insider stated in a message that was later presented to Congress, "[w]e rate every deal.  It could be structured by cows, and we would rate it."[27]  Another senior analytical manager made clear in an email that the agency's revenues and market share were the key factors governing its rating assignments:  "I am trying to ascertain whether we can determine at this point if we will suffer any loss of business because of our decision [on assigning separate ratings to principal and interest] and if so, how much."

128.    In a presentation to the company's Board of Directors in October 2007, Moody's Chief Executive Officer admitted that "Analysts and [Managing Directors] are continually pitched by bankers, issuers, investors . . . whose views can color credit judgment . . . (we drink the kool aid).  Coupled with strong internal emphasis on market share and margin focus, this does constitute a risk to ratings quality."  He further stated that "[i]t turns out that rating quality has surprisingly few friends:  issuers want high ratings; investors don't want rating downgrades; short-sighted bankers labor to game the rating agencies for a few extra basis points on

---

[26] For example, in 2006, of the 96,000 structured finance securities rated by Moody's, the ten largest issuers were responsible for over half of Moody's structured finance rating business.

[27] *Id.* at 33 (statement of Rep. John Yarmuth, H. Comm. on Oversight and Government Reform).

execution."  A Moody's Managing Director responsible for rating structured finance transactions would routinely tell his staff, "I will be fired if we lose out on a single deal."

129.    The banks, too, were well aware of – and, indeed, exploited – the financial incentives facing the rating agencies.  An issuer typically requests ratings from several rating agencies.  If the issuer is unhappy with the ratings proposed by one rating agency, the issuer can inform that rating agency of the rating that the other rating agencies have assigned to that particular security.  In that situation, the original rating agency must either loosen its standards to match the ratings assigned by its competitor or risk losing business.  Too often the rating agencies chose the former course, resulting in the "race to the bottom" described above.  As one former Moody's Managing Director testified before Congress in September 2007, "[a]nother aspect of conflict of interest . . . is that . . . rating agencies can come under pressure to loosen their standards for a whole sector.  And this can happen from behavior from the issuers called ratings shopping, where . . . an issuer . . . shows a deal to multiple rating agencies and then picks one or two that have the easiest standards to rate the deal.  Then the other rating agencies that had tougher standards become invisible, and, once more, they don't make any money, because the way you make money . . . is you rate the deal and charge the issuer.  So it puts pressure on the rating agencies to loosen their standards . . . .  [W]e call this competitive laxity."  Thus, for instance, in the context of rating a complex CDO in 2006, a Moody's analyst informed his superiors of S&P's willingness to accept a lower level of credit enhancement:  "FYI – I communicated these levels to [issuer] and they resisted somewhat saying that S&P was 6 notches lower at Aaa and their Ba2 was 6.15 v. our 9.15."  Following this exchange, the Moody's analyst relented and contacted the issuer again with the recommendation that Moody's "reconsider the

previously committed loss coverage levels." Thus, pressure from the issuer, and S&P's lower credit enhancement levels, directly influenced Moody's rating process.

**III.    The Rating Agencies Relaxed and Altered Their Criteria for Rating Structured Finance Products**

130.    Had the rating agencies done their job and acted as the independent "financial gatekeepers" that they held themselves out to be, many of these securities would not have been rated as "investment grade." The rating agencies, however, did not do their jobs. Over time, the rating agencies jettisoned their role as independent reviewers and became actively involved in creating and structuring complex financial products like the auction rate securities at issue here, and relaxed or altered their criteria for rating these securities to ensure that they would receive investment-grade ratings.

131.    The structured finance instruments that generated the exorbitant fees set forth above, quickly became so complicated that the rating agencies did not fully understand them or know how to accurately rate them. As admitted by the Chief Executive Officer of Fitch in 2009, "[i]n the last few years, especially three or four years, and in some securitization markets and with synthetic CDOs, for example, . . . the derivative instruments became so volatile that it is and was hard to assign ratings that would have much stability to them, and that certainly proved to be the case."

132.    The rating agencies therefore deviated from their published rating criteria, including their promises to conduct an independent, "thorough," and "robust" review of the investments prior to assigning an investment-grade rating. As a criteria officer in the structured finance surveillance group of one of the rating agencies noted in a March 14, 2007 email, "our published criteria as it currently stands is a bit too unwieldy and all over the map in terms of being current or comprehensive. It might be too much of a stretch to say that we're complying

with it because *our SF [structure finance] rating approach is inherently flexible and subjective*, while much of our written criteria is detailed and prescriptive." A senior credit analyst at S&P has further stated that the processes by which ratings were derived were "very ad hoc."

133.    When analysts within the rating agencies questioned how they were supposed to accurately rate the securities given a lack of information or a fundamental understanding of how the securities worked, they were admonished by their superiors, and instructed that "it is your responsibility to provide these credit estimates and your responsibility to determine some method for doing so."[28] A former managing Director at S&P stated that when he requested additional information in order to rate a CDO deal, he was told that this request was unreasonable and that it was his job to merely provide an "estimate."

134.    Moreover, the rating agencies went so far as to adjust their prior criteria in an effort to win business. In 2001, S&P relaxed its criteria for rating multiple credit backed obligations, adopting an approach intended to be more aggressive in the sense of providing higher ratings, which S&P's own report acknowledged resulted in a "less conservative evaluation of the credit quality" of such securities as compared to its long-standing approach. Faced with the loss of lucrative (and expanding) business, S&P relaxed its criteria once again in August 2004. In response to a decrease in CDO business as compared to prior quarters, an S&P Managing Director informed her colleagues that "[w]e are meeting with your group this week to discuss adjusting criteria for rating CDOs of real estate assets . . . because of the ongoing threat of losing deals." The head of S&P's CDO unit and a member of its Executive Committee

---

[28] *Id.* at 74 (statement of Rep. John F. Tierney, H. Comm. on Oversight and Government Reform citing an email from Richard Gugliada, dated Mar. 20, 2001).

responded: "OK with me to revise criteria." S&P therefore adjusted its criteria to be no more conservative than its closest competitor, so as not to lose deals to Moody's or Fitch.[29]

135.    Likewise, in 2005, Moody's relaxed its criteria for rating CDOs given the loss of business to S&P for rating the same types of securities. As a result, Moody's implemented an analytical approach that generated credit enhancement levels no more demanding than S&P, to prevent a loss of business. As explained by a Managing Director at Moody's, "[Moody's] continues to recklessly flout procedures and take analytical short cuts in their quest for revenue," and that "the culture at Moody's [is] to never say no to a deal."

136.    These problems were multiplied by the fact that, given the explosion in the number of investments to rate, the rating agencies simply did not have adequate resources to do their job. An analytical manager at one rating agency stated in one email that "[o]ur staffing issues, of course, make it difficult to deliver the value that justifies our fees," while another email complained that "[t]ensions are high. Just too much work, not enough people, pressure from company, quite a bit of turnover and no coordination of the non-deal 'stuff' they want us and our staff to do." As a result, ratings were often issued even when issues raised during the analysis of the deal remained unresolved. An internal rating agency document states that "[w]e didn't ha [sic] time to discuss this in detail at the committee, so they dropped the issue for this deal due to timing. We will need to revisit in the future." Likewise, a former Director of Moody's in the Structured Finance Group has stated that analysts in that group were overwhelmed and needed more resources to manage the growing workload. Nonetheless that former Director stated that

---

[29] The rating agencies also attempted to conceal the laxity of their ratings process. According to an S&P managing director, a memorandum was circulated at S&P instructing employees not to put anything in writing that they would not want the SEC to read. The unwritten rule at S&P was that "[y]ou don't write things down like that. If you have issues, you discuss them in person."

"[a]t the management level, essentially you couldn't say no to any deals.  That was the unwritten rule."  An S&P senior credit analyst has similarly conceded that the structured finance group was "overworked," and lacked the resources necessary to provide the level of scrutiny necessary.

## IV.    The Rating Agencies Failed to Adequately Monitor Their Ratings

137.    The rating agencies further abdicated their duty to regularly and accurately monitor the ratings that had previously been assigned.

138.    The S&P Code of Conduct states that "[S&P] shall allocate adequate personnel and financial resources to monitoring and updating its ratings . . . . [O]nce a rating is assigned [S&P] shall monitor on an ongoing basis and update the rating by:  (a) regularly reviewing the issuer's creditworthiness; (b) initiating review of the status of the rating upon becoming aware of any information that might reasonably be expected to result in a Rating Action (including withdrawal of a rating), consistent with the applicable rating criteria and methodology; and (c) updating on a timely basis the rating, as appropriate, based on the results of such review."  Fitch's disclosures state that "[u]nless they are of a 'point-in-time' nature, Fitch's ratings are monitored on an ongoing basis and Fitch is staffed to ensure that this is possible . . . the review process should be regarded as a continuous one.  Ratings are also subject to formal periodic reviews."  Moody's disclosures state that "[t]he rating process . . . monitors on an ongoing basis to determine whether the rating should be changed, and informs the marketplace and market participants of Moody's actions."

139.    The rating agencies knew, however, that proper surveillance would not only generate very little profit, but may lead to less revenue because there was a real business risk that if the rating agencies downgraded their ratings on outstanding structured finance securities, the banks may withdraw their business.  Thus, for instance, as explained by a senior S&P Managing

Director in Congressional testimony:  "at some point in the mid-1990s, the management in [S&P] decided to make surveillance a profit center instead of an adjunct critical key part of keeping investors informed as to how their investments were performing after they bought bonds.  And as a result, they didn't have the staff or the information.  They didn't even run the ratings model in the surveillance area which would have allowed them to have basically re-rated every deal S&P had rated to that time and see exactly what was going on and whether the support was there for those triple-A bonds."  A former Managing Director at S&P has also stated that his proposals to S&P for a new process that would have let surveillance analysts know that certain securities were deteriorating faster than expected was rejected because it would have a negative impact on S&P's market share.

## V.     The Rating Agencies Knew That Investors Relied on the Accuracy of Their Ratings

140.     The rating agencies and the investment banks knew that the ratings assigned to a security is an integral factor in an investor's investing decision.  The rating agencies and the investment banks also knew that, absent an investment-grade rating, there would be very little interest in and no market for many complex structured finance securities – especially from institutional investors such as TAC that were seeking to invest their working capital solely in safe investments that carried AAA or AA ratings (or their equivalents).  Indeed, the securities themselves were structured with that knowledge in mind – the offering memoranda for structured securities would explicitly state that the deal would not close and the securities would not issue unless they received a specified rating from the credit rating agencies.

141.     Because of the complexity and lack of transparency surrounding many of the issuers of auction rate securities and the complex financial instruments that underlay them, prospective investors, including institutional investors like TAC, relied heavily upon the credit

rating agencies and the integrity of their analyses.  In contrast to publicly traded companies that are required to provide broad disclosures of their financial position and have countless analysts dissecting and explaining those disclosures to the investing public, there is virtually no transparency regarding the issuers of auction rate securities backed by ABS or derivative securities.  As stated by a former Managing Director at Moody's, "[s]omehow unique to the structured finance [security] market is the opacity of the rated securities.  In certain situations, the details of the underlying asset pool and often the structure of the transaction are not publicly available for external scrutiny. . . ."  Investors must therefore necessarily rely on rating agencies to provide independent and unbiased analysis of the creditworthiness of the securities.  The rating agencies intended that the narrow class of potential investors in structured finance securities be the primary recipients of the information that a rating is meant to provide.  They also knew that issuers sought to obtain a credit rating for the specific purpose of making the risk characteristics of the structured finance security understandable to investors.

142.    Moreover, the rating agencies represented that their ratings were on one uniform scale and could be compared to one another even when used for different asset types, such as corporate bonds, U.S. Treasury bonds, and structured finance securities.  The rating agencies therefore knew that institutional investors, such as TAC, believed that an investment-grade rating denoted not only credit quality, but also – as in the case of any corporate bond or U.S. Treasury bond – that the security could be readily liquidated.  This was especially true in the case of ARS, which were marketed by underwriters such as Merrill Lynch and Deutsche Bank as highly liquid cash-equivalents.  The rating agencies understood how underwriters were marketing auction rate securities, and they knew that the high ratings the rating agencies assigned were being used to represent to prospective investors that these securities were safe and liquid investments.  Indeed,

there would not have been a robust market for auction rate securities at all – and thus no robust market for the ratings of such securities – were it not for the imprimatur and implicit guaranty of liquidity that the assignment of investment-grade ratings carried. On information and belief, the rating agencies were well aware of this fact.

143.    Nonetheless, the rating agencies knowingly, or through gross negligence, assigned investment-grade ratings to the vast majority of structured finance securities, including the complex auction rate securities such as those at issue in this action, without regard to whether the underlying security deserved an investment-grade rating and notwithstanding their knowledge that investors would equate an investment-grade rating with liquidity. Although they were aware of how their ratings were used in marketing these securities, S&P, Moody's, and Fitch made no effort to disabuse investors of the belief that the investment-grade ratings assigned to auction rate securities meant that those securities were highly liquid.

144.    Furthermore, although the credit markets began to tighten in the summer of 2007, and investment banks such as Merrill Lynch and Deutsche Bank decided to sell off their own inventory of auction rate securities backed by derivative instruments and decided not to submit any further "support bids," the rating agencies continued to assign high investment-grade ratings to these same securities. As one S&P analyst stated at the time, "[l]et's hope we are all wealthy and retired by the time this house of cards falters."[30]

**VI.    The Weaknesses in the Rating Agencies' Processes Have Been Well Documented**

145.    The significant weaknesses in the rating agencies' processes have been well documented. For instance, in July 2008, the SEC issued a "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies." This report focused

---

[30] *Id.* at 33 (statement of Rep. Waxman citing an email from Chris Meyer, dated Dec. 15, 2006).

exclusively on S&P, Moody's, and Fitch, and found that:  (a) significant aspects of the rating process were not disclosed; (b) policies and procedures for rating investments were not adequately documented; (c) the rating agencies did not adequately document significant steps in the rating process – including the rationale for deviations from their models and for rating committee actions and decisions – and they did not adequately document significant participants in the rating process; and (d) the agencies did not adequately manage their conflicts of interest.

## VII.    The Dutch Harbor and Anchorage Finance Securities

146.    The Dutch Harbor and Anchorage Finance securities underwritten by Merrill Lynch were rated by S&P and Moody's.  S&P assigned these securities an AA rating, reserved for securities where the "obligor's capacity to meet its financial commitment on the obligation is very strong."  Moody's assigned an Aa2 rating to these securities, which is reserved for those securities "judged to be of high quality and . . . subject to very low credit risk."

147.    The ratings assigned by S&P and Moody's are explicitly referenced in the Dutch Harbor and Anchorage Finance offering statements, and indeed these securities could not have been issued unless they received at least an "Aa2" rating from Moody's and an "AA" rating from S&P.  The Dutch Harbor offering statement states that these "securities will be rated at least 'Aa2' by Moody's and 'AA' by Standard & Poor's."  The same statements appear in the Anchorage Finance offering statement.

A.    <u>The Ratings Given to the Dutch Harbor and Anchorage Finance Securities Were False and Misleading</u>

148.    For a number of reasons, the ratings given to the Dutch Harbor and Anchorage Finance securities were false and misleading at the time they were issued, and over time as the securities continued to be traded through periodic auctions.

149.    First, the ratings assigned by Moody's and S&P were false and misleading because the rating agencies should not have assigned any rating to the Dutch Harbor and Anchorage Finance securities in the first place.  Credit ratings model the probability that an issuer can meet its obligations when due – *i.e.*, interest payments on the scheduled interest payment dates and the principal payments at maturity.  However, the structure of the Dutch Harbor and Anchorage Finance securities was such that Ambac was given the option of converting a *fixed-term* note issued by a special purpose vehicle (*i.e.*, the Dutch Harbor or Anchorage Finance auction rate securities) into a *perpetual* equity security issued by Ambac, which did not trade on any public market and which could not be sold on the secondary market (*i.e.*, Ambac preferred shares).  *See supra* paragraph 150.  Given the put feature inherent in the Dutch Harbor and Anchorage Finance securities, no rating should have been assigned to these securities, as there was no way of modeling the probability of default.  At any time, Ambac had full discretion to exercise the put feature, which effectively extends the maturity date into infinity and deprives investors of any right to both periodic interest payments and principal repayment. Stated otherwise, S&P and Moody's were not rating a static pool of collateral underlying the Dutch Harbor and Anchorage Finance securities, but rather collateral that could disappear at the whim of Ambac.  Prior to the Dutch Harbor and Anchorage Finance securities, it does not appear that any similarly structured security had ever been rated by the rating agencies, precisely because such securities should not be assigned credit ratings in the first place.

150.    Second, even assuming that the Dutch Harbor and Anchorage Finance securities could have been assigned a rating, that rating should have been downgraded by no later than 2006 and 2007 when TAC purchased these securities.  Moody's and S&P's public disclosures regarding their ratings of the Dutch Harbor and Anchorage Finance securities both state that the

assigned rating of those securities were directly tied to, and derivative of, the ratings that

Moody's and S&P assigned to Ambac, and were based on the rating that would have been

assigned to Ambac's preferred shares.[31]  In their initial ratings, Moody's and S&P asserted that

Ambac preferred shares would have been given an Aa2 or AA rating, respectively.  According to

Moody's:  "Moody's provisional rating assessment of Ambac Assurance's preferred stock

should such stock be issued is Aa2, based on the limited risk characteristics of the company's

core business, its strong capital base, solid underwriting and surveillance efforts, and profitable

financial results."  S&P similarly stated that the "'AA' rating on Ambac's preferred stock

reflects the subordinated nature of preferred obligations versus policyholder obligations.  The

outlook on Ambac's rating is stable, reflecting the company's strong franchise value, solid

capital position, and prudent underwriting strategy."  Moody's and S&P both assigned a rating

that was one step lower than the rating they assigned to Ambac's debt in order to reflect the

subordinated status of the preferred shares.  S&P reaffirmed its AA rating of Anchorage Finance

and Dutch Harbor at least as late as February 2008, Moody's reaffirmed its Aa2 rating of these

securities as late as December 2007, and both rating agencies failed to downgrade either Ambac

or Anchorage Finance and Dutch Harbor until June 2008.

---

[31] *See* S&P Global Bond Insurance, *Anchorage Finance Sub-Trusts I, II, III, IV* (2006) ("The 'AA' rating on the asset-backed capital commitment securities (ABC securities) issued by Anchorage Finance Sub-Trusts I, II, III, and IV reflects the 'AA' rating that would be applied to Ambac Assuracnce Corp.'s (Ambac) preferred stock."); Moody's Investor Service, *Moody's Assigns Ratings of Aa2 to ABC Securities Issued By Ambac-Linked Dutch Harbor Finance Sub-Trusts I, II, III and IV* (Dec. 3, 2001) ("the rating of the ABC securities is a reflection of both the eligible asset guidelines of the Sub-Trusts prior to any conversion by Ambac Assurance, as well as the rating of Ambac Assurance's perpetual preferred stock should the put be exercised"); Moody's Investor Service, *Moody's Assigns Ratings of Aa2 to ABC Securities Issued By Ambac-Linked Anchorage Finance Sub-Trusts I, II, III and IV* (May 24, 2001) ("the rating of the ABC securities is a reflection of both the eligible asset guidelines of the Sub-Trusts prior to any conversion by Ambac Assurance, as well as the rating of Ambac Assurance's perpetual preferred stock should the put be exercised").

151.    By mid-2006 and early 2007, however, S&P and Moody's knew or reasonably should have known that Ambac did not deserve an AAA debt rating, and therefore also knew or reasonably should have known that Ambac preferred shares could not carry an Aa2 or AA rating. Unbeknownst to TAC and other investors, the ratings assigned to the Dutch Harbor and Anchorage Finance securities were therefore false and misleading, and it was incumbent upon S&P and Moody's to downgrade them.

152.    From 2001 through 2007, Ambac guaranteed increasing amounts of structured finance products.  Ambac's guarantees in force related to structured finance products in the United States more than doubled from approximately $88.7 billion in 2001 to $170.7 billion in 2007, and its guarantees in force related to CDOs alone grew more than 700 percent from $7.06 billion in 2001 to $51.3 billion in 2007.  Moody's and S&P were well aware of these exposures – including the extent to which Ambac had guaranteed risky financial products tied to subprime mortgages and other toxic assets – given that Moody's and S&P not only issued ratings for Ambac, but also rated the structured finance products (including CDOs) that Ambac guaranteed.[32]  A huge percentage of these structured finance products (at least 60 percent of subprime related securities and at least 42 percent of CDOs) are now below investment-grade.

153.    Because Ambac's financial stability was and is directly related to the credit quality of the securities it guarantees, Moody's and S&P knew, or in the exercise of reasonable care should have known, that Ambac did not deserve the AAA debt rating that was the source of the rating assigned to the Dutch Harbor and Anchorage Finance structures.  Moody's and S&P,

---

[32] Indeed, Moody's and S&P rated a large majority of the structured finance securities issued into the global capital markets.  Moody's rated over 90 percent of the structured finance securities issued into the global capital markets, including 91.5 percent of the CDOs issued in 2003, 76.8 percent of the CDOs issued in 2004, 85.1 percent of the CDOs issued in 2005, and 96.8 percent of the CDOs issued in 2006.  In 2006, S&P rated 97.5 percent of all CDOs issued.

however, did not downgrade their ratings of Ambac until well after the rating agencies knew or

should have known that such downgrade was necessary (and well after TAC purchased the

Anchorage Finance and Dutch Harbor securities) either because Moody's and S&P failed to

monitor these ratings, and/or because doing so would be against their self interest, given the

interlocking relationship between Ambac, the rating agencies, and the public and structured

finance products that were the source of Moody's and S&P's massive revenue growth.  Any

downgrade in Ambac would have caused a cascade effect in which Moody's and S&P would be

forced to re-evaluate and downgrade a large number of the public obligations (including

municipal bonds) and structured finance obligations that were guaranteed by Ambac, and further

would be forced to assign lesser ratings to securities that were to be guaranteed by Ambac in the

future.  Because the payments received by the rating agencies were contingent on issuing

investment-grade ratings for the subject securities, any downgrade of a monoline insurance

organization such as Ambac would therefore have had a devastating impact on Moody's and

S&P's ability to generate revenues.

   154. Third, the ratings assigned to the Dutch Harbor and Anchorage Finance securities

were false and misleading because, as described above, *see supra* paragraphs 148-156, the Dutch

Harbor and Anchorage Finance securities were contingent capital arrangements and designed to

ensure that Ambac had an available pool of cash in the event of a catastrophic event.  Thus, the

most likely time that Ambac would access this contingent capital was when Ambac's capital

position had significantly deteriorated.  As a result, the ratings for the Anchorage Finance and

Dutch Harbor securities (assuming that ratings should have been assigned in the first place)

should not have been based on the credit quality of Ambac at the time the securities were issued,

but rather on the likely low credit quality of Ambac when the put feature would most likely be

exercised.  Accordingly, the ratings given to the Anchorage Finance and Dutch Harbor securities should have been significantly lower than the AA and Aa2 rating that were assigned and later reaffirmed by S&P and Moody's, and in any case should have been far lower than a one level departure from the debt rating assigned to Ambac.  Indeed, as described below, *see infra* paragraph 194, Ambac exercised its put option in December 2008 following write-downs of several billion dollars and a significant downgrade or withdrawal of its credit rating by Fitch, S&P, and Moody's.[33]  At or around that time, S&P withdrew its ratings for the Dutch Harbor and Anchorage Finance securities altogether, and Moody's would do so three months later in March 2009.

155.    Fourth, the ratings assigned to the Dutch Harbor and Anchorage Finance securities were false and misleading because, as explained above, *see supra* paragraphs 140-144, S&P and Moody's knew that investors – including TAC – understood strong ratings to be a representation about the ready liquidity of these securities.

156.    But S&P's and Moody's representations of liquidity for the Dutch Harbor and Anchorage Finance securities failed to account for (and failed to disclose) the facts that: (a) there was no actual legitimate market for these securities, and the appearance of a liquid and efficient market was created exclusively through Merrill Lynch's artificial support bids; (b) the auction markets would have routinely failed without these support bids; and (c) in the event of auction failures, the Dutch Harbor and Anchorage Finance securities would be saleable only at a substantial discount from their par value, if at all.  In addition, S&P and Moody's either knew, or were reckless or negligent in failing to learn, that participating broker-dealers were placing

---

[33] In June 2008, Fitch withdrew its rating for Ambac altogether.  In November 2008, S&P downgraded the debt rating of Ambac to A and Moody's downgraded the debt rating of Ambac to Baa1.

support bids in nearly 100 percent of the auctions for auction rate securities and, accordingly,

that there was no efficient, liquid market for either the Dutch Harbor or the Anchorage Finance

securities.

      B.    <u>S&P and Moody's Received Fees for Structuring and Rating the Dutch Harbor and Anchorage Finance Securities</u>

      157.    S&P and Moody's received fees directly from Merrill Lynch and/or Ambac in

exchange for assigning "AA" and "Aa2" ratings, respectively, to these securities.  On

information and belief, these fees were consistent with the fees that S&P and Moody's received

for other structured finance products and were three to four times the amount that these rating

agencies would have received for rating a corporate bond.

      158.    In addition, on information and belief, S&P and Moody's consulted in structuring

these securities such that they would bear an "AA" and "Aa2" rating.

      159.    To preserve the lucrative income stream offered by issuers and underwriters,

Moody's and S&P abdicated their role as independent and objective evaluators of credit quality.

As set forth above, Moody's and S&P assigned ratings to the Dutch Harbor and Anchorage

Finance securities when none should have been assigned in the first instance, and also failed to

downgrade these ratings when it became clear that the credit quality of Ambac did not support

these ratings.

      160.    S&P and Moody's claimed to have conducted extensive due diligence and

independent analysis in connection with assigning their ratings to the Dutch Harbor and

Anchorage Finance securities and to have routinely monitored the ratings assigned to these

securities.  For the reasons set forth above, if S&P and Moody's did, in fact, conduct this due

diligence and actively monitored these securities, they knew or should have known that these

securities did not deserve the "AA" and "Aa2" rating assigned to them.  If, on the other hand,

they did not conduct this due diligence and did not actively monitor these securities, then they were negligent in failing to do so.

      C.      The Ratings Given to the Dutch Harbor and Anchorage Finance Securities Were Intended For a Limited Subset of Investors

161.    Because the Dutch Harbor and Anchorage Finance securities were unregistered securities intended only for qualified institutional buyers ("QIBs") such as TAC, the ratings S&P and Moody's assigned to these securities were not intended for the general public, but instead for a very limited subset of investors.

162.    Moreover, both S&P and Moody's knew that potential QIBs would rely on the ratings assigned to these securities, as these ratings are prominently featured in the Offering Memoranda and routinely communicated by those marketing the securities as among their most critical features. Indeed, given the complexity and lack of transparency surrounding the Dutch Harbor and Anchorage Finance securities, and the fact that the details of the underlying asset pools were never disclosed to the investing public, the ratings issued by S&P and Moody's were the only basis by which prospective investors could evaluate the credit quality of these securities.

      D.      TAC Relied on the Ratings Given to the Dutch Harbor and Anchorage Finance Securities in Purchasing These Securities

163.    TAC relied on the investment-grade rating assigned by S&P and Moody's in making its purchasing decision. Had TAC known that these ratings were false and misleading, it never would have purchased the Dutch Harbor and Anchorage Finance securities for TAC's working capital account.

      E.      Moody's and S&P Downgrade the Dutch Harbor and Anchorage Finance Securities

164.    Well after the market for the Dutch Harbor and Anchorage Finance securities had completely evaporated, S&P and Moody's downgraded their ratings for these securities. On

June 5, 2008, S&P reassigned an "A" rating to these securities; on November 19, 2008, S&P reassigned a "BBB"[34] rating to these securities; and, on December 10, 2008, S&P withdrew its ratings for these securities altogether.  Likewise, on March 12, 2008, Moody's reassigned an "Aa3" rating to these securities; on June 19, 2008, Moody's reassigned an "A3" rating to these securities; on November 5, 2008, Moody's reassigned a "Ba1"[35] rating to these securities; and, on March 3, 2009, Moody's withdrew its ratings for these securities altogether.

165.    The nature and extent of these downgrades, and the speed with which they occurred, also indicate that the initial ratings assigned to these securities by S&P and Moody's were false and misleading, and/or that S&P and Moody's acted negligently in assigning them.

## VIII.   The Pivot Master Trust and Capstan Master Trust Securities

166.    The Pivot Master Trust and Capstan Master Trust securities underwritten by Deutsche Bank were rated by S&P and Fitch.[36]  S&P assigned these securities an AAA rating, its highest, which expresses the conclusion that "[t]he obligor's capacity to meet its financial commitment on the obligation is extremely strong."  Fitch also assigned an AAA rating to these securities, which is reserved for those securities "of the highest credit quality.  'AAA' ratings denote the lowest expectation of credit risk.  They are assigned only in cases of exceptionally

---

[34] "An obligation rated 'BBB' exhibits adequate protection parameters.  However, adverse economic conditions or changing circumstances are more likely to lead to a weakened capacity of the obligor to meet its financial commitment on the obligation."

[35] "Obligations rated Ba1 are judged to have speculative elements and are subject to substantial credit risk."

[36] The Private Placement Memoranda for the Pivot Master Trust and Capstan Master Trust securities state that Fitch Ratings will assign the ratings issued to these securities.  The ratings letters for these securities state that the ratings were assigned by Fitch, which "means Fitch, Inc., Fitch Ratings, Ltd. and their subsidiaries including Derivative Fitch, Inc. and Derivative Fitch Ltd. and any successor or successors thereto."

strong capacity for payment of financial commitments.  This capacity is highly unlikely to be adversely affected by foreseeable events."

167.    The ratings assigned by S&P and Fitch are explicitly referenced in the Pivot Master Trust and Capstan Master Trust offering statements, and indeed these securities could not have been issued unless they received an "AAA" rating from both Fitch and S&P.  Both offering statements state that "[i]t is a condition to issuance of the Certificates of any Series that they shall have been rated 'AAA' by Fitch Ratings ('Fitch') and 'AAA' by Standard and Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. ('S&P')."  Notably, however, Fitch did not publicize its ratings for the Pivot Master Trust or Capstan Master Trust securities until *after* the market for these securities had collapsed.  Fitch first publicized the AAA rating it assigned to the Capstan Master Trust on September 13, 2007, announcing that the rating's "effective date" was August 1, 2007.  Fitch first publicized the AAA rating it originally assigned to the Pivot Master Trust on May 15, 2008, the same day that it announced that the Pivot Master Trust securities were being placed on "Rating Watch Negative."

A.    The Ratings Given to the Pivot Master Trust and Capstan Master Trust Securities Were False and Misleading

168.    The AAA ratings assigned to the Pivot Master Trust and Capstan Master Trust securities were false and misleading for at least three independent reasons.

169.    First, the ratings assigned to these securities were based on a statistical analysis of the pool of reference securities that were the subject of the CDS between the special purpose vehicle and Deutsche Bank AG.  The special purpose vehicle trust was not required to make payments on the CDS until a certain percentage of the pool of reference securities suffered a credit event.  This percentage is referred to as the "attachment point."  Although not disclosed in the offering documents, Deutsche Bank has subsequently represented that the attachment point

was 7.8 percent in the case of the Pivot Master Trust securities and 9.75 percent in the case of

Capstan Master Trust securities.  If a greater percentage of the pool of reference securities

suffered a credit event, then the special purpose trust would be required to sell a portion of the

collateral underlying the Pivot Master Trust and Capstan Master Trust securities and make a

payment to Deutsche Bank AG on the CDS.  Each such payment would eviscerate the Pivot

Master Trust's and Capstan Master Trust's ability to make interest payments and return principal

to purchasers upon maturity.  Indeed, if an additional 1 percent of either pool of reference

securities experienced a credit event, then 100 percent of the collateral underlying these

securities would be eliminated and the securities holders would be wiped out altogether.

170.    Based on two accepted industry statistical practices, and published default rates

for the portfolio of reference securities subject to the CDS, in order for the Capstan Master Trust

securities to warrant an "AAA" rating, the attachment point would have to be either 12.70

percent or 12.75 percent.  The 9.75 percent attachment point assigned to the Capstan Master

Trust securities would at best warrant an "A" rating.  Similarly, in order for the Pivot Master

Trust securities to warrant an "AAA" rating, the attachment point would have to be either 9.01

percent or 10.56 percent.  The 7.8 percent attachment point assigned to the Pivot Master Trust

securities would at best warrant an "AA-" rating.  Accordingly, the AAA ratings assigned by

both S&P and Fitch to the Capstan Master Trust and Pivot Master Trust securities were false and

misleading at the time the ratings were assigned and at all points thereafter.

171.    Second, the AAA ratings assigned to the Pivot Master Trust and Capstan Master

Trust securities were false and misleading for another, independent reason.  As set forth in

paragraphs 83 through 87, the structure of the Pivot Master Trust and Capstan Master Trust

securities was such that the interest on the ARS securities was dependent on a series of basis

swaps that were entered into with Deutsche Bank AG as swap counter-party.  Accordingly, the ability of the Pivot Master Trust and Capstan Master Trust to meet its interest payment obligations is directly dependent on the credit worthiness of Deutsche Bank AG.

172.    S&P's publicized rating criteria for structured finance products indicates that it follows the "weak-link" ratings approach, meaning that the credit rating assigned to a structured finance product (such as the Pivot Master Trust and Capstan Master Trust securities) can only be as high as the weakest link in the structured finance payment chain.  For instance, S&P's ratings criteria states that an "'AAA' rated structured transaction require[s] . . . a hedge agreement with, or guaranteed by, a derivative product company rated 'AAA' or 'AAAt.'"  Accordingly, to justify an AAA rating for the Pivot Master Trust and Capstan Master Trust securities, Deutsche Bank AG, as swap counter-party to the basis swap, would also have to be AAA-rated.  This, however, was not the case.  At the time that the Pivot Master Trust and Capstan Master Trust securities were issued, Deutsche Bank AG was rated AA-, meaning that the Pivot Master Trust and Capstan Master Trust securities could merit a rating no higher than AA- (even if they had been assigned a higher attachment point).

173.    On information and belief, given the AAA rating assigned by S&P, it was necessary for Fitch to assign an AAA rating to the Pivot Master Trust and Capstan Master Trust securities as well in order to collect fees on the deal.

174.    Third, the ratings assigned to Pivot Master Trust and Capstan Master Trust were false and misleading because, as explained above, *see supra* paragraphs 168-175, S&P and Fitch knew that investors – including TAC – understood these AAA ratings to be a representation about the ready liquidity of these securities.

175.    But the rating agencies' representations of liquidity for Pivot Master Trust and Capstan Master Trust securities failed to account for (and failed to disclose) the facts that (a) there was no actual legitimate market for these securities, and the appearance of a liquid and efficient market was created exclusively through Deutsche Bank's artificial support bids; (b) the auction markets would have routinely failed without these support bids; and (c) in the event of auction failures, the Pivot Master Trust and Capstan Master Trust securities would be saleable only at a substantial discount from their par value, if at all.  In addition, S&P and Fitch either knew, or were reckless or negligent in failing to learn, that participating broker-dealers were placing support bids in nearly 100 percent of the auctions for auction rate securities and, accordingly, that there was no efficient, liquid market for either the Pivot Master Trust or Capstan Master Trust securities.

B.    S&P and Fitch Received Fees for Structuring and Rating the Pivot Master Trust and Capstan Master Trust Securities

176.    S&P and Fitch received fees directly from Deutsche Bank in exchange for assigning "AAA" ratings to these securities.  On information and belief, these fees were consistent with the fees that S&P and Fitch received for other structured finance products and were three to four times the amount that these rating agencies would have received for rating a corporate bond.

177.    In addition, on information and belief, S&P and Fitch consulted with Deutsche Bank in structuring these securities such that they would bear an "AAA" rating.

178.    To preserve the lucrative income stream offered by issuers and underwriters, Moody's and S&P abdicated their role as independent and objective evaluators of credit quality. As set forth above, S&P and Fitch assigned false and misleading ratings to the Pivot Master Trust and Capstan Master Trust securities.

179.    S&P and Fitch claimed to have conducted extensive due diligence in connection with assigning their ratings to the Pivot Master Trust and Capstan Master Trust securities.  If indeed they did conduct this due diligence, however, they knew or should have known that these securities did not deserve the "AAA" rating assigned by them.  If, on the other hand, they did not conduct this due diligence, then they were negligent in failing to do so.

C.    The Ratings Given to the Pivot Master Trust and Capstan Master Trust Securities Were Intended For a Limited Subset of Investors

180.    Because the Pivot Master Trust and Capstan Master Trust securities were unregistered securities intended only for QIBs like TAC, the ratings S&P and Fitch assigned to these securities were not intended for the general public, but instead for a very limited subset of investors.

181.    Moreover, both S&P and Fitch knew that potential QIBs would rely on the ratings assigned to these securities, as these ratings are prominently stated in the Offering Memorandum and routinely communicated by those marketing the securities as among their most critical features.  Indeed, given the complexity and lack of transparency surrounding the Pivot Master Trust and Capstan Master Trust securities, and the fact that the details of the underlying asset pools and reference securities were never fully disclosed to the investing public, the ratings issued by S&P and Fitch were the only basis by which prospective investors could evaluate the credit quality of these securities.

D.    TAC Relied on the Ratings Given to the Pivot Master Trust and Capstan Master Trust Securities in Purchasing These Securities

182.    TAC relied on the "AAA" rating assigned by S&P and Fitch in making its purchasing decision.  Had it known that these ratings were false and misleading, TAC never

would have purchased the Pivot Master Trust and Capstan Master Trust securities for its working capital account.

E.    S&P and Fitch Downgrade the Dutch Harbor and Anchorage Finance Securities

183.    Well after the market for the Pivot Master Trust and Capstan Master Trust securities had completely evaporated, S&P and Fitch downgraded their ratings for these securities. On December 18, 2008, S&P reassigned a "BBB" rating to the Capstan Master Trust securities and, on May 12, 2009, S&P reduced their rating to "BB-."[37] On July 23, 2008, Fitch reassigned an "A" rating to the Capstan Master Trust securities. Fitch lowered the rating to "BB"[38] on May 1, 2009, and reduced it further to "BB-" on May 26, 2009.

184.    Between December 29, 2008 and May 7, 2009, S&P lowered its rating of the Pivot Master Trust securities on four separate occasions, and they now carry a "BB-" rating. Fitch has similarly reduced its rating of the Pivot Master Trust securities on four occasions, such that they are now rated "BB-" by Fitch.

185.    The nature and extent of these downgrades also indicate that the initial ratings assigned to these securities by S&P and Fitch were false and misleading, and/or that S&P and Fitch acted negligently in assigning them.

**TAC'S PURCHASES OF THE MERRILL LYNCH AND DEUTSCHE BANK SECURITIES, AND ITS INABILITY TO SELL THOSE SECURITIES**

186.    As set forth above, TAC sought to invest its working capital exclusively in conservative, short-term, investment-grade securities. TAC purchased the Merrill Lynch- and Deutsche Bank-underwritten securities based on its understanding that these securities would

---

[37] An obligation rated "BB" by S&P "faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation."

[38] Fitch's "'BB' ratings indicate an elevated vulnerability to default risk, particularly in the event of adverse changes in business or economic conditions over time."

perform like highly liquid, safe, short-term debt securities. TAC believed that investments in securities of this nature would enable TAC to maximize the return on its cash, while ensuring TAC that the funds could be converted to cash on short notice. TAC had a range of conservative, short-term, investment-grade securities available to it that were consistent with TAC's goals of safety and liquidity.

**I.    The Dutch Harbor and Anchorage Finance Auction Rate Securities**

187.    Between June 2004 and October 2005, TAC purchased and then resold, in the aggregate tens of millions of dollars of securities issued by the Anchorage Finance Sub-Trust and the Dutch Harbor Finance Sub-Trust, as set forth below:

| Series | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Anchorage Finance Sub-Trust I | $5,000,000 | 6/30/2004 | 2/9/2005 |
| Anchorage Finance Sub-Trust III | $10,000,000 | 7/13/2005 | 10/5/2005 |
| Dutch Harbor Finance Sub-Trust I | $2,500,000 | 8/12/2005 | 9/9/2005 |
| Dutch Harbor Finance Sub-Trust III | $5,000,000 | 6/4/2004 | 2/11/2005 |
| Dutch Harbor Finance Sub-Trust III | $5,000,000 | 10/22/2004 | 2/11/2005 |

188.    The "auction" feature of Dutch Harbor and Anchorage Finance securities was attractive to TAC for a number of reasons. Among other things, TAC believed that the "auction" feature would allow TAC to sell these securities on short notice, at par, through the auction process. It also afforded TAC the opportunity to decide whether to hold or sell the securities, depending on the rate of interest established by the auction process and rates for other short-term, liquid, highly rated securities. Based on its prior experience, TAC therefore believed that the Dutch Harbor and Anchorage Finance securities would perform like a short-term, investment-grade debt security and would pay a market rate of interest for similar securities. TAC also

believed that these securities were highly liquid and could be sold at par, if not immediately, then in the periodic auctions.

189.    On or about July 21, 2006, TAC purchased $7.95 million worth of Dutch Harbor Finance Sub-Trust #II auction rate securities through Credit Suisse.  On or about January 25, 2007, TAC purchased $5 million worth of Dutch Harbor Finance Sub-Trust #III auction rate securities and $6 million worth of Anchorage Finance Sub-Trust #2 auction rate securities, also through Credit Suisse.

190.    As detailed above, Merrill Lynch was the sole broker-dealer for the Dutch Harbor and Anchorage Finance securities and, among other things, deceptively and manipulatively placed bids for its own account in 100 percent of the auctions for these securities, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Merrill Lynch knew, there was a lack of bona fide purchasers of the Dutch Harbor and Anchorage Finance securities.  Had TAC been aware of these deceptive and manipulative activities of Merrill Lynch, it would not have purchased any of these securities.

191.    TAC also relied on its previous ability to sell Dutch Harbor and Anchorage Finance securities at auction, as set forth in paragraph 187, and on the investment-grade ratings given to these securities by Moody's and S&P.  Had TAC been aware that the appearance of liquidity was created through Merrill Lynch's market manipulation or that the ratings assigned to these securities were false and misleading, it would not have purchased any of these securities.

192.    On or about August 16, 2007, TAC first tried to sell its Dutch Harbor Finance Sub-Trust #II securities, but the auction for those securities failed.  TAC also was unable to sell

its other Dutch Harbor and Anchorage Finance securities at their subsequent auctions.  On or about August 23, 2007, the Dutch Harbor Finance Sub-Trust #III auction failed.  On August 28, 2007, the Anchorage Finance Sub-Trust #II auction failed.

193.    At each subsequent auction, TAC attempted to sell all of its holdings of the Dutch Harbor and Anchorage Finance securities.  Each successive auction has also failed, such that TAC was left holding $18.95 million of these illiquid and severely impaired securities. Throughout this time period, Merrill Lynch received fees in connection with each failed auction.

194.    On December 3, 2008, Ambac announced that it was exercising its put rights to the Dutch Harbor and Anchorage Finance Sub-Trusts.  Thereafter, all of the commercial paper held by the relevant Sub-Trusts was liquidated and paid out to Ambac.  TAC received Ambac Auction Market Preferred shares ("AMPs"), which it has been unable to sell in any subsequent auction.  These AMPs are perpetual in nature, such that TAC faces the virtual certainty that it will never recover any of its investment in either the Anchorage Finance or Dutch Harbor securities.  On or about August 1, 2009, Ambac discontinued payment of the dividends on the AMPs, and therefore TAC is holding securities that earn no interest and are completely unsaleable.

## II.    The Pivot Master Trust and Capstan Master Trust Auction Rate Securities

195.    Between October 2006 and August 2007, TAC purchased and then resold, $10 million in securities issued by the Camber Master Trust, as set forth below:

| Series | Amount Purchased | Date Purchased | Date Sold |
|---|---|---|---|
| Camber Master Trust - Series 3 | $10,000,000 | 10/10/06 | 6/27/2007 |

196.    Based on its prior experience with the Camber Master Trust securities, TAC therefore believed that the Pivot Master Trust and Capstan Master Trust securities, which are

identically structured, would perform like a short-term, investment-grade debt security and would pay a market rate of interest for similar securities. TAC also believed that these securities were highly liquid and could be sold at par, if not immediately, then in the periodic auctions.

197.    On or about May 8, 2007, TAC purchased $20 million of Pivot Master Trust – Series 1 securities through Credit Suisse. On or about August 1, 2007, TAC purchased $10 million of Capstan Master Trust – Series 1 securities, and $10 million of Capstan Master Trust – Series 2 securities also through Credit Suisse.

198.    TAC purchased the Pivot Master Trust Series 1 and Capstan Master Trust Series 1 and 2 securities in the initial offering for these securities. The Private Placement Memoranda for both the Pivot Master Trust and Capstan Master Trust securities make clear that Deutsche Bank was the seller of all the securities in the initial offering: "Deutsche Bank Securities, Inc. will be the initial purchaser . . . of the Series for the private placement of the Certificates" and the "Certificates are being offered by the Initial Purchaser." Deutsche Bank knew that Credit Suisse did not make purchases of the Deutsche Bank-underwritten securities for its own account, but rather served only as an intermediary for purchases made by its brokerage customers, such as TAC.

199.    As set forth above, Deutsche Bank was the sole broker-dealer for the Pivot Master Trust and Capstan Master Trust securities and, among other things, deceptively and manipulatively placed bids for its own account in 100 percent of the auctions for the Pivot Master Trust securities and the identically structured Camber Master Trust securities, including bids in amounts that would prevent an auction from failing, bids at rates that were intended to alter the interest rate at which an auction otherwise would have cleared, and bids in amounts that ensured that an auction would clear in circumstances where, Deutsche Bank knew, there was a

lack of bona fide purchasers of these securities. Had TAC been aware of these deceptive and manipulative activities of Deutsche Bank, it would not have purchased any of the Pivot Master Trust or Capstan Master Trust securities.

200.    TAC also relied on its previous ability to sell Camber Master Trust securities at auction, as set forth in paragraph 195, and relied on the investment-grade rating assigned to these securities by Fitch and S&P. Had TAC known that these investment-grade ratings were false, it would not have purchased any of these securities.

201.    On or about August 27, 2007, TAC first tried to sell its Pivot Master Trust – Series 1 securities, but the auction for those securities failed. TAC also was unable to sell its other Pivot Master Trust and Capstan Master Trust securities at their subsequent auctions. On or about August 20, 2007, the Capstan Master Trust – Series 1 auction failed. On or about August 24, 2007, the Capstan Master Trust – Series 2 auction failed.

202.    At each subsequent auction from August 2007 through November 2009, TAC has attempted to sell its Pivot Master Trust and Capstan Master Trust securities. Each of these successive auctions has failed. Throughout this time period, Deutsche Bank has continued to receive fees in connection with each failed auction.

203.    On November 17, 2009, Deutsche Bank AG announced that through its London branch, it was commencing a cash tender offer for up to $958,000,000.00 aggregate principal amount of outstanding Camber Master Trust securities, Pivot Master Trust securities, and Capstan Master Trust securities. Pursuant to that tender offer, Deutsche Bank AG offered to purchase the Pivot Master Trust - Series 1 securities at a maximum of 40 percent of their face value, and the Capstan Master Trust – Series 1 and 2 securities at a maximum of 51 percent of their face value.

204.    The tender documents provide that, following tender:

the portion of the Credit-Linked Notes in respect of each series of Securities being exchanged will be distributed in-kind to the Bank, and the notional amount of the Basis Swap in respect of the series will be proportionally reduced, based on the amount of Securities of that series being exchanged (without any termination payment in respect thereof being paid or received by the relevant Issuer).  Upon receipt of the Credit-Linked Notes, the Bank intends to sell the Credit-Linked Notes to the respective issuers thereof in exchange for a corresponding proportion of the Collateral, following which the Credit-Linked Notes will be cancelled by the issuers thereof.  In addition, a corresponding proportion of the Portfolio Credit Default Swap will terminate (without any termination payment in respect thereof being paid or received by the relevant Credit-Linked Notes issuer).

In other words, despite the fact that Deutsche Bank AG offered to pay a maximum of between 35 percent to 51 percent to tender these auction rate securities, Deutsche Bank AG would receive collateral (either AAA-rated medium term notes in the case of the Camber Master Trust and Pivot Master Trust securities or "deposits or a payment obligation by [Deutsche Bank AG]" in the case of the Capstan Master Trust securities) worth 100 percent of the securities' face value after unwinding the complicated derivative transactions that underlie these securities.

205.    Only after Deutsche Bank AG's announcement of the tender offer was TAC able to sell its Pivot Master Trust and Capstan Master Trust securities on the secondary market. Specifically, TAC sold its Pivot Mast Trust – Series 1 securities for 40.5 percent of their face value, or $8,100,000.  TAC sold its Capstan Master Trust –Series 1 and 2 securities for 51.25 percent of their face value, or $10,250,000.  This significant discount to par reflects the fact that these securities were, and had always been, substantially impaired.  TAC suffered losses of $21.65 million as a result of Deutsche Bank's fraud.

## CLAIMS FOR RELIEF

### Count I
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Thereunder
### (against Merrill Lynch)

206.    TAC adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 205 above.

207.    In violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), Merrill Lynch directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, did knowingly, intentionally, and/or recklessly use or employ, in connection with the purchase or sale of securities, a manipulative or deceptive device or contrivance in violation of SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), by:  (a) employing devices, schemes, and artifices to defraud TAC with respect to the sale of the Dutch Harbor and Anchorage Finance auction rate securities; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaging in acts, practices, or courses of business that operated and would operate as a fraud and deceit upon TAC in connection with the sale and purchase of the foregoing securities.  These actions were intended to, and did, permit Merrill Lynch to earn hundreds of millions of dollars underwriting securities that it otherwise would have been unable to take to market, and/or to earn substantial commissions on securities with respect to which it served as the sole broker-dealer.

208.    Merrill Lynch engaged in a series of fraudulent and deceptive acts and practices, including, but not limited to, knowingly, intentionally, and/or recklessly omitting material information regarding the nature, structure, and level of risks associated with the Anchorage

Finance and Dutch Harbor securities as set forth in paragraph 71, as well as its manipulation of the market for these securities.

209.    Merrill Lynch engaged in acts, practices, or courses of business that operated as a fraud and deceit upon TAC in connection with the sale and purchase of the subject securities by secretly placing support bids in 100 percent of the Dutch Harbor and Anchorage Finance auctions, in order, among other things, to create a false appearance of liquidity and demand for these securities, to prevent auction failures, to control the rates at which the auctions cleared, and to encourage holders of these securities not to sell them.  Merrill Lynch intentionally interfered with the natural interplay of supply and demand for these securities, preventing auction failures that would have resulted in the absence of its secret purchases.  Merrill Lynch thereby manipulated the market for these securities.  At all relevant times, Merrill Lynch knew (or was reckless in not knowing) that its conduct deceived TAC and other buyers and holders of the Dutch Harbor and Anchorage Finance securities.

210.    In furtherance of its fraudulent and manipulative acts and omissions, Merrill Lynch made use, directly and indirectly, of the means and instrumentalities of interstate commerce.

211.    In making its decision to purchase $18.95 million of the Dutch Harbor and Anchorage Finance securities, TAC reasonably and justifiably relied upon the appearance of an efficient and liquid market created through Merrill Lynch's intentional use of the manipulative and deceptive devices described in this First Amended Complaint, on the integrity of the marketplace and the auction processes for these securities, and on its ability to sell securities issued by the Dutch Harbor and Anchorage Finance trusts in the past.  TAC additionally relied upon Merrill Lynch's material omissions concerning the nature, risks, and characteristics of these

securities. Had TAC known that Merrill Lynch had engaged in manipulative conduct to create

the appearance of an efficient and liquid market, and that Merrill Lynch had withheld material

information about the risks, liquidity, and demand for the Dutch Harbor and Anchorage Finance

securities, TAC never would have purchased the subject auction rate securities for its account.

212. By reason of the foregoing, TAC has suffered damages of at least $18.95 million.

**Count II**
**For Violations of Section 20(a) of the Exchange Act**
**(against Merrill Lynch & Co.)**

213. TAC adopts and incorporates by reference herein the allegations set forth in

paragraphs 1 through 212 above.

214. Merrill Lynch & Co. acted as a control person of Merrill Lynch with respect to all

of the acts described herein. By virtue of its position as the 100 percent shareholder of Merrill

Lynch, its shared officers with Merrill Lynch, and its supervisory authority over all aspects of the

business of Merrill Lynch, Merrill Lynch & Co. directed, participated in, and/or had knowledge

of: (a) Merrill Lynch's device, scheme, and artifice to defraud; (b) Merrill Lynch's untrue

statements of material fact and/or its failure to state material facts necessary in order to make the

statements made not misleading; and/or (c) Merrill Lynch's engagement in acts, practices, or

courses of business that operated as a fraud and deceit upon TAC in connection with the sale and

purchase of the Dutch Harbor and Anchorage Finance securities. Merrill Lynch & Co. had the

power to influence and control, and did influence and control, directly or indirectly, the decision-

making of Merrill Lynch, including the deceptive and manipulative devices and contrivances, as

well as the material omissions, described in this First Amended Complaint.

215. Merrill Lynch & Co. had operational control, operational management, and

supervisory involvement over the day-to-day operations of Merrill Lynch and, therefore, had the

88

power to and did direct and/or influence the particular deceptive and manipulative devices and contrivances and material omissions giving rise to the securities violations alleged herein.

216. Merrill Lynch & Co. had the authority and the ability to prevent the deceptive and manipulative devices and contrivances, as well as the material omissions alleged herein, but did not do so because the fraud enabled Merrill Lynch & Co. to earn extraordinary profits from the perpetuation of the fraud in the form of higher fees, which were reflected on Merrill Lynch & Co.'s financial statements.

217. As detailed herein, Merrill Lynch violated Section 10(b) of the Exchange Act (15 U.S.C. § 78t(b)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), by the manipulative and deceptive acts and contrivances, as well as the material omissions, alleged in paragraphs 206-212. By virtue of its position as a control person, Merrill Lynch & Co. is jointly and severally liable for those violations of the Exchange Act, under Section 20(a) of the Exchange Act.

### Count III
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Thereunder**
**(against Deutsche Bank)**

218. TAC adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 217 above.

219. In violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), Deutsche Bank directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, did knowingly, intentionally, and/or recklessly use or employ, in connection with the purchase or sale of securities, a manipulative or deceptive device or contrivance in violation of SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), by: (a) employing devices, schemes, and artifices to defraud TAC with respect to the sale of the Pivot Master Trust and Capstan Master Trust auction rate securities; (b) making untrue statements of material fact

and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaging in acts, practices, or courses of business that operated and would operate as a fraud and deceit upon TAC in connection with the sale and purchase of the foregoing securities. These actions were intended to, and did, permit Deutsche Bank to earn tens to hundreds of millions of dollars underwriting securities that it otherwise would have been unable to take to market; to earn substantial commissions on securities with respect to which it served as the sole broker-dealer; to earn profits based on the spread between the interest paid under the basis swap and the collared interest rate potentially payable to holders of the auction rate securities; and/or to provide insurance to Deutsche Bank against the performance of portfolios of corporate bonds.

220.    Deutsche Bank engaged in a series of fraudulent and deceptive acts and practices, including, but not limited to, knowingly, intentionally, and/or recklessly omitting material information regarding the nature, structure, and level of risks associated with the Pivot Master Trust and Capstan Master Trust securities as set forth in paragraph 111, as well as its manipulation of the market for those securities.

221.    Deutsche Bank engaged in acts, practices, or courses of business that operated as a fraud and deceit upon TAC in connection with the sale and purchase of the subject securities by routinely and secretly placing support bids for its own account in the auctions for the Camber Master Trust and Pivot Master Trust securities in order, among other things, to create a false appearance of liquidity and demand for these securities, to prevent auction failures, to control the rates at which the auctions cleared, and to encourage holders of these securities not to sell them. Deutsche Bank intentionally interfered with the natural interplay of supply and demand for the Camber Master Trust and Pivot Master Trust securities, preventing auction failures that

would have resulted in the absence of its secret purchases.  Deutsche Bank thereby manipulated the market for these securities.  Deutsche Bank would not have been able to place the Pivot Master Trust securities, and then later the Capstan Master Trust securities, had it failed to create the false appearance of liquidity for the Camber Master Trust and Pivot Master Trust securities. At all relevant times, Deutsche Bank knew (or was reckless in not knowing) that its conduct deceived TAC and other buyers and holders of the Pivot Master Trust and Capstan Master Trust securities.

222.    In furtherance of its fraudulent and manipulative acts and omissions, Deutsche Bank made use, directly and indirectly, of the means and instrumentalities of interstate commerce.

223.    In making its decision to purchase $40 million of Pivot Master Trust, and Capstan Master Trust securities, TAC reasonably and justifiably relied upon the appearance of an efficient and liquid market created through Deutsche Bank's intentional use of the manipulative and deceptive devices described in this First Amended Complaint, on the integrity of the marketplace and the auction process for these securities, and on its ability to sell securities issued by the Camber Master Trust in the past.  TAC additionally relied upon Deutsche Bank's material omissions concerning the nature, risks, and characteristics of these securities.  Had TAC known that Deutsche Bank had withheld material information about the risks, liquidity, and demand for the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities, or that Deutsche Bank had manipulated the market to create the appearance of an efficient and liquid market, TAC never would have purchased the subject auction rate securities for its account.

224.    By reason of the foregoing, TAC has suffered damages of at least $21.65 million.

<u>**Count IV**</u>
**For Violations of California Corporate Securities Law of 1968, Corp. Code §§ 25500 and 25501**
**(against Merrill Lynch)**

225.    TAC adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 224 above.

226.    Merrill Lynch, directly or indirectly sold to TAC and/or induced TAC to purchase securities from the State of California by means of written communications that contained material omissions of fact in violation of California law, as set forth in paragraph 71.  These actions were intended to, and did, permit Merrill Lynch to earn hundreds of millions of dollars underwriting securities that it otherwise would have been unable to take to market, and/or to earn substantial commissions on securities with respect to which it served as the sole broker-dealer.

227.    Merrill Lynch also engaged in acts, practices, or courses of business that operated as a fraud and deceit upon TAC in connection with the sale and purchase of the Dutch Harbor and Anchorage Finance securities by effecting, alone or with one or more other persons, a series of transactions that created actual or apparent active trading in the subject securities, for the purpose of inducing the purchase or sale of the subject securities by investors such as TAC. Specifically, Merrill Lynch placed undisclosed support bids in every Dutch Harbor and Anchorage Finance auction.  In bidding for 100 percent of the outstanding issue in 100 percent of the auctions, Merrill Lynch created the false appearance of legitimate third-party demand for these securities and a liquid and efficient market.  The purpose and effect of these support bids was to induce investors (such as TAC) to purchase these securities.

228.    As the sole broker-dealer in all of the auctions for the Dutch Harbor and Anchorage Finance securities, Merrill Lynch directly or indirectly sold to TAC all of the Merrill Lynch-underwritten securities that TAC acquired.

229.    At the time that it made each of the above material omissions and engaged in the manipulative and deceptive acts, practices, or courses of business described in this First Amended Complaint that operated as a fraud and deceit upon TAC, Merrill Lynch knew, or had reasonable grounds to believe, that its material misrepresentations and omissions were false and/or misleading, and it acted willfully and with an intent to defraud in selling or inducing TAC to purchase the relevant securities, in violation of California Corporate Securities Law of 1968 ("Corp. Code") §§ 25400(b) and (d), 25500, and 25501.

230.    By reason of the foregoing, TAC has suffered damages of at least $18.95 million and/or is entitled to rescission.

### Count V
**For Violations of California Corporate Securities Law of 1968, Corp. Code § 25504 (against Merrill Lynch & Co.)**

231.    TAC adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 230 above.

232.    Merrill Lynch & Co. acted as a control person of Merrill Lynch with respect to all of the acts described herein.  By virtue of its position as the 100 percent shareholder of Merrill Lynch, its shared officers with Merrill Lynch, and its supervisory authority over all aspects of the business of Merrill Lynch, Merrill Lynch & Co. directed, participated in, and/or had knowledge of:  (a) Merrill Lynch's device, scheme, and artifice to defraud; (b) Merrill Lynch's untrue statements of material fact and/or its failure to state material facts necessary in order to make the statements made not misleading; and/or (c) Merrill Lynch's engagement in acts, practices, or courses of business that operated as a fraud and deceit upon TAC in connection with the sale and purchase of the Dutch Harbor and Anchorage Finance securities.  Merrill Lynch & Co. had the power to influence and control, and did influence and control, directly or indirectly, the decision-

making of Merrill Lynch, including the statements and the conduct described herein, including the deceptive and manipulative devices and contrivances, as well as the material omissions, described in this First Amended Complaint.

233.    Merrill Lynch & Co. had operational control, operational management, and supervisory involvement over the day-to-day operations of Merrill Lynch and, therefore, had the power to, and did direct and/or influence, the particular deceptive and manipulative devices and contrivances, as well as the material omissions, giving rise to the securities violations alleged herein.

234.    Merrill Lynch & Co. had the authority and the ability to prevent the deceptive and manipulative devices and contrivances, as well as the material omissions alleged herein, and the market manipulation alleged herein, but did not do so because the fraud enabled Merrill Lynch & Co. to earn extraordinary profits from the perpetuation of the fraud in the form of higher fees, which were reflected on Merrill Lynch & Co.'s financial statements.

235.    As detailed herein, Merrill Lynch violated California Corporate Code §§ 25401 and 25501 by the misrepresentations, acts, and omissions alleged in paragraphs 225 through 230. By virtue of its position as a control person, Merrill Lynch & Co. is liable for those violations of California law pursuant to Corporate Code § 25504.

**Count VI**
**For Violations of California Corporate Securities Law of 1968, Corp. Code §§ 25500 and 25501**
**(against Deutsche Bank)**

236.    TAC adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 235 above.

237.    Deutsche Bank, directly or indirectly, sold to and/or induced TAC to purchase securities from the State of California by means of written communications that contained

material omissions of fact in violation of California law, as set forth in paragraph 111. These actions were intended to, and did, permit Deutsche Bank to earn tens to hundreds of millions of dollars underwriting securities that it otherwise would have been unable to take to market; to earn substantial commissions on securities with respect to which it served as sole broker-dealer; to earn profits based on the spread between the interest paid under the basis swap and the collared interest rate potentially payable to holders of the auction rate securities; and/or to provide insurance to Deutsche Bank against the performance of portfolios of corporate bonds.

238.    Deutsche Bank also engaged in acts, practices, or courses of business that operated as a fraud and deceit upon TAC in connection with the sale and purchase of the Pivot Master Trust and Capstan Master Trust securities by effecting, alone or with one or more other persons, a series of transactions that created actual or apparent active trading in the subject securities, for the purpose of inducing the purchase or sale of the subject securities by investors such as TAC. Specifically, Deutsche Bank routinely placed support bids in every Camber Master Trust and Pivot Master Trust auction. In bidding for 100 percent of the outstanding issue in 100 percent of the auctions, Deutsche Bank created the false appearance of active trading, legitimate third-party demand for these securities, as well as a liquid and efficient market for these securities. Deutsche Bank would not have been able to place the Pivot Master Trust securities, and then later the Capstan Master Trust securities, had it failed to create the false appearance of liquidity for the analogous Camber Master Trust and Pivot Master Trust securities. The purpose and effect of these support bids was to induce investors (such as TAC) to purchase the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities.

239.    Deutsche Bank directly or indirectly sold Pivot Master Trust and Capstan Master Trust securities to TAC as part of its initial placement of these securities.

240.    At the time that it made each of the above omissions and engaged in the acts, practices, or courses of business described in this First Amended Complaint that operated as a fraud and deceit upon TAC, Deutsche Bank knew, or had reasonable grounds to believe, that its material misrepresentations and omissions were false and/or misleading.  Deutsche Bank acted willfully and with an intent to defraud in selling or inducing TAC to purchase the relevant securities.  Deutsche Bank thereby violated California Corporate Code §§ 25400(b) and (d), 25401, 25500, and 25501.

241.    By reason of the foregoing, TAC has suffered damages of at least $21.65 million and/or is entitled to rescission.

### Count VII
### For Common Law Fraud
### (against Merrill Lynch)

242.    TAC adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 241 above.

243.    With the intent of inducing TAC to purchase the Dutch Harbor and Anchorage Finance securities, Merrill Lynch knowingly, intentionally, and/or recklessly engaged in acts, practices, or courses of business that operated as a fraud and deceit upon TAC in connection with the sale and purchase of the subject securities by routinely and secretly placing support bids for its own account in the auctions for the Dutch Harbor and Anchorage Finance securities in order, among other things, to create a false appearance of liquidity and demand for these securities, to prevent auction failures, to control the rates at which the auctions cleared, and to encourage holders of these securities not to sell them.  Merrill Lynch intentionally interfered with the natural interplay of supply and demand for these securities, preventing auction failures that would have resulted in the absence of its secret purchases.  Merrill Lynch thereby manipulated

the market for these securities.  At all relevant times, Merrill Lynch knew (or was reckless in not knowing) that its conduct deceived TAC and other buyers and holders of the Dutch Harbor and Anchorage Finance securities.

244.    Merrill Lynch also knowingly, intentionally, and/or recklessly concealed material information from TAC, as set forth in paragraph 71.  Merrill Lynch additionally concealed the manipulative and deceptive conduct described in the First Amended Complaint.  Merrill Lynch's actions were intended to, and did, permit Merrill Lynch to earn hundreds of millions of dollars underwriting securities that it otherwise would have been unable to take to market, and/or to earn substantial commissions on securities with respect to which it served as sole broker-dealer.

245.    In justifiable reliance upon Merrill Lynch's market manipulation and material omissions, and without knowledge of the truth, TAC purchased the Dutch Harbor and Anchorage Finance securities for its account.  Had TAC known that the information provided and the statements made by Merrill Lynch contained material omissions, or had TAC been aware of the material information that Merrill Lynch concealed, including but not limited to Merrill Lynch's market manipulation, TAC would not have purchased these securities for its account.

246.    By reason of the foregoing, TAC has suffered damages of at least $18.95 million.

**Count VIII**
**For Common Law Fraud**
**(against Deutsche Bank)**

247.    TAC adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 246 above.

248.    With the intent of inducing TAC to purchase the Pivot Master Trust and Capstan Master Trust securities, Deutsche Bank knowingly, intentionally, and/or recklessly engaged in acts, practices, or courses of business that operated as a fraud and deceit upon TAC in connection

with the sale and purchase of the subject securities by routinely and secretly placing support bids for its own account in the auctions for the Camber Master Trust and Pivot Master Trust securities in order, among other things, to create a false appearance of liquidity and demand for these securities, to prevent auction failures, to control the rates at which the auctions cleared, and to encourage holders of these securities not to sell them. Deutsche Bank intentionally interfered with the natural interplay of supply and demand for the Camber Master Trust and Pivot Master Trust securities, preventing auction failures that would have resulted in the absence of its secret purchases. Deutsche Bank thereby manipulated the market for these securities. Deutsche Bank would not have been able to place the Pivot Master Trust securities, and then later the Capstan Master Trust securities, had it failed to create the false appearance of liquidity for the Camber Master Trust and Pivot Master Trust securities. At all relevant times, Deutsche Bank knew (or was reckless in not knowing) that its conduct deceived TAC and other buyers and holders of the Camber Master Trust, Pivot Master Trust, and Capstan Master Trust securities.

249.    Deutsche Bank also knowingly, intentionally, and/or recklessly concealed material information from TAC, as set forth in paragraph 111. Deutsche Bank additionally concealed the manipulative and deceptive conduct described in the First Amended Complaint. These actions were intended to, and did, permit Deutsche Bank to earn tens to hundreds of millions of dollars underwriting securities that it otherwise would have been unable to take to market; to earn substantial commissions on securities with respect to which it served as sole broker-dealer; to earn profits based on the spread between the interest paid under the basis swap and the collared interest rate potentially payable to holders of the auction rate securities; and/or to provide insurance to Deutsche Bank against the performance of portfolios of corporate bonds.

250.    In justifiable reliance upon Deutsche Bank's market manipulation and material omissions, and without knowledge of the truth, TAC purchased the Pivot Master Trust and Capstan Master Trust securities for its account.  Had TAC known that the information provided and the statements made by Deutsche Bank contained material omissions, or had TAC been aware of the material information that Deutsche Bank concealed, including but not limited to Deutsche Bank's market manipulation, TAC would not have purchased the Pivot Master Trust securities.

251.    By reason of the foregoing, TAC has suffered damages of at least $21.65 million.

### Count IX
### For Common Law Negligent Misrepresentation
### (against S&P)

252.    TAC adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 251 above.

253.    With the intent of earning lucrative fees, S&P falsely represented that the Dutch Harbor and Anchorage Finance securities were deserving of an "AA" rating, and falsely represented that the Pivot Master Trust and Capstan Master Trust securities were deserving of an "AAA" rating.  These ratings, and the corresponding assertions that "the capacity [of the Dutch Harbor and Anchorage Finance Trusts] to meet [their] financial commitment on the obligation is very strong," and that "[t]he [Pivot Master and Capstan Master Trusts'] capacity to meet [their] financial commitment on the obligation is extremely strong" were false and misleading.

254.    At the time that it made these material misstatements, S&P knew that the above securities were unregistered securities intended solely for QIBs and not for the general public. S&P knew that its ratings would appear in the offering materials for these securities and be communicated by investment advisors and broker-dealers.  S&P also knew that its ratings would

be relied upon by QIB investors such as TAC in making their investment decisions. Accordingly, S&P owed a duty to TAC.

255.    S&P failed to exercise reasonable care in issuing the above ratings and in monitoring the above ratings over time.

256.    In justifiable reliance upon S&P's material misrepresentations, and without knowledge of the truth, TAC purchased the Dutch Harbor, Anchorage Finance, Pivot Master Trust, and Capstan Master Trust securities for its working capital account. Had TAC known that the ratings assigned to these securities constituted material misrepresentations, and/or had the securities been assigned ratings that accurately reflected their true nature and credit risk, TAC would not have acquired the Dutch Harbor, Anchorage Finance, Pivot Master Trust, or Capstan Master Trust securities.

257.    The Dutch Harbor, Anchorage Finance, Pivot Master Trust, and Capstan Master Trust securities would not have been issued were it not for S&P's false and misleading credit ratings. Accordingly, in the absence of the false and misleading credit ratings assigned to the Dutch Harbor, Anchorage Finance, Pivot Master Trust, and Capstan Master Trust securities, TAC could never have acquired them and would not have suffered the resulting losses.

258.    By reason of the foregoing, TAC has suffered damages of at least $40.6 million.

**Count X**
**For Common Law Negligent Misrepresentation**
**(against Moody's)**

259.    TAC adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 258 above.

260.    With the intent of earning lucrative fees, Moody's falsely represented that the Dutch Harbor and Anchorage Finance securities were deserving of an "Aa2" rating. These

ratings, and the corresponding assertion that the Dutch Harbor and Anchorage Finance securities were "judged to be of high quality and . . . subject to very low credit risk" were false and misleading.

261.    At the time that it made these material misstatements, Moody's knew that the above securities were unregistered securities intended solely for QIBs and not for the general public.  Moody's knew that its ratings would appear in the offering materials for these securities and be communicated by investment advisors and broker-dealers.  Moody's also knew that its ratings would be relied upon by potential QIB investors such as TAC in making their investment decisions.  Accordingly, Moody's owed a duty to TAC.

262.    Moody's failed to exercise reasonable care in issuing the above ratings and in monitoring the above ratings over time.

263.    In justifiable reliance upon Moody's misrepresentations, and without knowledge of the truth, TAC purchased the Dutch Harbor and Anchorage Finance securities for its working capital account.  Had TAC known that the ratings assigned to these securities constituted material misrepresentations, and/or had the securities been assigned ratings that accurately reflected their true nature and credit risk, TAC would not have acquired the Dutch Harbor and Anchorage Finance securities.

264.    The Dutch Harbor and Anchorage Finance securities would not have issued were it not for Moody's false and misleading credit ratings.  Accordingly, in the absence of the false and misleading credit ratings assigned to the Dutch Harbor and Anchorage Finance securities, TAC could never have acquired them and would not have suffered the resulting losses.

265.    By reason of the foregoing, TAC has suffered damages of at least $18.95 million.

**Count XI**
**For Common Law Negligent Misrepresentation**

**(against Fitch)**

266.    TAC adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 265 above.

267.    With the intent of earning lucrative fees, Fitch falsely represented that the Pivot Master Trust and Capstan Master Trust securities were deserving of an "AAA" rating.  These ratings, and the corresponding assertions that the Pivot Master Trust and Capstan Master Trust securities had the lowest expectation of credit risk[;] [that the Pivot Master Trust and Capstan Master Trust had the] exceptionally strong capacity for payment of financial commitments[;] and [that] [t]his capacity is highly unlikely to be adversely affected by foreseeable events," were false and misleading.

268.    At the time that it made these material misstatements, Fitch knew that the above securities were unregistered securities intended solely for QIBs and not for the general public. Fitch knew that its ratings would appear in the offering materials for these securities and be communicated by investment advisors and broker-dealers.  Fitch also knew that its ratings would be relied upon by QIB investors such as TAC in making their investment decisions. Accordingly, Fitch owed a duty to TAC.

269.    Fitch failed to exercise reasonable care in issuing the above ratings and monitoring the above ratings over time.

270.    In justifiable reliance upon Fitch's material misrepresentations, and without knowledge of the truth, TAC purchased the Pivot Master Trust and Capstan Master Trust securities for its working capital account.  Had TAC known that the ratings assigned to these securities constituted material misrepresentations, and/or had the securities been assigned ratings

that accurately reflected their true nature and credit risk, TAC would not have acquired the Pivot Master Trust and Capstan Master Trust securities.

271.    The Pivot Master Trust and Capstan Master Trust securities would not have been issued were it not for Fitch's false and misleading credit ratings. Accordingly, in the absence of the false and misleading credit ratings assigned to the Pivot Master Trust and Capstan Master Trust securities, TAC could never have acquired them and would not have suffered the resulting losses.

272.    By reason of the foregoing, TAC has suffered damages of at least $21.65 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff TAC prays for relief and judgment, as follows:

A.    Compensatory damages in an amount to be determined at trial;

B.    Rescission of TAC's purchase of Anchorage Finance, Dutch Harbor, Pivot Master Trust, and Capstan Master Trust securities;

C.    Disgorgement of all fees, commissions, or other income, compensation, or value received by Merrill Lynch in connection with the Anchorage Finance and Dutch Harbor securities, including, but not limited to, any underwriting fees and commission earned by Merrill Lynch in its capacity as broker-dealer for the auctions;

D.    Disgorgement of all fees, commissions, or other income, compensation, or value received by Deutsche Bank in connection with the Pivot Master Trust and Capstan Master Trust securities, including but not limited to, any underwriting fees and commission earned by Deutsche Bank in its capacity as broker-dealer for the auctions;

E.     Punitive damages in an amount to be determined at trial;

F.     An award of all of TAC's costs, expenses, and disbursements in prosecuting this action, including attorneys' and expert fees; and

G.     Such other relief as the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff TAC demands a jury trial on all issues so triable.

Dated: March 19, 2010

MARK C. HANSEN
DAVID L. SCHWARZ
KEVIN J. MILLER
ANDREW C. SHEN
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999

R. ALEXANDER SAVERI
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111-5619
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813

*Counsel for The Anschutz Corporation*