UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X
In re Merrill Lynch Auction Rate    :    09 MD 2030 (LAP)
Securities Litigation               :
----------------------------------X
This Document Relates To:           :
No. 09 Civ. 9888 (LAP)              :
                                    :
THE ANSCHUTZ CORP.,                 :    OPINION & ORDER
                                    :
             Plaintiff,             :
                                    :
             v.                     :
                                    :
MERRILL LYNCH & CO., INC.;          :
MERRILL LYNCH, PIERCE, FENNER       :
& SMITH INC.; DEUTSCHE BANK         :
SECURITIES INC.; MOODY'S INVESTORS  :
SERVICE, INC.; THE MCGRAW-HILL      :
COMPANIES, INC.; FITCH, INC.; AND   :
FITCH RATINGS, LTD.,                :
                                    :
             Defendants.            :
- - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, Chief United States District Judge:

     Plaintiff, the Anschutz Corporation, brings this action

alleging various state and federal causes of action against

Defendants Merrill Lynch & Co., Inc.; Merrill Lynch, Pierce,

Fenner & Smith Inc. ("MLPFS"); Moody's Investors Service, Inc.;

and The McGraw-Hill Companies, Inc. (the parent of Standard &

Poors or "S&P").  The action alleges that Defendants' activities

related to certain auction rate securities ("ARS") purchased by

Plaintiff ran afoul of the law.  Defendants are divided neatly

into two sets.  Of those just listed, Merrill Lynch & Co., Inc.,

and MLPFS (together, "Merrill") include the underwriter and

broker-dealer for the ARS at issue (MLPFS) and its parent company.  The others (the "Rating Agencies") are credit rating agencies that issued ratings on the ARS here.  Each set of Defendants moves to dismiss under Federal Rule of Civil Procedure 12(b)(6) separately.  Defendants' motions are GRANTED.

I. BACKGROUND

The Court takes as true the following factual allegations in the complaint and draws all reasonable inferences in favor of Plaintiff.  <u>Goldstein v. Pataki</u>, 516 F.3d 50, 56 (2d Cir. 2008).

A.   <u>Auction Rate Securities</u>

In short, ARS are variable-rate debt instruments or preferred stock with interest rates set by way of periodic auctions in which potential buyers submit bids at various interest rates.  (First Amended Complaint ("Compl.") ¶¶ 25-29.) The highest bid accepted sets the interest rate for the ARS issuance as a whole – the "clearing rate."  (<u>Id.</u>)  Holders may sell ARS at these auctions, but auctions with insufficient buy bids result in auction failure; then, prospective sellers are unable to sell ARS.  (<u>Id.</u>)

The details and operation of the ARS here are not materially different from the ARS described in other opinions in this Multidistrict Litigation.  The Court thus presumes familiarity with the ARS structure as previously described.  <u>In</u>

re Merrill Lynch ARS Litig. (Merrill II), No. 09 MD 2030, 2010
WL 5094296, at *1 (S.D.N.Y. Dec. 7, 2010) (describing ARS).
Plaintiff draws attention to one difference, however: the ARS
here had a "put" feature, which allowed the ARS to be converted
to preferred shares in Ambac Assurance Corp., the issuer, at its
option. (Compl. ¶ 149.)

    B.   Merrill's Conduct

MLPFS underwrote the "Dutch Harbor" and "Anchorage Finance"
issuances of ARS of Ambac Assurance Corp. (Id. ¶ 47.)
Plaintiff made the following purchases through its broker,
Credit Suisse: (1) on July 21, 2006, $7.95 million worth of
Dutch Harbor Finance Sub-Trust #II ARS and (2) on January 25,
2007, $5 million worth of Dutch Harbor Finance Sub-Trust #III
ARS and $6 million worth of Anchorage Finance Sub-Trust #2 ARS.
(Id. ¶ 189.) MLPFS was the sole broker-dealer for those
issuances. (Id. ¶ 51.) As broker-dealer, MLPFS selected the
agent to conduct the auction; received and transmitted all buy,
hold, or sell orders; participated in the preparation of ARS
offering statements; and entered into remarketing agreements
with downstream brokers who would buy, then sell, MLPFS ARS to
their customers, like Plaintiff here. (Id. ¶¶ 45, 50-51.)
MLPFS received fees both for its underwriting and its broker-
dealer services. (Id. ¶ 46.)

MLPFS also participated as a buyer and seller in the auctions for its own account in an effort to ensure that the auctions would not fail.  (Id. ¶¶ 4-6, 53.)  It placed bids – called "support bids" – for one-hundred percent of the notional value of the Dutch Harbor and Anchorage Finance ARS up for auction through July 2007 in one-hundred percent of those auctions.  (Id. ¶ 59, Ex. B.)  The extent of this practice was not fully disclosed to investors, and MLPFS knew that demand for ARS absent its bidding was insufficient to feed the auctions.  (See id. ¶¶ 56, 58, 60, 64, 68, 71, 73, 190.)

The support bids established the clearing rate in "a significant percentage" of the auctions.  (Id. ¶ 59.)  That clearing rate (or the failed auction rate) was lower than rates "otherwise would have been," meaning that Plaintiff earned less interest on its ARS that it otherwise would have earned.  (Id. ¶¶ 29, 72.)  Additionally, the support bids were undisclosed and therefore "injected false information into the marketplace" about the liquidity of these ARS.  (Id. ¶¶ 60, 73.)  The nefarious consequences related to these allegations constitute the primary injuries MLPFS allegedly caused here.  (See id. ¶¶ 60, 65, 72, 73, 192-193.)

In August 2007, MLPFS discontinued its practice of submitting support bids, and the auctions for the two ARS here

failed.  (Id. ¶¶ 63-64.)  The market for these ARS "completely evaporated" and has not recovered.  (Id. ¶¶ 64, 193-194.) Plaintiff was and has been unable to sell its ARS, which have been converted to preferred shares of Ambac Assurance Corp. earning no interest with no liquidity.  (Id. ¶ 194.)  Plaintiff claims it relied on the appearance of a liquid market (allegedly manufactured by MLPFS) and its prior success buying and selling similar ARS when deciding to make its purchases.  (Id. ¶¶ 188, 190-191.)  It says it never would have bought ARS had it known the truth and that it now holds nearly $19 million worth of "severely impaired securities."  (Id. ¶ 190, 193.)

    C.   SEC Order and Website Disclosure

    In May 2006, following an investigation, the Securities and Exchange Commission ("SEC") reached a settlement with several investment banks that participated in the ARS market, including MLPFS.  (Id. ¶ 36.)  The SEC issued a cease-and-desist order (the "SEC Order") on May 31, 2006.[1]  (Id.)  The SEC Order concluded that the banks violated the securities laws by intervening in ARS auctions without adequate disclosure.  (Id.)

---

[1] The Court takes judicial notice of the contents of the SEC Order and the remedial disclosures Merrill subsequently placed on its website.  (Declaration of Barry J. Mandel ("Mandel Decl.") Exs. A, C.)  The complaint incorporates these documents by reference, so they are properly considered on a motion to dismiss.  Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006).

The SEC determined that disclosures indicating that a broker-dealer "may submit orders in Auctions for its own accounts" and that it "might have an advantage over other bidders" were inadequate.  (Id.)  The SEC Order enumerated several violative practices, including bidding to prevent auction failures or to affect the auctions' clearing rates, but did not specify which banks engaged in which practice.  (Id.; Mandel Decl. Ex. C, at 6.)  Nevertheless, MLPFS was ordered to pay a larger penalty than other banks because it was among the banks that "engaged in more types of violative practices than" others.  (Compl. ¶ 37.) The SEC Order required the banks to post their ARS practices on their websites and provide all first-time purchasers and broker-dealer purchasers with a written description of the bank's ARS practices at or before the completion of each transaction. (Id.)

In August 2006, Merrill Lynch posted a document disclosing its ARS practices on its website (the "Website Disclosure"). See Merrill II, 2010 WL 5094296, at *4 (discussing the same disclosure).  The Website Disclosure states that "Merrill Lynch may routinely place one or more bids in an auction for its own account to acquire [ARS] for its inventory, to prevent an auction failure . . . or an auction from clearing at a rate that Merrill Lynch believes does not reflect the market for the

securities." (Mandel Decl. Ex. A, at 16.; see also id. at 15

("Merrill Lynch is permitted, but not obligated, to submit

orders in auctions for its own account either as a bidder or a

seller, or both, and routinely does so in its sole discretion.")

(emphasis added).)  It states that MLPFS's bids "are likely to

affect the clearing rate." (Id. at 16.)  The Website Disclosure

also discusses the risk of auction failures and the consequent

liquidity risk in the ARS market:

> Because of [MLPFS's ARS practices], the fact that an
> auction clears successfully does not mean that an
> investment in the securities involves no significant
> liquidity or credit risk.  Merrill Lynch is not
> obligated to continue to place such bids. . . .
> Investors should not assume that Merrill Lynch will do
> so or that auction failures will not occur.

(Id.; see also id. at 18 ("There may not always be enough

bidders to prevent an auction from failing in the absence of

Merrill Lynch bidding in the auction for its own account or

encouraging others to bid.  Therefore, auction failures are

possible, especially if the issuer's credit were to deteriorate,

if a market disruption were to occur or if, for any reason,

Merrill Lynch were unable or unwilling to bid.").)  Finally, the

Website Disclosure states that MLPFS had conflicts of interest;

"it would likely have an advantage over other bidders because

Merrill Lynch would have knowledge of some or all of the other

orders placed through Merrill Lynch in that auction . . . .

Merrill Lynch's interests in conducting an auction may differ from [investors] who participate in auctions." (Id. at 15-18.)

D.  Rating Agencies' Conduct

MLPFS engaged the Rating Agencies to evaluate and assign a credit rating to the ARS Plaintiff purchased. (Compl. ¶¶ 146, 157.) Moody's assigned a "Aa2" rating, and S&P assigned a "AA" rating to these ARS; both ratings indicated a low credit risk and were required for the ARS to have issued. (Id. ¶¶ 146-147.) Plaintiff also alleges that the Rating Agencies consulted with MLPFS to structure these ARS to ensure they would receive the desired AA or Aa2 ratings. (Id. ¶ 158.) For these services, the Rating Agencies received fees. (Id. ¶¶ 157-158.)

Plaintiff alleges that these ratings were false and misleading. (Id. ¶ 148.) First, Plaintiff asserts that the Rating Agencies should not have issued a credit rating, which is an indication of the probability of issuer default, for these ARS because the put option feature made it impossible to predict possible default. (Id. ¶ 149.) Second, Plaintiff says that the Rating Agencies should have downgraded the ratings on these ARS by mid-2006 or early 2007. (Id. ¶ 151.) Plaintiff alleges that the issuer guaranteed increasing amounts of structured finance products from 2001 to 2007, directly impairing its financial stability and ability to pay on its obligations, and that the

8

Rating Agencies should have known the ratings were not deserved. (Id. ¶¶ 152-153.)  Third, Plaintiff avers that the ARS here were, by way of the put option feature, contingent capital pools available in times of crisis – meaning that the credit ratings should have been lower.  (Id. ¶ 154.)  Fourth, Plaintiff asserts that the ratings were false representations about the liquidity of these ARS.  (Id. ¶ 156.)  In effect, Plaintiff claims that the Rating Agencies knew about the alleged malfeasance of MLPFS yet failed to disclose these facts.  (Id.)

Plaintiff claims that it relied on the Rating Agencies' credit ratings in making its purchase decision.  (Id. ¶ 163.) It says that the details of the asset pools supporting these ARS were not disclosed to the investing public, so the credit ratings were the "only basis by which prospective investors could evaluate the credit quality of these securities." (Id. ¶ 162.)  It says that the Rating Agencies generally relaxed their credit rating criteria to obtain and retain business from underwriters (id. ¶¶ 134-135) and that the Rating Agencies were understaffed and provided employees with inadequate resources to do their work (id. ¶ 136).  It also says that the Rating Agencies represented that their ratings were "on one uniform scale" that could be compared across asset classes and indicated, in the case of ARS, ready liquidity.  (Id. ¶ 142.)

Ultimately, the Rating Agencies downgraded their ratings for these ARS, and Moody's withdrew its rating altogether.  (Id. ¶ 164.)  After the downgrade, in 2008, the issuer exercised the put option, leaving Plaintiff with preferred shares in Ambac Assurance Corp.  (Id. ¶ 194.)  Plaintiff alleges that the shares are "completely unsaleable" and pay no interest.  (Id.)

    E.   <u>Procedural History</u>

Plaintiff filed this suit in the Northern District of California.  On December 1, 2009, the Judicial Panel on Multidistrict Litigation transferred this action here for inclusion in coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.  Plaintiff filed its First Amended Complaint on March 19, 2009.  On April 13, 2009, the Defendants filed motions to dismiss for failure to state a claim.  <u>See</u> Fed. R. Civ. P. 12(b)(6).

## II. DISCUSSION

There are two separate motions to dismiss <u>sub</u> <u>judice</u>, and they raise different substantive claims.  Therefore, the Court first discusses Merrill's motion and then moves to the Rating Agencies' motion.  First, it outlines the law governing the analysis of both motions.

A.   <u>Legal Standard</u>

In assessing a motion to dismiss, the Court must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  <u>Goldstein</u>, 516 F.3d at 56.  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  <u>Twombly</u>, 550 U.S. at 555.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  <u>Iqbal</u>, 129 S.Ct. at 1949 (quoting <u>Twombly</u>, 550 U.S. at 557) (internal quotation marks omitted).  For securities law violation claims, the complaint also must meet heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and, for federal claims, the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007).

B.   <u>Merrill's Motion to Dismiss</u>

Plaintiff asserts claims against MLPFS for market manipulation and material misstatements or omissions under section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  <u>See</u> 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  It also asserts a control-person liability claim against Merrill Lynch & Co. under section 20(a) of the Exchange Act.  <u>See</u> 15 U.S.C. § 78t(a).  It finally asserts claims against Merrill Lynch & Co. and MLPFS under California law.  Merrill moves to dismiss all of these claims.  The Court addresses them in the order outlined above.

1.   Section 10(b) Claims

To state a misrepresentation claim under section 10(b) and Rule 10b-5, Plaintiffs must "allege that the defendant[s] (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the Plaintiffs' reliance was the proximate cause of its injury." <u>ATSI</u>, 493 F.3d at 105.  To make out a market manipulation claim, the complaint must "allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's

12

use of the mails or any facility of a national securities
exchange." Id. at 101.  A failure on any one of these elements
necessitates dismissal.  Good Hill Partners L.P. v. WM Asset
Holdings Corp., 583 F. Supp. 2d 517, 520-21 (S.D.N.Y. 2008).

These two claims are interrelated here because Plaintiff's
market manipulation claims involve a failure to disclose fully
MLPFS's ARS market activities.  See In re Merrill Lynch ARS
Litig. (Merrill I), 704 F. Supp. 2d 378, 390-91 (S.D.N.Y. 2010)
(discussing analogous interrelated claims); see also Def. Mem.
at 15 (arguing that Plaintiff alleged no manipulative act
because disclosures were adequate).  And "nondisclosure is
usually essential to the success of a manipulative scheme."
Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477 (1977).  The
Court thus addresses legal elements common to both claims.  It
begins with an analysis of the alleged misstatements or
omissions and then turns to scienter.

a.   Misstatements or Omissions

A misstatement or omission claim must include allegations
of a material misstatement or omission.  ECA & Local 134 IBEW
Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d
187, 197 (2d Cir. 2009).  "[T]o be material, 'there must be a
substantial likelihood that the disclosure of the omitted fact
would have been viewed by the reasonable investor as having

13

significantly altered the "total mix" of information made available.'"  Id. (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 232-33 (1988)).  "Therefore, the determination of whether an alleged misrepresentation is material necessarily depends on all relevant circumstances."  Id.

Plaintiff's misstatement and market manipulation claims predicated on purchases that followed the Website Disclosure fail because the Website Disclosure adequately disclosed MLPFS's ARS practices.  (See Mandel Decl. Ex. A, at 15-16, 18.)  The Website Disclosure disclosed "the advantages that Defendants would have if they did engage in such conduct, the ability of such conduct to affect clearing rates[,] and the possibility that auctions would fail if Defendants did not intervene in them."  In re Citigroup ARS Litig., 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009) (involving similar disclosures); see also Merrill I, 704 F. Supp. 2d at 390-92, 396 (same disclosures as here).

Indeed, Plaintiff's misstatement and manipulation claims boil down to two basic plaints: (1) MLPFS's support bidding affected the clearing rate of the auctions and (2) MLPFS's ARS market activities created a false appearance of liquidity and

thereby artificially inflated prices paid for ARS.[2]  (Pl. Mem. at
5.)  But the Website Disclosure was sufficient to apprise
Plaintiff of MLPFS's activities.  See Merrill I, 704 F. Supp. 2d
at 392.  It stated that MLPFS "may routinely" place bids in its
own auctions and that it "routinely does so in its sole
discretion." (Mandel Decl. Ex. A, at 15-16.)  It stated that
MLPFS's bids "are likely to affect the clearing rate" (id. at
16) and would "cause lower clearing rates to occur" (id. at 17).
And it disclosed that auction failures are possible, that a
cleared auction does not mean ARS have no liquidity risk, that
there may be insufficient third-party demand, and that "auction
failures are possible . . . if, for any reason, Merrill Lynch
were unable or unwilling to bid." (Id. at 18; see id. at 16.)

     The Court rejects Plaintiff's suggestion that these
disclosures were inadequate because they used the word "may";
the disclosures explained exactly what MLPFS's ARS activities
were, that MLPFS "routinely" bids, and the specific risk of

---

[2] Plaintiff's assertion that MLPFS omitted the fact that Ambac
Assurance could not obtain contingent capital from investment
banks (Pl. Mem. at 25) is irrelevant to Plaintiff's section
10(b) claims.  Additionally, Plaintiff's argument that the put
feature of these ARS was not disclosed is belied by the record;
it was plainly disclosed on the face of the offering memoranda.
(Mandel Decl. Exs. D, E, at 1 ("Ambac Assurance, at its option,
can require the respective [ARS holders] to purchase the Ambac
preferred stock at any time."); id. (stating that ARS purchasers
"are also making an investment decision with respect to Ambac
Assurance and the Ambac preferred stock")).)  No more is needed.

auction failure were MLPFS, "for any reason," to stop bidding. These disclosures are more robust than those in Defer L.P. v. Raymond James Fin., Inc. (Defer II), No. 08 Civ. 3449, 2010 WL 3452387, at *11 (S.D.N.Y. Sept. 2, 2010) (Kaplan, J.), which Plaintiff submitted as supplemental authority in support of its case.  Here, MLPFS, unlike the defendant in Defer II, affirmatively indicated that it may bid "to keep [an auction] from failing"; that it "routinely does so in its sole discretion"; and that its cessation of bidding alone would cause auction failure.  (Mandel Decl. Ex. A, at 15-16, 18.)  Putting these statements, among others, together, no reasonable person would assume that MLPFS's bidding was not keeping the auctions afloat.  Cf. Citigroup ARS, 700 F. Supp. 2d at 307 (concluding that similar disclosures apprised plaintiffs of consequences of defendant's auction market participation).  In light of the central allegations in this complaint – that MLPFS's bidding affected clearing rates and disguised the liquidity of ARS – these disclosures are adequate.  See Merrill I, 704 F. Supp. 2d at 392 ("Corporations are not required to phrase disclosures in pejorative terms.").

Indeed, the Exchange Act "substitute[s] a philosophy of full disclosure for the philosophy of caveat emptor."  ATSI, 493 F.3d at 100 (quoting Santa Fe Indus., 430 U.S. at 476-77); see

16

also <u>ECA</u>, 553 F.3d at 197.  The SEC Order is congruent; the agency's settlement requires disclosure of ARS practices, not cessation.  Thus, these disclosures relieve MLPFS of liability on Plaintiff's misstatement and market manipulation claims based on purchases made after the Website Disclosure.  <u>See</u> <u>Merrill I</u>, 704 F. Supp. 2d at 391 ("The market is not misled when a transaction's terms are fully disclosed."); <u>id.</u> at 390-92, 396; <u>Citigroup ARS</u>, 700 F. Supp. 2d at 307.  In this case, this conclusion means that MLPFS is not liable on Plaintiff's claims relating to its two January 25, 2007, purchases of ARS.  (<u>See</u> Compl. ¶ 189.)

Plaintiff makes several attempts to counter this reasoning. First, it says that the Website Disclosure was directed at retail investors but that it was a qualified institutional buyer ("QIB") to whom such disclosures were not made.  (Pl. Mem. at 3, 13-14.)  Second, it argues that in settling its investigation, the SEC determined that similar disclosures were legally insufficient, a determination entitled to <u>Chevron</u> deference.[3]

_____

[3] Although Plaintiff makes much of this argument, it cites no case in which a court accorded <u>Chevron</u> deference to an SEC settlement, as opposed to an adjudication.  <u>See</u> <u>SEC v. Zandford</u>, 535 U.S. 813, 819-20 (2002) (SEC interpretation, "in the context of formal adjudication, is entitled to deference"); <u>United States v. Mead Corp.</u>, 533 U.S. 218, 230-31 (2001).  The Court need not wade into these waters, however, because the disclosures at issue here are different from – and much more extensive than – those found to be insufficient by the (cont'd)

(Id. at 15-16.)  Third, it points to other nonadjudicative SEC pronouncements regarding ARS disclosures.  (Id. at 16-17.) Finally, it points, by way of a post-briefing letter, to a District of New Jersey case, Dow Corning Corp. v. BB&T Corp., No. 09 Civ. 5637, 2010 WL 4860354 (D.N.J. Nov. 23, 2010), to argue that Merrill's motion should be denied.  These arguments do not alter the Court's conclusion.

As to the first, Plaintiff ignores several critical facts. It is a QIB that purchased an unregistered ARS offering offered only to QIBs.  (Compl. ¶ 161.)  QIBs have a more sophisticated understanding of risks of the investments they make and are better able to protect themselves.  See, e.g., Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541-42 (2d Cir. 1997); see also 17 C.F.R. § 230.144A(a), (d) (defining QIBs and limiting certain offerings to QIBs).  Not only was the Website Disclosure publicly available and widely disseminated, but it was also posted as a direct result of the SEC's investigation and the SEC Order, which was covered in the news.  See Merrill I, 704 F. Supp. 2d at 392; see also In re UBS ARS Litig., No. 08 Civ. 2967, 2010 WL 2541166, at *10-11 (S.D.N.Y. June 10, 2010);

---

(cont'd from previous page) SEC.  (Compare Mandel Decl. Ex. C, at 5 (pre-SEC Order disclosure examples), with, e.g., id. Ex. A, at 15-16 (Website Disclosure).)  Put simply, this argument misses the mark because the Court is not reviewing the SEC's determination that the pre-SEC Order disclosures were legally inadequate.

18

Mandel Decl. Exs. B, F, G, H.  And, contrary to Plaintiff's argument that these ARS were unique, the Website Disclosure plainly applied to MLPFS's ARS practices generally, while acknowledging that every offering is unique.  (Mandel Decl. Ex. A, at 2.)  Finally, all of this occurred after Plaintiff had made substantial ARS purchases and sales (Compl. ¶ 187), giving it the incentive to "read up" on the ARS market.  Plaintiff, a QIB, cannot now play the ostrich.

Plaintiff's next two arguments are based on entirely different (and less robust) disclosures and SEC actions.  Indeed, the Website Disclosure is substantially more detailed than the prior disclosures Plaintiff says are "virtually identical" (Pl. Mem. at 15): the Website Dislcosure says MLPFS "routinely" bids in auctions and that its decision to stop bidding can cause failure.  (Mandel Decl. Ex. A, at 15-16.)  And the SEC no-action letter cited by Plaintiff disclaims any legally binding effect.  (Declaration of David L. Schwarz Ex. C, at 4.)  These arguments are therefore not relevant to rebut the effectiveness of the Website Disclosure here.  That ends this aspect of the matter.  After the Website Disclosure was posted, Plaintiff was informed "that Defendants could engage in the very conduct of which Plaintiff complains." Citigroup ARS, 700 F. Supp. 2d at 307.  The securities laws demand no more.

19

Finally, Plaintiff's reliance on <u>Dow Corning</u> is misplaced. This case only allowed claims based on allegations of specific misstatements made to reassure investors <u>after</u> the collapse of the ARS market to proceed.  <u>See</u> <u>Dow Corning</u>, 2010 WL 4860354, at *3-5, *11-12.  It does not support Plaintiff's cause.

This conclusion does not end the section 10(b) analysis, however.  Prior to the Website Disclosure, on July 21, 2006, Plaintiff purchased $7.95 million worth of ARS for which it claims damages.  (Compl. ¶ 189.)  The Website Disclosure obviously is not retroactive, so the Court considers other aspects of these allegations as well.

Given the sophistication of Plaintiff, the SEC Order of May 31, 2006, was enough in these circumstances to disclose MLPFS's ARS market intervention at the time of this earlier purchase. The SEC Order itself, which was publicized and available on the SEC's website, "highlighted the practice of auction dealer participation in ARS auctions."  <u>Merrill I</u>, 704 F. Supp. 2d at 396.  It disclosed that MLPFS was in the "first tier" of respondents (meaning it had engaged in more violative practices than others) and explained that ARS broker-dealers placed support bids and prevented auction failure in doing so.  (Mandel Decl. Ex. C, at 6-7, 9).  It is not unreasonable to expect Plaintiff, a QIB, to draw straightforward inferences from the

SEC Order and understand at the time of purchase that MLPFS was
engaging in the conduct of which Plaintiff now complains.  At
minimum, Plaintiff, armed with the information in the SEC Order,
was on notice of that information and all information that a
diligent inquiry would have disclosed.  And it could have
demanded more information from MLPFS before purchasing ARS.[4]  <u>See</u>
<u>Lazard Freres & Co</u>, 108 F.3d at 1541-42.

The omissions of which Plaintiff complains were adequately
disclosed.[5]

b.   Scienter

Even if the proposition that MLPFS disclosed its ARS
practices finds insufficient purchase, Plaintiff fails to allege
that MLPFS acted with the requisite scienter.

"In order to plead scienter adequately under the PSLRA, a
plaintiff must plead 'with particularity facts giving rise to a
strong inference that the defendant acted with the required
state of mind.'"  <u>ECA</u>, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-
4(b)(2)).  "The plaintiff may satisfy this requirement by
alleging facts (1) showing that the defendants had both motive

---

[4] This reasoning applies to post-Website Disclosure purchases as
well.

[5] Given this holding, Plaintiff also fails to plead that its
alleged reliance was reasonable.  "The market is not misled when
a transaction's terms are fully disclosed."  <u>Merrill I</u>, 704 F.
Supp. 2d at 390.

21

and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99.  Moreover, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 310 (2007).  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

Here, Plaintiff's scienter allegations fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit. A representative example of the complaint's scienter allegations states that MLPFS's motive was to "earn hundreds of millions of dollars underwriting securities that it otherwise would have been unable to take to market." (Compl. ¶ 207; see also id. ¶¶ 6, 46.)  But "[a]n allegation that defendants' motive was merely to increase or maintain profit such as this is insufficient." Defer LP v. Raymond James Fin., Inc. (Defer I), 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009); see Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000).  The Court of Appeals has been clear that "similar allegations of a generalized motive that

22

could be imputed to any for-profit endeavor" are not concrete
enough to infer scienter.  Defer I, 654 F. Supp. 2d at 217; see,
e.g., Novak, 216 F.3d at 307.  Indeed, Plaintiff alleges no
concrete motive to defraud on the part of any individual, and it
does not allege that MLPFS was particularly motivated to sell
ARS, as opposed to any other product; it only alleges that MLPFS
earned substantial fees. (Compl. ¶ 46.)  These allegations are
insufficient.

Plaintiff's scienter allegations also fall short of the
recklessness standard because Plaintiff does not allege, as it
must, conduct that is "highly unreasonable and which represents
an extreme departure from the standards of ordinary care."
Defer I, 654 F. Supp. 2d at 219.  "For scienter purposes, the
[Court of Appeals for the] Second Circuit distinguished
misleading statements . . . from a defendant's allegedly
unlawful omissions . . . ."  In re Bank of Am. Corp. Sec.,
Derivatives, ERISA Litig., No. 09 MD 2058, 2010 WL 3448194, at
*53 (S.D.N.Y. Aug. 27, 2010).  That said, an analysis of an
omission allegation typically focuses on the existence vel non
of a duty to disclose.  Id.  No one contests that a duty exists
here; the question is about the amount of disclosure made, which
is a question more akin to the analysis of alleged
misstatements.  See Novak, 216 F.3d at 311 (stating that

23

allegation that defendant "knew facts or had access to information suggesting that their public statements were not accurate" is sufficient).  It is possible for a complaint to allege scienter by way of "circumstances indicating conscious behavior by the defendant" absent allegations of a motive, "though the strength of the circumstantial allegations must be correspondingly greater."  Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).

Plaintiff's allegations cannot carry this heavy burden.  As held in Part II.B.1.a., supra, MLPFS made adequate disclosures about its ARS practices.  The Website Disclosure was sufficient, and the SEC Order equally disclosed MLPFS's bidding to Plaintiff, a QIB.  In those circumstances, "recklessness cannot be inferred from the failure to disclose."  See id. at 143.  When adequate disclosures are made, it cannot be said that a defendant's conduct is "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care."  Defer I, 654 F. Supp. 2d at 219.

Indeed, the offering memoranda in this case, which are also incorporated into the complaint, state that (1) auctions may fail, (2) MLPFS can bid, (3) it would be at an advantage if it did, and (4) it is under no obligation to ensure that an auction succeed.  (Mandel Decl. Ex. D, at 19, 26, 28).  Assuming,

arguendo, that these disclosures may not have been adequate (and the Court takes no view on the question), they at minimum indicate that MLPFS made some disclosures relating to the type of conduct alleged here.  That they may have been less robust than they should have been does not necessarily mean that MLPFS's conduct meets the substantially higher bar set for recklessness allegations.  See Novak, 216 F.3d at 312 (stating that recklessness is "not merely a heightened form of negligence" and instead "approximat[es] actual intent").

> c.   Conclusion

Plaintiff has not alleged any actionable misstatement or omission.  It also has not alleged that MLPFS acted with the requisite scienter.  Plaintiff's section 10(b) claims against MLPFS therefore fail.  They are dismissed with prejudice because the claims cannot be remedied by further amendment of the complaint.

> 2.   Control Person Liability Claim

The dismissal of Plaintiff's section 10(b) claim against MLPFS mandates the dismissal of Count Two against Merrill Lynch & Co. because Count Two is a section 20 claim, dependent on the existence of a primary violation, which does not exist here. Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 & n.2 (2d Cir. 1993); see ATSI, 493 F.3d at 108.

      3.   PSLRA Rule 11 Finding

The PSLRA requires courts "upon final adjudication of the action" to make specific Rule 11 findings.  15 U.S.C. § 78u-4(c)(1).  "[L]iability for Rule 11 violations requires only a showing of objective unreasonableness on the part of the attorney or client signing the papers."  ATSI, 579 F.3d at 150 (internal quotation marks omitted).  Plaintiff's claims were not harassing or frivolous, and Merrill did not affirmatively allege any improper conduct or move for sanctions.  Therefore, the Court finds no basis to conclude that Plaintiff or its counsel violated their obligations under Rule 11(b).

      4.   California State Law Claims

Plaintiff alleges violations of California securities statutes and common law fraud.  The Court addresses these claims in that order.

      a.   California Securities Laws

Plaintiff alleges violations of California Corporations Code sections 25400, 25401, and 25504.  The Court addresses the claims sequentially.

Plaintiff fails to state a claim against Merrill Lynch under California Corporations Code section 25400 because Plaintiff does not allege that it was injured in California from any conduct by Merrill Lynch in California.  See Cal. Corp. Code

26

§ 25400.  Plaintiff is a Kansas corporation based in Denver, Colorado, and its only relevant contacts with California were its dealings with its broker, Credit Suisse, which is not a party to this action.  (Compl. ¶¶ 12, 189.)  Moreover, Plaintiff does not allege that it communicated or interacted with anyone at Merrill in California regarding the Merrill ARS.  Absent any such well-pled allegations of California-based conduct by Merrill, or allegations of an injury incurred by Plaintiff in California as a result of conduct by Merrill in California, Plaintiff cannot assert claims against Merrill under this statute.  See Norwest Mortg., Inc. v. Superior Court, 72 Cal. App. 4th 214, 224-25 (Cal. Ct. App. 1999) (non-California residents cannot assert California statutory claims for injuries allegedly "caused by conduct occurring outside of California's borders, by defendants whose headquarters and principal places of operations are outside of California") (interpreting Diamond Multimedia Sys., Inc. v. Superior Court, 19 Cal. 4th 1036, 1063 (Cal. 1999) ("[S]ection 25400 regulates only manipulative conduct in California.")); see also, e.g., Churchill Vill., L.L.C. v. Gen. Elec. Co., 169 F. Supp. 2d 1119, 1126-27 (N.D. Cal. 2000).  Because there is no claim under section 25400, there is no liability for its violation (which is provided for

27

by section 25500).  See Cal. Corp. Code § 25500; Diamond
Multimedia, 19 Cal. 4th at 1052.

Plaintiff also fails to state a claim under section 25401
because, as discussed in Part II.B.1.a., supra, MLPFS made no
material misstatements or omissions in relation to these ARS.
Section 25401 makes it "unlawful for any person to offer or sell
a security in this state . . . by means of any written or oral
communication which includes an untrue statement of a material
fact or omits to state a material fact . . . ."  Cal Corp. Code
§ 25401.  Plaintiff thus has no claim under section 25501 (which
provides for liability for violation of section 25401).  See
Ins. Underwriters Clearing House, Inc. v. Natomas Co., 184 Cal.
App. 3d 1520, 1526 (Cal. Ct. App. 1986) ("The test of
materiality under the California Corporations Code is the same
[as under federal securities law].").

Finally, Plaintiff fails to state a control person
liability claim under section 25504 because its underlying
claims for violations of California securities law fail.  See
Cal. Corp. Code § 25504 (providing for control person liability
predicated upon an underlying violation).

b.   Common Law Fraud

The parties agree that the elements of common law fraud essentially mirror those involved in the section 10(b) claims. (Pl. Mem at 35; Def. Reply Mem. at 20.)  Thus, for the same reasons that Plaintiff's section 10(b) claims fail, this claim fails.  See, e.g., In re 3Com Sec. Litig., 761 F. Supp. 1411, 1415 (N.D. Cal. 1990).

c.   Conclusion

For the reasons stated above, Plaintiff's state law claims are dismissed with prejudice because they cannot be amended to survive a motion to dismiss.

C.   The Rating Agencies' Motion to Dismiss

The complaint posits causes of action against the Rating Agencies for common law negligent misrepresentation.  (Compl. ¶¶ 252-265.)  In essence, the complaint alleges that the Rating Agencies issued credit ratings that should have been downgraded following their issuance because of the deteriorating financial condition of Ambac Assurance Corporation, the issuer of the ARS purchased.  (Id. ¶¶ 150-154.)  It also alleges that these securities should have never been rated in the first place and that the Rating Agencies failed to account for MLPFS's bidding practices, thereby disguising liquidity problems.  (Id. ¶¶ 149, 155-156.)

29

The Rating Agencies move to dismiss the complaint on three grounds: first, that the Credit Rating Agencies Reform Act of 2006 ("CRARA"), 15 U.S.C. § 78o-7, preempts these state law claims; second, that the state law claims fail; and third, that the First Amendment bars these claims.  Irrespective of whether CRARA preempts the state law claims or whether they are barred by the First Amendment, the Court concludes that the state law claims fail and therefore does not address the other two arguments.  See Rice v. Charles Schwab, No. 10 Civ. 398, 2010 WL 5156654, at *4 n.3 (C.D. Cal. Oct. 22, 2010) (taking the same approach with similar claims).  The Court thus begins and ends with the state law claims.

Before getting to the substance of the claims, the parties disagree about what state's law applies.  The Rating Agencies say that New York law applies, whereas Plaintiff says that California law applies.  However, the Court need not carve this bird.  In neither state is a statement of opinion actionable.[6]

---

[6] Additionally, in New York, such a claim is preempted by the Martin Act.  Abu Dhabi Comm'l Bank v. Morgan Stanley & Co., 651 F. Supp. 2d 155, 181-83 (S.D.N.Y. 2009) ("[T]he Second Circuit has adopted the . . . rule that the Martin Act preempts common law tort claims in the securities context."); see Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190 (2d Cir. 2001); CPC Int'l Inc. v. McKesson Corp., 514 N.E.2d 116, 118 (N.Y. 1987); Horn v. 440 E. 57th Co., 547 N.Y.S.2d 1 (N.Y. App. Div. 1989). Although there has been some unsettling of these waters recently in this Court, see Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 354 (S.D.N.Y. 2010) (Marrero, J.), "the (cont'd)

See Pacnet Network Ltd. v. KDDI Corp., No. 602182/08, 2009 WL
2999200, at *4 (N.Y. Sup. Ct. Sept. 16, 2009) ("Statements of
prediction or expectation about future events cannot give rise
to a negligent misrepresentation or fraud claim.") (citing,
inter alia, ESBE Holdings, Inc. v. Vanquish Acquisition
Partners, 858 N.Y.S.2d 94, 95 (N.Y. App. Div. 2008)); Gentry v.
eBay, Inc., 99 Cal. App. 4th 816, 835 (Cal. Ct. App. 2002) ("The
law is quite clear that expressions of opinion are not generally
treated as representations of fact, and thus are not grounds for
a misrepresentation cause of action.").  Credit ratings are
statements of opinion.  See In re Lehman Bros. Sec. & ERISA
Litig., 684 F. Supp. 2d 485, 494-95 (S.D.N.Y. 2010) (Kaplan,
J.); see also Compuware Corp. v. Moody's Investors Servs., Inc.,
499 F.3d 520, 529 (6th Cir. 2007) (A . . . credit rating is a
predictive opinion, dependent on a subjective and discretionary
weighing of complex factors."); Rice, 2010 WL 5156654, at *3
("Defendants' credit ratings are opinions or predictions of the

(cont'd from previous page) weight of opposing authority,
including Second Circuit Court of Appeals precedent, compels
this Court to reaffirm its recognition of Martin Act
preemption."  In re Beacon Assocs. Litig., No. 09 Civ. 777, 2010
WL 3895582, at *37 (S.D.N.Y. Oct. 5, 2010) (Sand, J.).  And in
California, misrepresentation claims may only be brought when
the alleged misrepresentation was made to a "narrow and
circumscribed class of persons."  See Bily v. Arthur Young &
Co., 3 Cal. 4th 370, 408 (Cal. 1992).  Here, the ratings were
intended for QIBs generally.  (Compl. ¶ 161.)  That category is
far from "narrow and circumscribed"; thus, Plaintiff does not
adequately allege that a duty existed.

future creditworthiness or value of companies . . . ."). Even the complaint implicitly acknowledges that credit ratings are inherently forward-looking, "based upon the ability of issuers to make timely payments" on their obligations.  (Compl. ¶ 117.)

There is an exception to the non-actionable opinion rule in cases where the opinion holder knew the opinion was false or did not hold the opinion expressed at the time it was expressed.[7] See N.J. Carpenters Health Fund v. Residential Capital, LLC, No. 08 Civ. 8781, 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010) (New York law); Bily v. Arthur Young & Co., 3 Cal. 4th 370, 407 (Cal. 1992) (California law).  But "[t]here is no factual allegation that indicates the ratings . . . were incorrect at the time offered."[8]  N.J. Carpenters, 2010 WL 1257528, at *6.

---

[7] Although Plaintiff argues California law provides another exception for situations where a party possesses superior knowledge, the duty of care under California law arises only when a party represents knowledge to a "narrow and circumscribed class of persons." See supra note 6.  Indeed, the California case cited by Plaintiff on this point requires the existence of something like a fiduciary duty; the recipient must be "so situated that he may reasonably rely upon such supposed superior knowledge." Harazim v. Lynam, 267 Cal. App. 2d 127, 131 (Cal Ct. App. 1968).  Given the broad recipient pool here, this set of circumstances did not obtain.

[8] To the extent that the complaint suggests that the ratings were incorrect when offered because the ARS should not have been rated at all (due to the put option that was included), the Court disagrees.  (Compl. ¶ 149.)  The ratings assigned to these ARS, which the Court may consider because they are referenced in the complaint, expressly disclosed that they reflected the rating that would be assigned to the preferred shares (cont'd)

Instead, the complaint suggests that the ratings were improvident.  It alleges that, as conditions deteriorated, the Rating Agencies did not properly downgrade ratings after they were issued (Compl. ¶¶ 150-153) or that the ratings should have been issued based on different criteria (id. ¶ 154).  This line of argument is simply a disagreement, informed by hindsight, with the opinions stated and is not enough to sustain this action.  See, e.g., N.J. Carpenters, 2010 WL 1257528, at *6 ("Plaintiffs' allegations that the ratings were outdated . . . are not actionable."); In re Lehman Bros., 684 F. Supp. 2d at 495 ("At best, [similar allegations] support an inference that some employees believed that the ratings agencies could have used methods that better would have informed their opinions."). And the fact that the Rating Agencies may have given higher – but not untruthful – ratings to retain business does not render the opinions of the Rating Agencies actionable.  Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., No. 09-2596, 2011 WL 183971, at *10 (1st Cir. Jan. 20, 2011).

Indeed, the Court of Appeals for the First Circuit recently affirmed the dismissal of analogous claims under federal securities law against underwriters that reported rating

---

(cont'd from previous page) for which the ARS could be exchanged by way of the put option.  (Declaration of Carl H. Loewenson, Jr. Ex. B, at 2; Declaration of Joshua M. Rubins Ex. A.)

agencies' ratings on similar reasoning.  <u>Id.</u> at *9 ("The ratings

are <u>opinions</u> purportedly expressing the agencies' professional

judgment . . . ."). That Court noted the following:

> That a high rating may be mistaken, a rater negligent
> in the model employed or the rating company interested
> in securing more business may be true, but it does not
> make the report of the rating false or misleading.  If
> the purchaser wants absolute protection against errors
> of opinion, the answer is insurance rather than
> lawsuits.

<u>Id.</u> at *10. This Court agrees, and this reasoning applies in

this context.  Moreover, the weight of authority in the Southern

District of New York cuts against Plaintiff.  Similar claims

against the Rating Agencies have been repeatedly rejected.  <u>See</u>

<u>In re IndyMac Mortg.-Backed Sec. Litig.</u>, 718 F. Supp. 2d 495,

511-12 (S.D.N.Y. 2010); <u>N.J. Carpenters</u>, 2010 WL 1257528, at *6;

<u>N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.</u>, No. 08

Civ. 5653, 2010 WL 1473288, at *8 (S.D.N.Y. Mar. 29, 2010); <u>N.J.</u>

<u>Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC</u>, No.

08 Civ. 5093, 2010 WL 1172694, at *14 (S.D.N.Y. Mar. 26, 2010);

<u>Tsereteli v. Residential Asset Sec. Trust 2006-A8</u>, 692 F. Supp.

2d 387, 394-95 (S.D.N.Y. 2010); <u>In re Lehman Bros.</u>, 684 F. Supp.

2d at 494-95.  The Court finds the reasoning of those cases

sound and is not persuaded otherwise by this Plaintiff.

    Finally, Plaintiff alleges that the Rating Agencies should

have known about and disclosed or digested MLPFS's support

bidding practices.  (Compl. ¶¶ 155-156.)  Their failure to do so
allegedly misrepresented the liquidity of the ARS.  The Court
again disagrees.  First of all, as stated in Part II.B.1.a.,
supra, the bidding practices were disclosed, so reliance on the
ratings to contradict Merrill would have been unreasonable.
Secondly, notwithstanding Plaintiff's assertions to the
contrary, the ratings themselves did not discuss liquidity.  As
the Rating Agencies point out, the SEC rules Plaintiff cites to
demonstrate that a high rating equates with liquidity "merely
recognize some general correlation between a strong rating and a
strong market for a security; they do not suggest . . . that a
strong credit rating is itself a representation of any kind
about liquidity."  (Rating Agencies Reply Mem. at 17.)  There
was no representation about liquidity to form the basis for the
claim here.

     The Court has carefully considered the other arguments
advanced by Plaintiff in connection with the state law claims
and finds them without merit.  The Rating Agencies' motion to
dismiss is granted with prejudice.  Plaintiff states no
actionable claim.

III. CONCLUSION

     For the foregoing reasons, Merrill's motion to dismiss
[dkt. no. 17 in No. 09 Civ. 9888; dkt. no. 125 in No. 09 MD

2030] is GRANTED with prejudice.  Likewise, the Rating Agencies'
motion to dismiss [dkt. no. 20 in No. 09 Civ. 9888; dkt. no. 121
in No. 09 MD 2030] is GRANTED with prejudice.  The Clerk of the
Court shall mark this case [No. 09 Civ. 9888] closed and all
pending motions are denied as moot.[9]  Pursuant to Rule 7.6 of the
Rules of Procedure of the Judicial Panel on Multidistrict
Litigation, the Clerk shall also send a copy of this order to
the transferor court, the United States District Court for the
Northern District of California, and to the Judicial Panel on
Multidistrict Litigation.  See Patricia D. Howard, A Guide to
Multidistrict Litigation, 124 F.R.D. 479, 485-86 (1989).


SO ORDERED.

Dated:     February 9, 2011
           New York, New York


                              _Loretta A. Preska_____
                              LORETTA A. PRESKA
                              Chief U.S. District Judge



_____

[9] The claims relating to other defendants included in this case
caption were severed and remanded to the Northern District of
California.  The Anschutz Corp. v. Merrill Lynch & Co., No. 09
Civ. 3780 (N.D. Cal. Dec. 28, 2009) (dkt. no. 93).  Those claims
thus are not under consideration here.